IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

2007 MAR 16  P 4 02

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

|  |  |
|---|---|
| LOUISE HARRIS, | |
| Petitioner, | |
| vs. | Case No. 2:07CV239-mht |
| RICHARD ALLEN, Commissioner, Alabama Department of Corrections, | |
| Respondent. | |

## PETITION FOR WRIT OF HABEAS CORPUS BY PRISONER IN STATE CUSTODY

Petitioner Louise Harris, now incarcerated at the Julia Tutwiler Prison for Women in Wetumpka, Alabama, respectfully petitions this Court for relief from her unconstitutionally obtained conviction.

## I. INTRODUCTION

1. Louise Harris, petitioner, makes application to this Court for a writ of habeas corpus under 28 U.S.C. § 2254. Mrs. Harris was convicted of capital murder in the Montgomery County Circuit Court in 1989.

2. The jury recommended, by a vote of seven to five, that Mrs. Harris be sentenced to life in prison without the possibility of parole. The trial judge, however, rejected the jury's recommendation and sentenced Mrs. Harris to death by electrocution.

3. In 2004, the Alabama Court of Criminal Appeals granted in part Mrs. Harris's petition for post-conviction relief. The Court of Criminal Appeals held that there was a reasonable probability that had counsel conducted a reasonable investigation into possible mitigating evidence, the balance between the aggravating circumstance and mitigating

circumstances would have tipped further in favor of a sentence of life imprisonment.

Accordingly, the court found that Mrs. Harris's counsel had been ineffective at the penalty

phase, and remanded the case for a new sentencing hearing. As of yet the Montgomery Circuit

Court has not set a rehearing date.

        4.     Mrs. Harris, however, was denied relief for errors committed during the

guilt phase of her trial.

        5.     At the time of her trial, Mrs. Harris was a 36-year-old black woman with

an elementary school reading level and an IQ of approximately 77. She had suffered trauma

outside the range of normal human experience, including being raped at an early age and

witnessing the deaths of her older sister, brother and father. She had also experienced years of

severe emotional and physical abuse from each of her husbands, as well her lover, Lorenzo

McCarter.

        6.     Lorenzo McCarter planned and directed the murder of Mrs. Harris's

husband, Isaiah Harris. Mr. McCarter recruited Michael Sockwell and Alex Hood, paid them

$100 and promised them more money after the murder. He attempted to recruit two of his co-

workers -- Alonzo Trimble and Willie Pickett -- for the job, but both refused. The night of the

murder, Mr. McCarter drove Mr. Sockwell to the intersection where Mr. Harris would pass, and

waited with Mr. Hood across the street while Mr. Sockwell murdered Mr. Harris.

        7.     The day after the murder, all three men were arrested by the police, and

charged with Mr. Harris's murder. Although Mrs. Harris's name was mentioned to the police,

she was not considered a suspect until after the police interrogated Mr. McCarter.

        8.     Thereafter, Mr. McCarter agreed to testify against his partners -- and Mrs.

Harris -- in exchange for the State's agreement not to seek the death penalty against him. He

testified that Mrs. Harris planned the murder and provided the $100 he paid to Messrs. Sockwell and Hood. He blamed everyone else and took no responsibility for his actions.

9.    Other than Mr. McCarter's self-serving testimony, there was no evidence directly connecting Mrs. Harris to the crime. To compensate for falling well short of its burden of proof, the State engaged in numerous improper tactics that created serious prejudice to Mrs. Harris's defense.

10.    Most egregiously, the State used 12 of its 19 peremptory challenges to strike 12 of the 18 black members of the venire. Those 12 peremptory challenges removed black jurors from the venire at a rate three times greater than whites. The State refused to explain what appeared to be blatant racial discrimination, consistent with the Montgomery County District Attorney's Office's past discriminatory practices. Instead, the State chose to argue that there were a sufficient number of black persons remaining on Mrs. Harris's jury, making the reasons for its strikes of black potential jurors irrelevant. The court accepted the State's argument, and denied the defense's motion pursuant to Batson v. Kentucky, 476 U.S. 79 (1986), without even requiring the prosecutor to rebut the inference of racial bias. In doing so, the court committed both legal and factual error.

11.    Mrs. Harris's trial counsel, moreover, were wholly ineffective, doing little to combat key elements of the State's case and its trial misconduct. Mrs. Harris was represented by court-appointed counsel Eric Bowen and Knox Argo. Before Messrs. Bowen and Argo, Mrs. Harris was represented by seven different attorneys. One by one, each of her appointed attorneys were dismissed or withdrew. Mr. Bowen had never defended a capital case before. Mr. Argo had fewer than five years of experience in criminal defense. Their lack of experience presaged, among other things, their failure to protect Mrs. Harris's right to a fair and impartial jury, their

- 3 -

ineffective investigation of Mrs. Harris's background of abuse and their inability to put the State's case through meaningful adversarial testing.  Indeed, Messrs. Bowen and Argo have already been found by the Alabama Court of Criminal Appeals to have provided ineffective assistance during the penalty phase of the trial.

12.     The ineffectiveness of Mrs. Harris's counsel and the trial court's erroneous rejection of the defense's Batson motion, along with a host of other failures by the trial court, precluded Mrs. Harris from having a fair trial.  These fundamental errors, individually and collectively, rendered the guilty verdict in this case unreliable and unconstitutional, and the verdict should be reversed by this Court.

## II.   PROCEDURAL HISTORY

13.     On July 13, 1989, Mrs. Harris was convicted of capital murder in violation of Ala. Code § 13A-5-40(a)(7), in the Montgomery County Circuit Court.  On that same day, the jury recommended a life sentence for Mrs. Harris by a vote of seven to five.  On August 11, 1989, the trial judge overrode the jury verdict and sentenced Mrs. Harris to death by electrocution.

14.     On June 12, 1992, the Court of Criminal Appeals affirmed Mrs. Harris's conviction and death sentence.  Harris v. State, 632 So. 2d 503, 542 (Ala. Crim. App. 1992).

15.     On June 25, 1993, the Alabama Supreme Court affirmed Mrs. Harris's conviction and death sentence.  Ex parte Harris, 632 So. 2d 543, 546 (Ala. 1993).

16.     On June 27, 1994, the United States Supreme Court granted a petition for a writ of certiorari, limited to the question of the constitutionality of aspects of the Alabama capital sentencing scheme.

17.     On February 22, 1995, the United States Supreme Court affirmed Mrs. Harris's conviction and death sentence.  Harris v. Alabama, 513 U.S. 504, 515 (1995).

- 4 -

18.    On June 22, 1995, Mrs. Harris filed a petition, pursuant to Rule 32 of the Alabama Rules of Criminal Procedure, for postconviction relief in the Montgomery County Circuit Court.

19.    On August 27, 1998, the Montgomery County Circuit Court summarily dismissed several of Mrs. Harris's claims as being procedurally barred, but granted Mrs. Harris leave to amend the petition as to several claims that the court found to be insufficiently plead.

20.    On November 23, 1998, Mrs. Harris filed an amended petition in the Montgomery County Circuit Court. On July 26 and 27, 1999, a hearing was conducted on Mrs. Harris's claims that the prosecution had used its peremptory challenges to exclude African-Americans from jury service because of their race in violation of Batson, and her claims that she had received ineffective assistance of counsel at trial and on appeal. On July 28, 1999, the testimony of Eric Bowen was taken to be used as a part of the hearing record.

21.    On April 16, 2002, the Montgomery County Circuit Court issued an order denying Mrs. Harris's amended petition in all respects. (See Order, Harris v. State, Case No. CC-88-1237.60 (Ala. Cir. Ct. Apr. 16, 2002) (attached hereto as Ex. A).)

22.    On October 29, 2004, the Court of Criminal Appeals affirmed in part and reversed in part the denial of Mrs. Harris's Rule 32 petition. Harris v. State, Case No. CR-01-1748, at 123-24, 2004 WL 2418073, at *49 (Ala. Crim. App. Oct. 21, 2004) (attached hereto as Ex. B).[1] The court found that Mrs. Harris's trial counsel had failed to conduct a reasonable investigation into possible mitigating evidence and, as a result, had been ineffective at the

---

[1] In Ex parte Jenkins, the Alabama Supreme Court overruled a portion of the Alabama Court of Criminal Appeals' decision in Harris, Case No. CR-01-1748, 2004 WL 2418073, on the grounds that the Alabama Rules of Criminal Procedure govern the amendment of postconviction pleadings and that the civil doctrine of "relation-back" had no application in the amendment of Rule 32 petitions. No. 1031313, 2005 WL 796809, at *5 (Ala. Apr. 8, 2005). The Ex parte Jenkins decision did not impact the disposition of Mrs. Harris's case with respect to the penalty phase.

penalty phase of her trial. Id., at *48. The court therefore reversed the circuit court's order as to sentencing and remanded the case for a new penalty phase hearing. Id. The court, however, affirmed the circuit court's denial of Mrs. Harris's claims regarding errors committed during the guilt phase of her trial. Id. On May 27, 2005, the court overruled the parties' respective applications for rehearing. Id., at *51.

23. On October 21, 2005, the Alabama Supreme Court denied the State's petition for writ of certiorari. (See Order, Ex parte State of Alabama, No. 1041347 (Ala. Oct. 21, 2005) (attached hereto as Ex. C).) That same day, it also granted in part Mrs. Harris's petition for writ of certiorari, to consider: (1) Mrs. Harris's claim regarding a violation of Batson; (2) Mrs. Harris's claim that her trial counsel failed to maintain continuity in representation; and (3) Mrs. Harris's claim that several of her ineffective assistance of counsel arguments were not precluded by findings of no plain error on direct appeal. (See Order, Ex parte Harris, No. 1041332, at 4 (Ala. Oct. 21, 2005) (attached hereto as Ex. D).)

24. On May 12, 2006, the Alabama Supreme Court quashed the writ in part and affirmed the judgment of the Court of Criminal Appeals. (See Order, Ex parte Harris, No. 1041332, at 21-22 (Ala. May 12, 2006) (attached hereto as Ex. E).)

25. On July 21, 2006, the Alabama Supreme Court overruled Mrs. Harris's application for rehearing. (See Order, Ex parte Harris, No. 1041332 (Ala. July 21, 2006) (attached hereto as Ex. F).)

26. This petition is timely and represents Mrs. Harris's first and only application for habeas corpus relief.[2]

---

[2] As Mrs. Harris's resentencing hearing has not yet occurred, this habeas petition challenges only Mrs. Harris's original judgment of conviction. Mrs. Harris reserves her right to make a subsequent challenge to any issues arising from her resentencing hearing, and moves for a stay and abeyance of this petition so that her conviction and resentencing claims may be heard together. (See Petitioner Louise Harris's Mot.

## III.    GROUNDS SUPPORTING PETITION FOR RELIEF

### A.    The Prosecutor's Racially Discriminatory Use Of Peremptory Challenges Deprived Mrs. Harris Of Equal Protection And A Fair Trial.

27.    In Batson, the United States Supreme Court articulated the principle that "the State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded". 476 U.S. at 85.

28.    In Batson, the Supreme Court concluded that a black defendant could make a prima facie case of purposeful discrimination in the selection of a jury solely on evidence concerning the prosecutor's pattern of peremptory strikes of black potential jurors. See 476 U.S. at 97; see also Johnson v. California, 545 U.S. 162, 170 (2005) ("[A] defendant satisfies the requirements of Batson's first step [which is not meant to be "onerous"] by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred."); cf. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) (explaining, in the context of a Title VII gender discrimination claim, that "[t]he burden of establishing a prima facie case of disparate treatment is not onerous").

---

for Stay and Abeyance, filed herewith.) That course of action is in keeping with the guidance provided by the Court of Appeals in Rainey v. Secretary for the Department of Corrections, 443 F.3d 1323 (11th Cir. 2006). In Rainey, the Court of Appeals found that a petitioner need not jeopardize her claims challenging her original judgment of conviction by waiting to file her habeas application until her resentencing judgment becomes final. Id. at 1329. The court stated that those claims could be preserved during the initial one-year statute of limitations period, by filing a federal habeas petition directed to the conviction alone. Id. The court further observed that, "while we have no occasion to decide the issue here, we noted in Hepburn that other circuits have uniformly held a petitioner is permitted to file one petition challenging his conviction and sentencing, and . . . bring another petition challenging resentencing without the subsequent petition being dismissed as second or successive". Id. at 1329 n.8 (citing Hepburn v. Moore, 215 F.3d 1208, 1209 (11th Cir. 2000); Walker v. Roth, 133 F.3d 454, 455 & n.1 (7th Cir. 1997); Galtieri v. United States, 128 F.3d 33, 37-38 (2d Cir. 1997)). Thus, all relevant precedent from the Court of Appeals and other circuits suggests that, should Mrs. Harris wish to challenge her resentencing in the future, she could do so in a subsequent petition, once those claims have become ripe for review. If the Court disagrees, Mrs. Harris requests clarification as to how to address her claims regarding her original conviction via habeas review without sacrificing any future claim which may arise.

29.     Once a prima facie case has been made, the burden shifts to the State to come forward with race-neutral explanations for its strikes. <u>Batson</u>, 476 U.S. at 97.

30.     During jury selection at Mrs. Harris's trial, the Montgomery County District Attorney, Ellen Brooks, used 12 out of 19 peremptory challenges to remove 12 of the 18 black persons in the venire.

31.     Pursuant to <u>Batson</u>, defense counsel filed a pretrial motion to prevent the State from using its strikes in a discriminatory manner, objected to the strikes as actually employed and demanded race-neutral reasons for the State's use of peremptory challenges against prospective black jurors.

32.     Ms. Brooks, however, refused to give any reason for the strikes. Instead, she argued that no prima facie showing of discrimination had been made, based solely on her representation that there were five black jurors (and one black alternate) on Mrs. Harris's jury.

33.     The trial court erroneously accepted the State's argument, ruling that no prima facie case of discrimination had been established and that the State was not required to provide race-neutral reasons for its peremptory challenges as long as the percentage of blacks on the petit jury was greater than the percentage of blacks in the venire. In fact, the trial court -- at the State's suggestion -- compared the percentage of blacks on the petit jury with the percentage of blacks in Montgomery County, as opposed to the venire. Since the court accepted that there were five blacks on the petit jury, constituting 40 percent of the jury, and that mirrored the percentage of blacks residing in Montgomery County, it denied the <u>Batson</u> motion.

34.     In fact, the State's use of nearly two-thirds of its peremptory challenges to strike two-thirds of the black persons on the venire illustrates a "pattern of strikes" indicating intentional racial discrimination. A pattern of strikes, standing alone, can establish a prima facie

case of purposeful discrimination.  See Batson, 476 U.S. at 97 ("[A] 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination"); see also Fernandez v. Roe, 286 F.3d 1073, 1078-79 (9th Cir. 2002) (finding prima facie case of discrimination where prosecution exercised 29 percent of its challenges to eliminate 57 percent of Hispanic prospective jurors).  Here, the pattern of strikes is overwhelming -- blacks were struck at a rate three times the rate at which whites were struck.

35.    Moreover, the numerical evidence is bolstered by the history of purposeful discrimination by Ms. Brooks and the Montgomery County District Attorney's Office:  "'[T]he State in this case does not write on a clean slate.  A number of cases prosecuted in Montgomery County have been reversed because of a Batson violation'".  Sims v. State, 587 So. 2d 1271, 1277 (Ala. Crim. App. 1991) (citation omitted).

36.    Both before and after Mrs. Harris's trial, Alabama courts recognized the State's "systematic practice of discrimination".  See Ex parte Bird, 594 So. 2d 676, 681, 689 (Ala. 1991) (reversing based on Batson violation by prosecutors, including Ms. Brooks); Williams v. State, 548 So. 2d 501, 507-08 (Ala. Crim. App. 1989) (granting new trial because Ms. Brooks's explanation for the use of peremptory challenges was not "specific, bona fide, or legitimate" and did not satisfy Batson requirements); Powell v. State, 548 So. 2d 590, 594-95 (Ala. Crim. App. 1988) (granting new trial because of Batson violation by Montgomery County prosecutor); see also Ex parte Yelder, 630 So. 2d 107, 110 (Ala. 1992); Ex parte Floyd, 571 So. 2d 1234, 1235-36 (Ala. 1990); Freeman v. State, 651 So. 2d 576, 582-83 (Ala. Crim. App. 1994); Parker v. State, 568 So. 2d 335, 336 (Ala. Crim. App. 1990); Moss v. Montgomery, 588 So. 2d 520, 521 (Ala. Crim. App. 1991); Carrick v. State, 580 So. 2d 31, 32 (Ala. Crim. App. 1990).

37.    In addition, the characteristic most predictive of whether any particular person was struck from Mrs. Harris's venire was that person's race. In fact, of those persons struck, no other shared characteristic emerges. It would have been possible to predict with 74 percent accuracy whether or not the State struck someone solely on the basis of their race.

38.    The pattern of strikes in the venire in this case, particularly when coupled with the history of discriminatory practices by the prosecution, and the lack of non-racial, shared characteristics among the struck jurors, easily establishes a prima facie case for discrimination. The State should have been required, at a minimum, to provide race-neutral explanations for its challenges. At this stage of the proceedings, a new trial should be granted.

39.    The prosecutor's representation that there were five black jurors was not a proper basis on which to deny Mrs. Harris's <u>Batson</u> motion. Moreover, there were in fact only four black jurors on the petit jury, which meant the petit jury did not even satisfy the constitutionally infirm standard used by the Alabama courts at that time.

40.    Under <u>Batson</u>, courts must inquire into claims that jurors were struck on improper racial grounds, even when the petit jury composition satisfies the Sixth Amendment's fair cross-section requirement. <u>Alvarado v. United States</u>, 497 U.S. 543, 544-45 (1990). In <u>Alvarado</u>, even the Government conceded that the final composition of the jury can never alone satisfy the <u>Batson</u> inquiry. <u>See id.</u> at 544 ("The United States agrees that the Court of Appeals erred in holding that as long as the petit jury chosen satisfied the Sixth Amendment's fair-cross-section concept, it need not inquire into the claim that the prosecution had stricken jurors on purely racial grounds. . . . That holding, the Government states, is contrary to <u>Batson</u>".); <u>see also</u> <u>United States v. David</u>, 803 F.2d 1567, 1571 (11th Cir. 1986) ("[U]nder <u>Batson</u>, the striking of one black juror for a racial reason violates the Equal Protection Clause, even where other black

jurors are seated, and even when valid reasons for the striking of some black jurors are shown.");
Batson, 476 U.S. at 95 ("A single invidiously discriminatory governmental act" is not
"immunized by the absence of such discrimination in the making of other comparable
decisions.") (citation omitted).

41.     The state courts failed to follow that principle of Batson in evaluating Mrs.
Harris's claim.  The trial court erroneously found that the State was not required to provide race-
neutral reasons for its peremptory challenges, on the grounds that the percentage of blacks on the
petit jury was greater than the percentage of blacks in Montgomery County.  On appeal, the state
courts upheld the trial court's finding by adopting the erroneous reasoning of Hood v. State, 598
So. 2d 1022 (Ala. Cr. App. 1991) and Harrell v. State, 571 So. 2d 1270 (Ala. 1990) ("Harrell
II").  Indeed, in rejecting Mrs. Harris's Batson claim, the Alabama Court of Criminal Appeals
specifically relied on Harrell II's conclusion that "[w]hen the evidence shows only that blacks
were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully
established venire, an inference of discrimination has not been created".  See Harris, 632 So. 2d
at 513 (citing Harrell II, 571 So. 2d at 1271).

42.     Harrell II's standard is directly contrary to Batson, as both Alvarado, 497
U.S. at 544-45 and David, 803 F.2d at 1571 make clear.  In fact, the Alabama Supreme Court
recognized the impropriety of the Harrell II standard, and its inadequate protection of the
defendant's constitutional rights, in Ex parte Thomas, 659 So. 2d 3, 7-8 (Ala. 1994).
Accordingly, the state courts' reliance upon the Harrell II standard -- which wrongly allowed the
Batson inquiry to be satisfied by focusing exclusively on the final composition of the jury --
deprived Mrs. Harris of any review of the requisite Batson factors.  Mrs. Harris was thus denied
a meaningful inquiry into her Batson claim.

- 11 -

43.    Moreover, the record reveals that the prosecutor was incorrect: there were not, in fact, five black persons serving on Mrs. Harris's jury. The State has relied on attorney notes to argue that juror Barbara Edwards was black. The official venire sheet, however, indicates that Ms. Edwards is Caucasian. The official venire sheet is based on self-reporting by the jurors and is far more reliable than attorney notes, which are based on observation. Indeed, at trial, the parties and the court debated the problem with judging race by observation, and Ms. Brooks conceded that the State had wrongly recorded the race of another prospective juror, Evelyn Etheridge, in its notes.

44.    Had the trial court used accurate information, it would have found that there were only four black jurors (and one black alternate) serving on Mrs. Harris's jury, comprising only 33 percent of the total jury panel. That percentage was less than the percentage of blacks in the venire (36 percent) and in Montgomery County generally (40 percent).

45.    The trial court should have relied on those, accurate numbers, rather than on the unreliable figures presented by the prosecutor. See Freeman v. State, 555 So. 2d 196, 214-15 (Ala. Crim. App. 1988), aff'd sub nom., Ex parte Freeman, 555 So. 2d 215 (Ala. 1989) (concluding, on application for rehearing, that handwritten notes of "W" or "B" on the jury strike list were "only the assertions of the defense counsel" and would not be considered evidence of the jury's racial composition).

46.    Thus, even under the now-overruled standard set forth in Hood and Harrell II, it was clearly erroneous not to require the State to provide non-discriminatory reasons for its peremptory challenges. Indeed, Mrs. Harris's case is unique in that she has never had her Batson claim considered in light of the correct facts or under the proper constitutional standard.

47.    Now, almost twenty years after the trial's conclusion, it is clearly too late to hold a hearing on Mrs. Harris's <u>Batson</u> claim and reliably ascertain the State's reasons for its challenges. Accordingly, a new trial should be granted.

48.    By failing to require the prosecutor to rebut the inference of racial bias, the state courts deprived Mrs. Harris of her rights to equal protection and a fair trial by an impartial jury under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution.

49.    The state court adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established United States Supreme Court precedent, and that was based on an unreasonable determination of the facts in light of the evidence presented.

**B.    Mrs. Harris Was Denied The Effective Assistance Of Counsel During The Guilt/Innocence Phase Of Her Trial.**

50.    Central to the adversarial system of criminal justice is the provision to the indigent accused of adequate, effective counsel. <u>See generally</u> <u>Gideon v. Wainright</u>, 372 U.S. 335 (1963); <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). The attorneys representing Mrs. Harris at the trial for her life failed to meet this requirement.

51.    Mrs. Harris was unable to afford retained counsel and was represented at trial by court-appointed attorneys. The record reveals that Mrs. Harris's counsel's performance in the trial's guilt phase was deficient and was a substantial factor in her conviction on evidence that was incredibly thin. Counsels' errors and deficient performance demonstrate that they were simply overwhelmed by their responsibility and were unable to represent Mrs. Harris effectively or to protect her rights.

52.    The Alabama courts have already found that Mrs. Harris did not receive effective assistance of counsel at the penalty phase of her trial. They should also have held that,

- 13 -

at the guilt/innocence phase of her trial, Mrs. Harris was severely prejudiced by the serious and substantial ineffectiveness of the counsel who represented her.

        a.    <u>Failure to Maintain Continuity in Representation for Mrs. Harris and to Obtain Adequate Compensation for Her Defense.</u>

53.    Frank Riggs and Tim Halstrom were first appointed to represent Mrs. Harris on May 19, 1988. They made a motion for reasonable and adequate compensation of counsel, or to excuse appointed counsel, and the circuit court elected to excuse them and appointed Pete Yates, Maury Smith and David Allred as their replacements, on August 30 and September 1, 1988. Those attorneys were excused and replaced by John Alley and Barry Leavell. Alley was replaced by Knox Argo on September 29, 1988. But several months after that, Messrs. Leavell and Argo realized that neither of them had the requisite criminal practice experience necessary to be lead counsel, so the court had to relieve one of them (Mr. Leavell). Finally, Eric Bowen was appointed as lead counsel on March 29, 1989.

54.    This "shell game" of appointed counsel interrupted the development of Mrs. Harris's case and denied her the opportunity to form a relationship of trust and confidence with her counsel.

55.    Additionally, Mrs. Harris's counsel failed to obtain adequate compensation for her defense. When Mrs. Harris's first-appointed counsel, Messrs. Riggs and Halstrom, attempted to file a motion for adequate compensation, they failed, allowing the court to excuse them instead. After that, Messrs. Bowen and Argo tried again, but filed a motion almost identical to Messrs. Riggs and Halstrom's unsuccessful motion. They added no independent thought or strategy. The need for additional funding was paramount, however, to obtain, among other things, a scientific, objective poll of potential jurors in Montgomery County, to support their motion for a change of venue, as well as hiring a mental health expert to deal

with certain of the difficult issues relating to a client whose reactions to the news of the death of her husband could be seen to be unusual. Messrs. Bowen and Argo knew that, pursuant to Ake v. Oklahoma, 470 U.S. 68, 83 (1985), the State was required to provide Mrs. Harris with access to a competent mental health expert had she "demonstrate[d] to the trial judge that [her] sanity at the time of the offense [was] to be a significant factor at trial". Nevertheless, trial counsel did not even attempt to make that showing on her behalf.

                    b.    Failure to Protect Mrs. Harris's Right to a Fair and Impartial Jury.

56.    In Montgomery County, the pretrial publicity of this case saturated newspapers, radio and other media, making it impossible for Mrs. Harris to receive a fair trial by an impartial jury. Trial counsel filed a motion to change venue, but that motion failed to describe to the court and provide available evidence on the extent of pretrial publicity. Trial counsel supported their change of venue motion with a single unscientific poll of fewer than 30 Montgomery County residents. They submitted to the court neither the nearly daily coverage of the case by the Montgomery Advertiser and the Alabama Journal, which took place between March 11 and March 20, 1988, nor the transcripts of the extensive television and radio coverage of the crime.

57.    Trial counsel also failed to secure adequate voir dire of the jury. Three of the jurors -- Barbara Edwards, Elizabeth Bellinger and Mary Kay Levert -- were closely related to people who worked in law enforcement, but were not asked if this would cause them prejudice in a case where the victim was a law enforcement officer. And none of the jurors were questioned about their views on adultery, an area that likely would engender prejudice considering the circumstances of this case. Mrs. Harris had a right to have both issues explored.

58.    Moreover, counsel failed to litigate properly the State's discriminatory use of peremptory challenges in jury selection. Trial counsel based its Batson motion on the

- 15 -

(incorrect) facts that the State used 11 of its 19 peremptory challenges to strike 11 of 18 black venire members, and that Mrs. Harris's jury contained five black jurors (and one black alternate). In truth, the State used 12 of its 19 peremptory challenges to strike 12 of 18 black venire members, and Mrs. Harris's jury contained only four black jurors (and one black alternate). Mr. Bowen misstated the numbers to Mrs. Harris's disadvantage. Indeed, with only four blacks on the petit jury, the judge, even applying the now-overruled Hood and Harrell II standard, would likely have required the State to justify its strikes on a race-neutral basis.

59.     While the pattern of strikes by the State was enough to satisfy the Batson threshold for a prima facie showing of discrimination, in view of the Harrell II standard and the trial judge's questioning, trial counsel also should have supported its Batson motion by arguing, inter alia, that the Montgomery County District Attorney's Office had a history of using peremptory strikes to exclude blacks from the jury, and that the blacks struck from Mrs. Harris's jury differed in age and occupation and shared only one common characteristic -- race. Whether correctly or incorrectly, the trial court was searching for more evidence than the pattern of strikes. In fact, the judge specifically asked trial counsel "[w]hat's your evidence of prima facie discrimination in light of that there's seven and five on the jury"? Counsel, despite having filed its motion months earlier, argued nothing else.

c.     Failure to Develop an Adequate Defense Strategy.

60.     Counsel's investigation and defense of Mrs. Harris was inadequate by any standard of professional competence. Before trial, counsel knew the State's evidence, because they had the State and police case files. Counsel nonetheless failed in their investigation to prepare to counter the State's case. Counsel did not follow up on significant evidence of abuse and other leads that Mrs. Harris provided them. As a result, counsel failed to uncover the effect of that evidence on her mental state, or how it would affect the State's case characterizing her as

- 16 -

the mastermind behind her husband's murder and regarding her supposedly calm emotional state that night.

61.    Prior to marrying Mr. Harris, Mrs. Harris had also been severely abused by both of the fathers of her children, one of whom was later convicted in connection with the beating death of his second wife. Mrs. Harris was also abused by Mr. McCarter and the victim, and suffered trauma as a result, including Post-Traumatic Stress Syndrome.

62.    Counsel did not investigate or interview Mrs. Harris or others concerning these prior relationships. Counsel's interviews with Mrs. Harris and her family were perfunctory, and the minimal contact counsel had with Mrs. Harris's family was spent in a large group. Key evidence concerning Mrs. Harris's abuse would have been uncovered if proper interviews had been conducted with family members.

63.    It was plainly inconsistent with the available evidence to claim that Mrs. Harris was capable of orchestrating an involved scheme to kill her husband. The State alleged that she organized an alibi, found a shooter, selected a particular car, arranged a signal to Messrs. Sockwell and McCarter and considered the value of federal and state benefits if her husband was killed in the line of duty, including extra workman's compensation. According to the State, it required months of calculated planning and premeditation. But at the time of the murder, Mrs. Harris had an IQ of approximately 77, which is borderline mentally impaired, and read at an elementary school level. Moreover, the severe abuse suffered by Mrs. Harris casts serious doubt on her ability to participate in the crime, particularly as the "mastermind".

64.    Police reports filed prior to the trial put counsel on notice that Mrs. Harris's behavior the night her husband was killed would be an important piece of the State's case. Investigator Huggins and Officers Santina Jenkins and Dorinda Hinton testified that they

- 17 -

did not witness tears as Mrs. Harris cried the night she was told her husband had been murdered, implying that she was faking her grief. The State said that her conduct indicated guilt. Trial counsel said nothing. The State's witnesses were not cross-examined regarding their experience with battered women and whether that would affect their perception of Mrs. Harris's response. Moreover, mental health professionals, whose assistance trial counsel failed to seek, could have testified that Mrs. Harris's alleged failure to react to her husband's death was not an indicator of guilt. A mental health expert could also have refuted the State's argument that Mrs. Harris was not under duress or domination and could have freely left her husband.

65.    Counsel made no attempt to demonstrate any motive for Mr. McCarter to kill Mr. Harris. They left a wide path for the State to claim (predictably) that Mr. McCarter acted solely because Mrs. Harris asked him. Prior to the trial, counsel knew that Mr. McCarter had told Mrs. Harris that if she tried to break off their relationship, he would make her life a "nightmare". Nevertheless, counsel failed to confront Mr. McCarter regarding that statement. Further, counsel failed to impeach Mr. McCarter on his statement that he knew Mr. Harris only from one card game, and Mr. McCarter was not cross-examined on his plea agreement with the State, his alcoholism and marijuana use and his criminal convictions.

66.    Counsel also failed adequately to cross-examine other important witnesses for the prosecution, and to use effectively exculpatory evidence including, but not limited to, checks and other financial records. For instance, counsel did not cross-examine Officer Jenkins at all, although she worked and had a close relationship with Mr. Harris, suggesting potential bias. Counsel, moreover, did not make effective use of a key piece of evidence -- a $100 check endorsed from Mr. McCarter to Mrs. Harris. Mr. McCarter contended that Mrs. Harris had given him $100 to hire Messrs. Sockwell and Hood to murder Mr. Harris. The $100 check, however,

- 18 -

supported Mrs. Harris's claim that, instead, she had loaned Mr. McCarter $100 to fix his car, and

he had repaid that loan. Counsel failed to stress that point, either in direct examination of Mrs.

Harris or to the jury, which would have shown that the State had failed to prove murder for hire.

                d.       Failure to Challenge the State's Misconduct.

         67.     As a crutch for its lack of solid, credible evidence, much less proof beyond

a reasonable doubt, the State resorted to unreasonable argument, speculation and appeals to the

jury's passion and bias. Defense counsel failed effectively to challenge that misconduct, in

derogation of their responsibility to put the State's case through "the crucible of meaningful

adversarial testing". United States v. Cronic, 466 U.S. 648, 656 (1984).

         68.     The courtroom was highly charged with passion and bias from several

sources. Throughout the trial, the prosecution highlighted the victim's occupation as a law

enforcement officer, even after the line-of-duty count was stricken from the jury's consideration.

There were a number of uniformed sheriff's officers present in the courtroom during the trial.

The bailiffs in the courtroom were connected with the Sheriff's Department and interacted

significantly with the jury, escorting them back and forth from the hotel to court, and

accompanying them during recesses. Three jurors -- Barbara Edwards, Elizabeth Bellinger and

Mary Kay Levert -- were closely related to people who worked in law enforcement. Moreover,

Mr. Harris's sister sat at the prosecution table during the trial, and the State referred to members

of his family during the trial in the presence of the jury. The State called Mr. Harris's sister to

testify on wholly irrelevant issues, offering her primarily to engender sympathy for Mr. Harris's

family and create bias against Mrs. Harris.

         69.     Counsel did not sufficiently object to the State's encroachment on Mrs.

Harris's rights to a fair trial. Counsel did not object at all to the number of officers in the

courtroom or to the testimony of Mr. Harris's sister until well into the State's parade of

- 19 -

irrelevant, highly emotional and biased evidence. The State, without objection, even referred to

Mrs. Harris as "breaking God's law".

70.    The State also endeavored to mislead the jury, which defense counsel

allowed with no challenge. For example, during its closing arguments, the State characterized

Michael Sockwell and Alex Hood's pleas of the Fifth Amendment as admissions of guilt that the

jury could properly use against Mrs. Harris. The State argued that without its agreement with its

main witness, Mr. McCarter, "this man would have taken the Fifth Amendment, just like the

other two, cause he was guilty and involved, and he told you". The "other two" that the

prosecutor referred to are Messrs. Sockwell and Hood, who invoked their privileges against self-

incrimination when called as witnesses by the defense. By this comment, the State was

suggesting that Messrs. Sockwell and Hood would implicate (and that their silence did implicate)

Mrs. Harris. Defense counsel did not object or seek a corrective instruction.

71.    Moreover, the State made the following false and misleading statements

during its closing about the testimony and interests of its witnesses, without any rebuttal from

defense counsel:

- The prosecution described Alonzo Trimble as having "absolutely nothing to gain by testifying", when he was on probation at the time he became involved in this case;

- The prosecution stated that Mr. Trimble "has not changed [his] story at all" about the alleged phone call made to him by Mrs. Harris, when in fact he gave a substantially different version of that story in chambers than he did in open court;

- The prosecution stated that Freddie Patterson had "nothing to gain" by testifying, despite the fact that he had charges against him pending at the time he was asked to testify;

- The prosecution claimed that "[t]here's no evidence that Lorenzo McCarter had a criminal record", when in fact Mr. McCarter had both prior convictions and arrests; and

- 20 -

- The prosecution claimed that Mr. McCarter would "have his day in Court, I assure you", when Mr. McCarter actually had a plea agreement with the State that he would be spared an adversarial proceeding.

72.    The State also improperly cited the following facts in its closing, as to which there was no evidence in the record, without any rebuttal or objection:

- Mrs. Harris moved out of the house with her in-laws in order to carry on an affair with Mr. McCarter. Mrs. Harris never lived with her in-laws, merely in a house that they owned, and did not even meet Mr. McCarter until after her in-laws had already moved out;

- Mrs. Harris wanted to kill her husband because he was getting a car loan. There was no evidence that Mrs. Harris knew of any such car loan; and

- Mrs. Harris had been drinking when a sergeant called her to say that Mr. Harris had not arrived at work. The State's witness, Ralph Burton, actually testified that it sounded as if Mrs. Harris was asleep when he called.

73.    There can be no legitimate reason for counsel not to correct those mischaracterizations. The jury walked away thinking that Mr. Trimble's testimony was unimpeachable, consistent and truthful; that Mr. McCarter was not the habitual criminal he obviously was, who had negotiated his way out of any true "day in Court"; and that Mrs. Harris was drinking in celebration the night her husband was murdered. None were true.

     e.    <u>Failure to Request and Obtain Legally Sufficient Jury Instructions.</u>

74.    Proper jury instructions are indispensable to a fair trial. However, counsel failed to ensure that the trial court provided a proper instruction on one of the most critical parts of the State's case: corroboration.

75.    The court instructed the jury only that "[a] conviction for a felony offense cannot be had on the testimony of an accomplice or of numerous accomplices unless such testimony is corroborated by other evidence tending to connect the defendant with the commission of the offense." The court, however, did not say that the independent evidence must itself connect the defendant with the offense, <u>i.e.</u>, evidence that connects the defendant with the

- 21 -

offense only when read in conjunction with accomplice testimony is insufficient. Mills v. State, 408 So. 2d 187, 191-92 (Ala. Crim. App. 1981); McCoy v. State, 397 So. 2d 577, 587 (Ala. Crim. App. 1981). Trial counsel should have objected to the adequacy of the court's instruction, as there was no such corroborating evidence.

76.    Trial counsel also failed to object to an instruction that allowed Mrs. Harris to be convicted on a non-unanimous verdict. The trial court's instruction gave the jury a choice of elements, defining capital murder as "murder of the intentional killing-type plus pecuniary, other valuable consideration, pecuniary gain, or contract for hire." Trial counsel's failure to object to the court's disjunctive use of the pecuniary gain and murder for hire elements, as well as their failure to request an instruction that required a unanimous finding with respect to Mrs. Harris's conduct, deprived Mrs. Harris of due process. See In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); see also United States v. Beros, 833 F.2d 455, 462 (3d Cir. 1987) ("Conviction by a jury that was not unanimous as to the defendant's specific illegal action is no more justifiable than is a conviction by a jury that is not unanimous on the specific count.").

77.    Moreover, trial counsel failed to secure various essential instructions concerning knowledge and intent. Trial counsel did not request an instruction that, in order to find Mrs. Harris guilty of murder for pecuniary gain, Mrs. Harris had to have knowledge of the benefits she would have received in the event of her husband's death. Trial counsel did not request an instruction explaining the definition of intent for the lesser included offense of murder. And trial counsel did not request an instruction explaining that, to be found guilty of aiding and abetting, the defendant must possess the requisite intent to kill.

- 22 -

f.    Cumulative Effect of Counsel's Errors.

78.    These errors individually and collectively denied Mrs. Harris the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution. See United States v. Baker, 432 F.3d 1189, 1203 (11th Cir. 2005), cert. denied 126 S. Ct. 1809 (2006) ("[W]e must review the prejudicial effect of *all* evidentiary errors . . . in the aggregate. We will therefore reverse if the cumulative effect of the errors is prejudicial, even if the prejudice caused by each individual error was harmless.") (emphasis in original) (footnote and citations omitted); United States v. Blasco, 702 F.2d 1315, 1329 (11th Cir. 1983) ("A piecemeal review of each incident does not end our inquiry. We must consider the cumulative effect of these incidents and determine whether, viewing the trial as a whole, appellants received a fair trial as is their due under our Constitution.") (citation omitted).

79.    Each error, individually and collectively, constituted deficient performance that prejudiced Mrs. Harris. See, e.g., United States v. Pearson, 746 F.2d 787, 796 (11th Cir. 1984) (holding that "[e]ven if we were to find any of the above errors, standing alone, to be harmless, their cumulative effect . . . was clearly prejudicial and combined to deprive [the defendant] of a fair trial"). But for counsel's deficient performance, the outcome of Mrs. Harris's trial would have been different and she would not have been found guilty of capital murder. Because of counsel's ineffectiveness, Mrs. Harris was wrongly convicted. See Strickland, 466 U.S. at 687.

80.    The state court adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established United States Supreme Court precedent, and that was based on an unreasonable determination of the facts in light of the evidence presented.

- 23 -

C.    **The Exclusion Of Mrs. Harris From Hearings In Which Her Lawyers Were Dismissed And Other Critical Proceedings Violated Her Rights To Due Process And A Fair Trial.**

81.    "One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial." Illinois v. Allen, 397 U.S. 337, 338 (1970); see also Dasher v. Stripling, 685 F.2d 385, 387 (11th Cir. 1982).

82.    Further, "even in situations where the defendant is not actually confronting witnesses or evidence against him, he has a due process right 'to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge'". Kentucky v. Stincer, 482 U.S. 730, 745 (1987) (citation omitted). Thus, under the due process clause of the Fourteenth Amendment, "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure". Id.

83.    Mrs. Harris was not present when the trial court removed two of her attorneys, Mr. Riggs and Mr. Halstrom.

84.    Mrs. Harris had formed a strong attorney-client relationship with Mr. Riggs and Mr. Halstrom, who had been representing her for several months prior to their removal. Mr. Riggs and Mr. Halstrom filed a number of motions on Mrs. Harris's behalf, and quickly undertook a preliminary investigation of the case.

85.    The trial court relieved Mr. Riggs and Mr. Halstrom of their appointment on August 23, 1988, during a hearing on their motion for reasonable and adequate compensation. The record is clear that Mrs. Harris was not present at that hearing.

86.    Mr. Riggs and Mr. Halstrom indicated that they preferred not to be excused from the case. They requested an evidentiary hearing in which to prove that the limited

- 24 -

compensation authorized by Ala. Code § 15-12-21(d) was less than their office overhead, and amounted to a taking of a conscientious attorney's property. Instead, the trial court, in Mrs. Harris's absence, relieved them from their representation.

87.    Mrs. Harris had the right to be present at this critical stage of the proceedings. The dismissal of Mrs. Harris's counsel in her absence was prejudicial and violated her rights to due process and a fair trial under the Sixth and Fourteenth Amendments.

88.    The remedy for the trial court's erroneous dismissal of Mr. Riggs and Mr. Halstrom should be a reversal of Mrs. Harris's conviction. Although Mrs. Harris was prejudiced by the dismissal of her counsel, a finding of prejudice should not be necessary for her to obtain that reversal. See United States v. Gonzalez-Lopez, 126 S. Ct. 2557, 2562 (2006). Mr. Riggs and Mr. Halstrom, though initially appointed as counsel, had become Mrs. Harris's counsel of choice. Mrs. Harris had come to trust and rely upon them and, given the opportunity, would have opposed their dismissal. Accordingly, Mrs. Harris's Sixth Amendment right to her counsel of choice was violated, and she need not make an additional showing of "prejudice" to make the violation complete. See Gonzalez-Lopez, 126 S. Ct. at 2562.

89.    Mrs. Harris was also absent from a number of other critical proceedings that required her involvement, including, but not limited to: the trial court's removal of another of her attorneys, Barry Leavell; various pretrial motions; discussion of the testimony of potential state witnesses; discussion of information for which she may have been the source; and discussion of various statements allegedly made by her and about her.

90.    Mrs. Harris's absence from those proceedings violated her rights to due process and a fair trial under the Sixth and Fourteenth Amendments.

91.     The state court adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established United States Supreme Court precedent, and that was based on an unreasonable determination of the facts in light of the evidence presented.

**D.     The Trial Court Improperly Denied Mrs. Harris's Motion For A Change Of Venue.**

92.     Mrs. Harris was entitled to a trial by an impartial jury "free from outside influences". Sheppard v. Maxwell, 384 U.S. 333, 362 (1966).

93.     "When prejudicial pretrial publicity or an inflamed community atmosphere preclude seating an impartial jury, due process requires the trial court to grant a defendant's motion for a change of venue . . . or a continuance." Coleman v. Zant, 708 F.2d 541, 544 (11th Cir. 1983) (citations omitted).

94.     Given the degree of publicity attending her case, Mrs. Harris sought to transfer venue to another county. It was error for the trial court not to grant a change of venue.

95.     Montgomery County, where Mrs. Harris's trial was held, was saturated with pretrial publicity about the facts surrounding the death of the victim, a Montgomery County law enforcement officer, and Mrs. Harris's arrest.

96.     Accounts of the murder and of the circumstances surrounding Mrs. Harris's arrest were portrayed on television and radio news broadcasts, as well as in newspaper reports and editorials. Mrs. Harris's jurors had heard about and read about the matter.

97.     Moreover, members of the Montgomery County sheriff's department, and thus colleagues of the deceased, were not only present at Mrs. Harris's trial but also attended to the needs of the jury and escorted jurors to and from the court. The trial court refused to give even a cautionary instruction to the jury regarding the officers' presence.

98.    Both the court and the prosecutor made clear to the jurors that it was the sheriff's department that would make them comfortable during the trial and that was responsible for investigating the case.

99.    Numerous law enforcement agents, including the sheriff of Montgomery County, testified against petitioner. The sheriff's testimony regarding the victim's occupation as a deputy sheriff and the length of his association with the victim was not relevant to any issue before the jury, and served only to emphasize the close connection between the victim and an important elected official.

100.    The amount of prejudicial pretrial publicity, coupled with the presence in the courtroom of members of the sheriff's department and the close association between the jury and members of the sheriff's department, rose to the level of inherent prejudice, depriving petitioner of a fair trial in violation of the Sixth and Fourteenth Amendments of the United States Constitution. See, e.g., Woods v. Dugger, 923 F.2d 1454, 1460 (11th Cir. 1991) (holding that combination of pretrial publicity along with presence of large numbers of uniformed spectators during trial "rose to the level of inherent prejudice, thereby depriving the petitioner of a fair trial").

101.    Mrs. Harris should have been granted a change of venue based upon a finding of inherent or presumed prejudice. See Coleman, 708 F.2d at 544 ("Prejudice is presumed from pretrial publicity when (1) pretrial publicity is sufficiently prejudicial and inflammatory, and (2) the prejudicial pretrial publicity saturated the community where the trials were held."). The trial court's failure to grant Mrs. Harris that change of venue violated her rights under the Sixth and Fourteenth Amendments.

102.    The state court adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established United States Supreme Court precedent, and that was based on an unreasonable determination of the facts in light of the evidence presented.

E.    **The Trial Court Improperly Limited The Cross-Examination Of State's Witnesses Alonzo Trimble And Freddie Patterson.**

103.    A primary interest secured by the Confrontation Clause is the right of cross-examination of witnesses against the accused. Davis v. Alaska, 415 U.S. 308, 315 (1974) (citing Douglas v. Alabama, 380 U.S. 415, 418 (1965)).

104.    "[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination". Davis, 415 U.S. at 316-17 (citing Greene v. McElroy, 360 U.S. 474, 496 (1959)).

105.    In order to demonstrate that Alonzo Trimble was biased to cooperate with the State, defense counsel twice attempted to question Mr. Trimble about whether he was on probation at the time of Isaiah Harris's murder. Both times the trial court upheld objections by the prosecution to this questioning. Defense counsel made clear in chambers that the point of the testimony was to show that Mr. Trimble had reason to perjure himself and to cooperate with the State. The jury, however, was never informed of this potential interest or bias. Instead, the jury was left with the impression that Mr. Trimble "didn't have a Probation Officer" and thus had no reason to cooperate with the State, even though Mr. Trimble had admitted in the trial court's chambers that he had been on probation at the time of the murder.

106.    Defense counsel attempted to question Freddie Patterson about an unrelated felony charge pending against him for leaving the scene of an accident, for which he later pleaded guilty to a misdemeanor, and numerous other arrests and convictions. The trial

- 28 -

court upheld the prosecution's objections to these questions. Defense counsel made clear that the purpose of such questions was to show Mr. Patterson's bias to cooperate with the State. Mr. Patterson, in fact, had been arrested for leaving the scene of the accident on the same day that he had come in to give his statement to the police in this case. The jury, however, was left with the impression that Mr. Patterson also had no reason to perjure himself or to cooperate with the State.

107.    Cross-examination of Mr. Trimble and Mr. Patterson would have challenged their credibility by showing both witnesses' incentives to join the State's view of the case and by rebutting the State's assertions that they had "nothing to gain" by testifying.

108.    The failure of the trial court to allow full cross-examination of Mr. Trimble and Mr. Patterson in order to expose their bias toward the State violated Mrs. Harris's rights under the Sixth and Fourteenth Amendments. See Davis, 415 U.S. at 317-18 (reversing a conviction where the trial court had refused to permit defense counsel to cross-examine a witness about his probationary status).

109.    The state court adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established United States Supreme Court precedent, and that was based on an unreasonable determination of the facts in light of the evidence presented.

F.    **The Prosecution Engaged In Numerous Instances Of Unconstitutional Misconduct That Resulted In A Denial Of Mrs. Harris's Rights.**

110.    When the State's closing argument "so infect[s] the trial with unfairness", a resulting conviction is a denial of due process. Darden v. Wainright, 477 U.S. 168, 181 (1986) (internal quotation marks and citation omitted).

111.    The essence of the claim is that "the prosecutor's conduct as a whole violated the Fourteenth Amendment due process right to a fair trial". Davis v. Zant, 36 F.3d 1538, 1546 (11th Cir. 1994). Accordingly, the court determines "whether a remark or series of remarks, in the context of that trial, rendered the entire trial unfair". Id.

112.    At Mrs. Harris's trial, the prosecution's closing argument was replete with unconstitutional misconduct, thus rendering the entire trial unfair.

113.    During its closing, the State mischaracterized Michael Sockwell's and Alex Hood's pleas of the Fifth Amendment as admissions of guilt that the jury could properly use against Mrs. Harris. In explaining why the State had made a deal with its main witness, Lorenzo McCarter, the prosecutor stated: "[T]his man would have taken the Fifth Amendment, just like the other two, cause he was guilty and involved, and he told you". The "other two" that the prosecutor referred to were Messrs. Sockwell and Hood, who had invoked their right against self-incrimination when called as witnesses by the defense. This comment amounts to misconduct which is in direct violation of the dictates of the Fifth Amendment and, therefore, petitioner's due process rights. See Bowles v. United States, 439 F.2d 536, 541 (D.C. Cir. 1970) ("It is well settled that the jury is not entitled to draw any inferences from the decision of a witness to exercise his constitutional privilege whether those inferences be favorable to the prosecution or the defense.").

114.    The prosecution, moreover, made the following false statements about the testimony and interests of its witnesses, thereby misleading the jury regarding their credibility:

- The prosecution described Alonzo Trimble as having "absolutely nothing to gain by testifying", when he was on probation at the time he became involved in this case;

- The prosecution stated that Mr. Trimble "has not changed [his] story at all" about the alleged phone call made to him by Mrs. Harris, when in fact he gave

- 30 -

a substantially different version of that story in chambers than he did in open court;

- The prosecution stated that Freddie Patterson had "nothing to gain" by testifying, despite the fact that he had charges against him pending at the time he was asked to testify;

- The prosecution claimed that "[t]here's no evidence that Lorenzo McCarter had a criminal record", when in fact Mr. McCarter had both prior convictions and arrests; and

- The prosecution claimed that Mr. McCarter would "have his day in Court, I assure you", when Mr. McCarter actually had a plea agreement with the State that he would be spared an adversarial proceeding.

115.    The prosecution also improperly stated that Mrs. Harris had been able to "concoct" a good story because she was able to see the State's files. It was improper and prejudicial for the prosecutor to rely on the open file discovery rules of the trial court, which are designed to provide the defendant with material to aid in his defense, in order to suggest that Mrs. Harris perjured herself.

116.    Throughout the trial, the prosecution highlighted the victim's occupation as a deputy sheriff. Even after the line-of-duty count was stricken from the jury's consideration, the prosecution continued in closing to emphasize the victim's occupation as a law enforcement officer. Testimony revealed that if the victim had been killed while on duty, Mrs. Harris stood to gain 20 times more than what she would have received if he were killed while off duty. The introduction of such irrelevant testimony, and reference to its content, improperly induced the jury to find that the murder was committed for pecuniary gain.

117.    Finally, the State improperly cited the following facts, as to which there was no evidence in the record:

- Mrs. Harris moved out of the house with her in-laws in order to carry on an affair with Mr. McCarter. Mrs. Harris never lived with her in-laws, merely in a house that they owned, and did not even meet Mr. McCarter until after her in-laws had already moved out;

- 31 -

- Mrs. Harris wanted to kill her husband because he was getting a car loan. There was no evidence that she knew of any such car loan; and

- Mrs. Harris had been drinking when a sergeant called her to say that Mr. Harris had not arrived at work. The State's witness, Ralph Burton, actually testified that it sounded as if Mrs. Harris was asleep when he called.

118.    The prosecution's numerous improper remarks amount to prosecutorial misconduct, which deprived petitioner of her right to a reliable verdict and violated her rights under the Fifth, Sixth and Fourteenth Amendments.

119.    The state court adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established United States Supreme Court precedent, and that was based on an unreasonable determination of the facts in light of the evidence presented.

### G.    The Trial Court Failed To Give A Specific Unanimity Instruction To The Jury To Clarify The State's Duplicitous Indictment.

120.    "[U]nanimity is one of the indispensable features of federal jury trial". Johnson v. Louisiana, 406 U.S. 356, 369-70 (1972) (Powell, J., concurring).  In criminal cases, the requirement of unanimity "extends to all issues -- character or degree of the crime, guilt and punishment -- which are left to the jury".  Andres v. United States, 333 U.S. 740, 748 (1948); see also United States v. Correa-Ventura, 6 F.3d 1070, 1078 (5th Cir. 1993) (a unanimous verdict requires both "unanimity as to verdict and unanimity as to the critical facts necessary to support that verdict").

121.    At the guilt/innocence phase of Mrs. Harris's trial, the trial court failed to give a specific unanimity instruction to the jury when Mrs. Harris was charged under a duplicitous indictment.  This failure violated Mrs. Harris's rights under the Sixth and Fourteenth Amendments.

- 32 -

122.    Mrs. Harris was charged with killing her husband "for a pecuniary gain or other valuable consideration <u>or</u> pursuant to a contract or for hire". Ala. Code § 13A-5-40(a)(7) (emphasis added). The prosecution argued both theories, but had to prove at least one beyond a reasonable doubt. <u>Beros</u>, 833 F.2d at 462 ("When the government chooses to prosecute under an indictment advancing multiple theories, it must prove beyond a reasonable doubt at least one of the theories to the satisfaction of the entire jury."); <u>see also</u> <u>United States v. Payseno</u>, 782 F.2d 832, 836 (9th Cir. 1986); <u>United States v. Echeverry</u>, 698 F.2d 375, 377-78, <u>modified</u>, 719 F.2d 974 (9th Cir. 1983).

123.    The trial court's charge to the jury, however, erroneously gave the jurors a choice of elements, defining capital murder as "murder of the intentional killing-type plus pecuniary, other valuable consideration, pecuniary gain, or contract for hire".

124.    The trial court charge improperly allowed Mrs. Harris to be convicted on a non-unanimous verdict. This deprived Mrs. Harris of due process and the requirement that the State prove all elements of a crime beyond a reasonable doubt. <u>In re Winship</u>, 397 U.S. at 364 ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); <u>see also</u> <u>Beros</u>, 833 F.2d at 462 ("Conviction by a jury that was not unanimous as to the defendant's specific illegal action is no more justifiable than is a conviction by a jury that is not unanimous on the specific count."). The risk of a non-unanimous verdict was particularly high in this case, where the prosecution chose to present evidence in an attempt to show both pecuniary gain and murder for hire. For instance, it is quite possible that six jury members found the pecuniary gain element, but not the murder for hire element, and that the other six found the murder for hire element, and not the pecuniary gain element.

- 33 -

125.    The state court adjudication of this claim resulted in a decision that was contrary to, and involved an unreasonable application of, clearly established United States Supreme Court precedent, and that was based on an unreasonable determination of the facts in light of the evidence presented.

## IV.    PRAYER FOR RELIEF

126.    For all of the above stated reasons and other such reasons as may be made upon amendment of this petition and a full evidentiary hearing, Louise Harris respectfully asks this Honorable Court to grant her the following relief:

(a)    Afford petitioner an opportunity to reply to any responsive pleading filed by respondent;

(b)    Grant petitioner discovery under Rule 6 of the Rules Governing Section 2254 Cases in the United States District Courts and a sufficient period of time to conduct discovery, and further grant petitioner authority to obtain subpoenas to further document and prove the facts set forth in this petition;

(c)    Grant petitioner an evidentiary hearing at which additional proof may be offered supporting the allegations set forth in the petition;

(d)    Permit petitioner after additional factual development an opportunity to brief and argue the issues presented in this petition;

(e)    Issue a writ of habeas corpus granting petitioner relief from her unconstitutionally obtained conviction; and

(f)     Grant such further and other relief as may be appropriate.

Respectfully submitted,

Stuart W. Gold, Esq. (NY Bar #1473859)
*Pro hac vice application pending*

Sarah E. Paul, Esq. (NY Bar #4379830)
Elana J. Zeide, Esq. (NY Bar #4408241)
Ryan M. Billings, Esq. (NY Bar #4299285)
*Pro hac vice applications pending*

Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
Telephone: (212) 474-1000
Telecopier: (212) 474-3700

William Blanchard, Esq.
SJIS Code BLA029
Blanchard Law Offices
505 South Perry Street
Montgomery, AL 36104-4615
Telephone: (334) 269-9691
Telecopier: (334) 263-4766

*Attorneys for Petitioner Louise Harris*

March 15, 2007

EXHIBIT   A

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

LOUISE HARRIS,                               )
                                             )
                  Petitioner,                )
                                             )
v.                                           ) Case No. CC-88-1237.60
                                             )
STATE OF ALABAMA,                            )
                                             )
                  Respondent.                )

## ORDER

### I.
### PROCEDURALLY BARRED CLAIMS

The *Alabama Rules of Criminal Procedure*, at Rule 32.2(a), unambiguously state which category of claims raised by a Rule 32 petitioner are procedurally defaulted from this Court's review. The following claim is barred from review, at least in part, because it was raised or addressed at trial: Claim II. The following claims are barred from review, at least in part, because they were not raised at trial: Claim III, Claim IV, Claim V, Claim VI, and Claim VII. The following claim is barred from review, at least in part, because it was raised or addressed on appeal: Claim II. The following claims are barred from review, at least in part, because of Harris' failure to raise the claims on appeal: Claim III, Claim IV, Claim V, Claim VI, and Claim VII.

### II.

### INEFFECTIVE ASSISTANCE OF COUNSEL

The remaining claims all allege ineffective assistance of counsel. Harris failed to prove that trial or appellate counsel failed to perform as the counsel required by the

United States Constitution.[1]  The Court applies the legal standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and its progeny to Harris's claims.  *See also Chandler v. United States*, 218 F.3d 1305, 1313-1319 (11th Cir. 2000) (en banc) (setting forth and discussing twelve "principles and presumptions" that govern the review of claims of ineffective assistance of counsel).  Harris's allegations of ineffective assistance of counsel are found in Section I the Amended Petition and are addressed below in the order in which they are set forth in the petition.

### B.  Trial Counsel and Their Representation of Harris

Knox Argo and Eric Bowen represented Louise Harris at her capital murder trial. Knox Argo was appointed on September 29, 1988, more than nine months before the trial in this case.  (R. 1113)[2]  Eric Bowen was appointed on March 29, 1989, more than three months before trial.  (R. 1141)  Mr. Argo had been practicing law for nearly two decades when he was appointed.  Although his practice generally focused on civil law, he did have some criminal experience before the appointment, including the representation of at least two capital murder defendants.  (EH. 71-74, 138-39)  Mr. Bowen was admitted to the Alabama bar in 1973 and began his practice in the State Attorney General's Office handling criminal appeals, including death penalty appeals.  (D. 9)  He entered private practice in 1978.  In addition to the experience gained in the Attorney General's Office and private practice, Mr. Bowen also spent at least two years serving as a special

---

[1] On October 15, 1999, Harris filed a "motion to supplement the record concerning her ineffective assistance of counsel claims" along with numerous exhibits that were not offered during the evidentiary hearing.  The Court denies the motion to supplement and does not consider the exhibits.  Additionally, the Court did not consider the testimony of Stephen Glassroth due to his failure to consider any direct evidence from trial counsel and, perhaps more importantly, the reasons he gave for not doing so.

[2] "R." denotes citation to the record on direct appeal.  "EH." denotes citation to the transcript of the evidentiary hearing resulting from these proceedings.  "D." denotes citation to the deposition of Eric Bowen.  "SR." denotes citation to the supplemental record filed on direct appeal.

2

prosecutor for the Montgomery County District Attorney's office. (D. 7-9)  In that capacity, he prosecuted one capital murder case and was involved in the trial of another. (D. 9)

Knox Argo's time sheet reflects that he spent more than 131 hours working on the case out of court and an additional 46 hours in court.  The fee application did not, however, reflect all of the time he spent on the case.  (EH. 69, 140)  At the time of the evidentiary hearing, Mr. Argo had not had access to his file for more than two years.  (EH. 85)  He could not recall every action undertaken or every decision that he made ten years ago regarding the case.  Where the record is unclear as to any issue regarding counsel's performance, however, this Court will presume that counsel acted appropriately.  Eric Bowen's time sheet reflects that he spent more than 120 hours out of court preparing Harris' case and 41 hours in court.  The defense team also included an investigator who spent 216 hours on Harris's case.

Trial counsel presented a defense of factual innocence, seeking to create reasonable doubt in the minds of the jury.  The strategy was "absolutely" affected by what Harris relayed about her involvement in the crime. (D. 15)  Bowen testified that Harris "[a]bsolutely" and "[a]lways" denied any involvement in the crime. (D. 17)  When asked if the theory of defense was affected by what his client told him, Mr. Argo stated, "[w]ell, like I said, she denied being involved in any way whatsoever." (EH. 142)[3]  The theory was

---

[3] Apparently Harris has always asserted her innocence and continues to do so.  Dr. Kirkland testified that "she denied any participation in the offense." (EH. 402)  The social worker provided similar information - although she was reluctant to give a straight answer and appears to have chosen her words carefully.  She repeatedly stated that Harris was not involved in the "active planning" of the murder.  (EH. 287-91)  Additionally, "Mrs Harris is not claiming now, nor has she ever claimed, that she perpetrated the crime but is not criminally responsible for her acts.  Mrs. Harris is not claiming Battered Women's Syndrome as a form of self-defense, as the State's expert seemed to believe. (RR. 436-37)  Indeed, Louise Harris has always denied involvement in the incident for which she was convicted."

3

that Harris was innocent and the implication of her by the others was "an after-thought frame-up . . . in order to try to work a deal to save their own lives." (D. 25) Part of that goal was "to show that only the accomplices' testimony was really actually providing the nexus between Louise and the murder." (D. 27) The defense team sought to discover any information that would either demonstrate Harris's innocence or, at least, undermine the State's case against her. (EH. 142, D. 25)

Mr. Bowen and Mr. Argo were aware of information indicating that the victim had previously physically abused Harris. (EH. 114, D. 15) Both testified that they considered the possibility of presenting that type of evidence, but "decided it probably wasn't a real good idea to do that as trial strategy." (EH. 116) It would have been inconsistent with the chosen defense and, among other adverse effects, would constitute evidence of motive. (EH. 119, 143, D. 30) Moreover, Harris was absolutely against presenting evidence of abuse. (D. 16, 27, 101) Trial counsel's representation was more than adequate to satisfy the performance requirement of the *Strickland* test. Harris failed to demonstrate that she was denied the effective assiistance of counsel.

## C. Claims For Relief

A great deal of the testimony offered by Harris at the Rule 32 hearing dealt with issues of mental health. The Court sets forth its findings regarding that issue immediately below and applies them to any relevant claim in the petition.

### 1. Mental Health Issues

Much of the mental health testimony presented by Harris at the Rule 32 hearing was intertwined with the abuse she allegedly suffered at the hands of the victim. Trial counsel, however, made a strategic decision not to present evidence of that alleged abuse.

4

The claim that trial counsel were ineffective in failing to present mental health testimony is, therefore, denied for that reason alone.

Harris presented the testimony of Dr. Marti Loring, a social worker, and Dr. Robert Shaffer, a clinical psychologist. Dr. Loring testified that, in her opinion, Harris "has the Battered Woman Syndrome, as well as the Post Traumatic Stress Disorder at the time of the incident, and currently." (EH. 256) Dr. Shaffer testified that testing he conducted "indicated that Louise Harris scored at a range typical of most individuals who have Dissociative Disorder" and that her score was "in a range typically higher than that obtained by most individuals with Post Traumatic Stress Disorder." (EH. 328) He also testified that Harris' IQ was in the borderline range at 79. (EH. 323) Dr. Karl Kirkland, a forensic psychologist, testified as a rebuttal witness for the State. (EH. 388) Based upon his evaluation, Dr. Kirkland testified that he did "not agree with the conclusion of Dissociative Disorder or Post Traumatic Stress Disorder." (EH. 402) Regarding Battered Woman Syndrome, Dr. Kirkland stated that he had "yet to see the relevancy of [that diagnosis] to the offense in this case." (EH. 402)

Harris failed to comply with Rule 32.6(b). Although the amended petition references mental health issues and mental health experts generally, the terms Post Traumatic Stress Disorder, Battered Woman's Syndrome, and Dissociative Disorder are entirely absent from the pleading. In failing to disclose the mental disorders she is alleged to suffer from, Harris did not comply with the rules of procedure. Alternatively, the claim is without merit. The only question is whether trial counsel were ineffective in failing to investigate, develop, and present mental health evidence similar to that presented in these proceedings. Only upon a finding of deficient performance does it

5

become necessary to evaluate whether the presentation of the evidence would have made a difference in the outcome. Harris failed to show deficient performance regarding her mental health claims.

On May 19, 1988, Frank Riggs and Tim Halstrom filed a "Motion for Psychiatric Examination." (R. 1069) The trial court granted the motion and ordered that Harris be transported to Taylor Hardin Secure Medical Facility to undergo an examination into the present mental condition of Harris. Contrary to the representations of current counsel for Harris, it additionally ordered a determination of "whether at the time of the alleged offense the defendant was suffering from symptoms of mental illness, mental retardation or other psychiatric disorder, and if so, then, whether at the time of the offense such symptoms contributed to the commission of the offense, and if so, in what manner."[4] (R. 1079) Harris remained at Taylor Hardin for approximately 30 days. She was evaluated by three psychiatrists and one psychologist. Her actions and behavior were closely observed on a daily basis. The records are devoid of any indications that Harris suffered from – or currently suffers from - any mental health problems. The records are inconsistent with the testimony of Loring and Shaffer and the contention that counsel should have conducted additional investigation into Harris's mental health. Trial counsel is not deficient for failing to see what three psychiatrists and a psychologist did not discover over a period of thirty days.[5] Both Mr. Bowen and Mr. Argo testified that they never saw anything that would indicate a mental problem in Harris. (EH. 145, D. 42) Even assuming that they wished to request additional evaluations, it has not been shown

---

[4] On page 16 of her "Proposed findings of fact and conclusions of law," Harris contends that "the only issue for which she was examined – an examination conducted by the State – was her competency to stand trial." The testimony of Harris' experts at the Rule 32 hearing indicates that they were under this mistaken impression as well. (EH. 264-65, 296-98, 333)

6

that the trial court would have provided funds. Harris must show, not only that counsel should have requested the funds, she must also demonstrate that the request would have succeeded. She has made no such showing.

Dr. Kirkland – who is certainly more experienced in recognizing mental health disorders than trial counsel – evaluated Harris. Dr. Kirkland testified that he did not "see any evidence" of any of the symptoms that are necessary to support a diagnosis of Post Traumatic Stress Disorder. (EH. 405) Harris is critical of the time Dr. Kirkland spent evaluating Harris. (EH. 413-19) In footnote 2 on page 7 of a document entitled "Summary of Mental Health Expert Testimony," Harris contrasts Dr. Kirkland's evaluation with the "several hours spent with Mrs. Harris by Dr. Loring." Dr. Loring testified that she spent approximately 30 hours with Harris. (EH. 253, 298) When asked if that time was sufficient, Dr. Loring replied, yes, "although it was very difficult because she minimized so much of the trauma she has, sometimes it was like pulling teeth." (EH. 299) In her opinion, the findings of the four experts at Taylor Hardin were the result of Harris' disguising and minimizing her symptoms. (EH. 300) She additionally stated that "it's quite remarkable that individuals that have trauma such as the trauma that she does can manage to keep up that happy [countenance], *unless someone like me comes along and confronts them with questions and asks them to remember things that are in their minds*." (EH. 268) Dr. Shaffer made similar remarks during his testimony. (EH. 333)

Presumably, Harris feels that these points assist her in an attempt to explain the complete absence of any documented history of mental health problems in her past. She additionally contends that it makes Dr. Loring's and Dr. Shaffer's testimony more

---

[3] Additionally, nothing in the testimony of Harris's family members, who testified during these proceedings, supports the existence of the symptomology Loring found in making her diagnoses.

7

reliable than that of Dr. Kirkland and, therefore, supports a finding of prejudice. While not finding her contentions valid, they directly and significantly undercut any attempt to demonstrate deficient performance. Harris cannot have it both ways. She faults and criticizes trial counsel for failing to recognize and investigate mental health issues. Yet, at the same time, she contends that three psychiatrists and two psychologists failed to properly diagnose her because she was masking and minimizing the symptoms. Harris has not proved deficient performance on the part of trial counsel. A contrary result would necessarily require a finding that the law expects trial counsel to be more adept at spotting symptoms of mental disorders than qualified mental health professionals. The law does not require counsel to be "someone like" Dr. Loring. Alternatively, even assuming deficient performance, Harris has failed to show prejudice. First, insofar as the testimony relates to the guilt phase, Dr. Loring's testimony would have been irrelevant and, therefore, inadmissible. "Mrs Harris is not claiming now, nor has she ever claimed, that she perpetrated the crime but is not criminally responsible for her acts." Moreover, Dr. Loring's testimony would have been inadmissible at the guilt phase because it was based upon information that was not admitted into evidence.

Harris asserts that, according to both Dr. Loring and Dr. Shaffer, her alleged mental disorders would have rendered her incapable of formulating a "complicated" and "sophisticated" plan to kill her husband. (EH. 291-93, 330) Even assuming that the testimony is accurate -- a finding not made here -- the manner in which Harris achieved her husband's death was not "complicated" and "sophisticated." The contention that the testimony explained Harris's reaction to being told of her husband's death is similarly rejected. Harris asserts that, according to Dr. Loring, "a numbing response" directly

8

resulting from her alleged mental disorders "may have delayed her grief at news of Isaiah's death." The evidence does not, however, support a conclusion that any grief Harris may have felt was "delayed." Either Harris was grieving immediately upon being told of her husband's death, or she was feigning a response. The testimony supports the latter finding. Finally, Dr. Loring was a biased and incredible witness. Dr. Kirkland accurately described her testimony as "characterized by . . . unassailable advocacy that lacked objectivity." (EH. 401) Dr. Loring was tailoring her testimony to fit the specific facts of this case.

The Court credits the Taylor Hardin findings and the testimony of Dr. Kirkland. Harris has failed to show a reasonable probability that, had the testimony in question been presented, the outcome of the trial would have been different. The Court also credits the testimony of Dr. Kirkland and the results of the Taylor Hardin evaluation over that of Dr. Shaffer regarding the question of whether Harris suffers from Dissociative Disorder. Moreover, even if one assumes the accuracy of Dr. Shaffer's opinion, its relevancy is unclear. Harris, "is not claiming now, nor has she ever claimed, that she perpetrated the crime but is not criminally responsible for her acts." If the testimony is not relevant to the offense, the Court certainly cannot make a finding that it would have affected the outcome of the trial.

### 2. Guilt Phase Claims

**Paragraph 10:** Harris presented no evidence in support of this claim and trial counsel was not ineffective because their motion was denied. Additionally, because the Court of Criminal Appeals rejected the underlying claim, Harris cannot show prejudice. *See Harris v. State*, 632 So. 2d at 510.

9

**Paragraph 11:** Harris presented no evidence in support of this claim. The record does not indicate that Harris was absent from the relevant proceeding. (R. 9-20) This Court "will not presume error from a silent record." *Harris v. State*, 632 So. 2d 503, 516 (Ala. Crim. App. 1992). Moreover, the Court of Criminal Appeals found that "it is clear that the appellant's presence would not have aided her defense." *Harris*, 632 So. 2d at 516. A capital murder defendant is not entitled to bail. *See* Rule 7.2(b), *A.R.Cr.P.* Because Harris has failed to prove either prong of *Strickland*, the claim is denied.

**Paragraph 12:** The record does not indicate that Harris was absent from the relevant proceeding and Harris has produced no evidence to demonstrate otherwise. (R. 21-26) This Court "will not presume error from a silent record." *Harris*, 632 So. 2d at 516. Additionally, even if Harris could establish deficient performance, she has failed to show prejudice. The Court of Criminal Appeals specifically held that "Harris has been unable to suggest or demonstrate any possibility of prejudice resulting from her absence." *Harris*, 632 So. 2d at 512.

**Paragraph 13:** Harris has failed to meet the burden placed upon her by Rule 32.3. She presented no evidence in support of the claim other than to ask Mr. Bowen about his actions regarding the change of venue motion. Bowen testified that he made a strategic decision not to press for a change of venue. (D. 144-45) Additionally, Harris had failed to prove prejudice.

**Paragraph 14:** Harris failed to present any evidence in support of this claim. Moreover, the record refutes any claim of deficient performance on the part of trial counsel. The voir dire of the jury panel was conducted by the trial court. (R. 104-226) Defense

10

counsel submitted, however, "proposed voir dire questions," covering the subjects Harris sets forth in the claim. (SR. 8, 11, R. 1211) This claim is denied.

Paragraph 15: Before trial, counsel filed a "motion to preclude the prosecution from using its peremptory challenges to exclude black persons and other groups." (R. 1156) At the conclusion of the jury striking process, counsel "renewed" the motion, but it was denied. (R. 236, 240) Harris asserts that counsel were ineffective for basing the motion solely on the numbers. The *Batson* claim was, however, raised in the Court of Criminal Appeals and the Alabama Supreme Court. The former specifically considered that "the assistant district attorney who prosecuted [Harris] has a history of using peremptory challenges to discriminate against black jurors." *Harris*, 603 So. 2d at 513, *quoting Hood v. State*, 598 So. 2d (Ala. Crim. App. 1992). Based on the finding of the appellate courts – that the additional consideration of the prosecutor's history still did not warrant the finding of a prima facie case – Harris's claim is denied.

Harris additionally contends that trial counsel were ineffective for allowing the prosecutor to "misstate" the number of blacks on the jury. This claim is denied. First, this claim does not appear in the amended petition for relief and is, therefore, denied due to Harris's failure to comply with the rules of procedure. Alternatively, it is denied because the number of blacks on the jury – as represented by the prosecutor, the trial court, and defense counsel – was correct. (R. 237-31) The following jury members, including the alternate, were African American: Elle Tate, Joanne Carpenter, Barbara Edwards, Shirephine Mathis, Alice Thomas, Patricia Calloway. Every one of these jurors is denoted as being black on petitioner's exhibits 44 and 47. Moreover, petitioner's exhibit 48 - Mr. Argo's notes from the "jury selection process" - also indicates that

11

Barbara Edwards was African American. The Court credits the perceptions and observations of trial counsel, the trial judge, and the District Attorney - each of whom had a substantial interest in observing the racial makeup of the jury.

**Paragraph 16:** Harris has failed to meet her burden of proof. Moreover, defense counsel filed a "motion to require the court reporter to transcribe the entire proceedings," including voir dire and bench conferences. (R. 1086) The motion was granted. Trial counsel cannot be faulted for the court's failure to ensure that its ruling was followed. Additionally, the Alabama Supreme Court reviewed and rejected the substantive portion of the claim. *See Ex parte Harris*, 632 So. 2d at 546.

**Paragraph 17:** Presumably, this paragraph is an introductory paragraph and is not intended to assert individual claims for relief. To the extent this is wrong, the claim fails to comply with Rule 32.6(b).

**Paragraph 18:** This claim is denied. Harris has failed to meet her burden of proof. She failed to demonstrate that no reasonable attorney would ever meet with a defendant's family in a group setting. Additionally, she offered no evidence that any of the family members, who were present during the meeting, withheld information based upon "group dynamics." The only assertion of prejudice offered is that, by conducting this group meeting, "defense counsel failed to uncover and develop information concerning [her] violent home life, history of abuse and the fact that, in spite of co-defendant Lorenzo McCarter's testimony, Mr. McCarter and the victim, Isaiah Harris, had previously clashed." Again, counsel had information about the abuse, but made a strategic decision

not to pursue it. Regarding the McCarter allegation, Harris presented no evidence to support it."[6]

**Paragraph 19:** This claim is refuted by the record. Trial counsel testified they came across information indicating physical abuse in the relationship between Harris and the victim. (EH. 114, D. 15) Trial counsel discussed the abuse with Harris and Harris's divorce attorney. (EH. 113, 114, D. 15, 27) Counsel made a strategic decision not to pursue the abuse. (EH. 116) Moreover, the decision was made in accordance with the directives and wishes of Harris, who characterized the relationship as consisting of "problems like everybody else." (D. 15, 27, 101) The decision was reasonable.

**Paragraph 20:** Evidence concerning Harris's relationship with the men named in the claim is irrelevant to any issue at the guilt phase of the trial.

**Paragraph 21:** Harris failed to present any evidence establishing that she suffered abuse and trauma at the hands of McCarter. The only testimony offered at the hearing on the subject came from Dr. Loring. During that testimony, even Harris' current attorneys admitted that there were no witnesses to any alleged physical abuse between Harris and McCarter. (EH. 272) As was discussed extensively in section C.1 of this order, the testimony of Dr. Loring does not assist Harris in her attempt to prove ineffective assistance of counsel. The only other "evidence" Harris can point to, in an effort to support her claim, are the handwritten notes of her trial attorneys. The notes could not

---

[6] Harris introduced a page of Bowen's handwritten notes that contained the following statement: "Lorenzo McCarter knew Ike Harris from jail." (Petitioner's exhibit 18) When shown the note, Bowen testified that one of the goals of the investigation was to find evidence that would indicate that McCarter had an independent reason for committing the crime and explained that the note was a result of "some rumors." (D. 78-79) The investigation, however, never resulted in any evidence that would support the claim. (D. 80, 151) Trial counsel's handwritten notes would not have constituted evidence at trial and Harris has failed to present anything to substantiate the claim in these proceedings.

have been admitted at trial and do not amount to evidence in these proceedings. Finally, Harris's own behavior, statements, and testimony contradict the allegation.

**Paragraph 22:** This claim is denied based upon Harris's failure to comply with Rule 32.6(b) and her failure to meet her burden of proof. The petition does not identify what family member testimony would have "put into context" Harris's reaction, and no family member testimony during the hearing was relevant to this claim.

**Paragraph 23:** This claim plainly fails to comply with Rule 32.6(b). It is alternatively denied for two reasons. First, counsel made a strategic decision not to focus on any abuse Harris allegedly suffered in her relationship with the victim and any other "abuse and trauma" referred to would have been irrelevant at the guilt phase. Second, because Harris did not testify at the Rule 32 hearing, she has failed to demonstrate prejudice.

**Paragraph 24:** This claim fails to comply with Rule 32.6(b) and is additionally denied based upon the strategic decision of counsel to not pursue a defense based upon spousal abuse. Moreover, Harris has failed to demonstrate prejudice.

**Paragraph 25:** Harris did not present any evidence in support of this claim. She has failed to demonstrate that there were, in fact, what she deems an "excessive number of uniformed officers and bailiffs" present. Additionally, trial counsel did "object to members of the Sheriff's Department [escorting the jurors]" and that motion was denied. (R. 244-45) Finally, the underlying issue was rejected by the Court of Criminal Appeals and the Alabama Supreme Court. *See Harris*, 632 So. 2d at 518.

**Paragraphs 26, 27, and 28:** Harris failed to present any evidence in support of these claims and has, therefore, failed to meet her burden of proof. The claims are additionally

dismissed for failure to comply with Rule 32.6(b). Moreover, the underlying issues were rejected on direct appeal. *See Harris*, 632 So. 2d at 525. The claims are denied.

**Paragraph 29:** Harris has asserted nothing to support her contention that the admission of the photograph in question was improper. Her claim is, therefore, dismissed for failure to comply with Rule 32.6(b). Additionally, a claim that the introduction of the photograph was improper was rejected on direct appeal. *See Harris*, 632 So. 2d at 530-31. Counsel is not ineffective for failing to assert an objection that has no merit.

**Paragraph 30:** Although this claim makes a general reference to "exculpatory evidence" and proffers not to be "limited," the only piece of evidence specifically referenced is "the check endorsed from Mr. McCarter to Mrs. Harris." Pursuant to Rule 32.6(b), the claim is, therefore, "limited." To the extent it was intended to apply to anything else, it is denied for failure to comply with the rules of procedure. Regarding the check, Harris failed to present any evidence or argument in support of the allegation and, therefore, demonstrate prejudice. Moreover, there was no deficient performance. Trial counsel made effective use of it during closing argument. (R. 869, 885)

**Paragraph 31:** This claim is directed at four witnesses - Officer Santina Jenkins, Officer Dorinda Hinton, Alonzo Trimble, and Lorenzo McCarter. None of these witnesses were called to testify and there is no contention that they were unavailable. While no finding of deficient performance is made, Harris plainly failed to demonstrate prejudice.

**Paragraph 32:** Harris has set forth no relevant facts, supporting argument, or even record cites to assist in evaluating this claim. Because it does not comply with the rules of procedure, the Court can only speculate as to the substance of the claim. The Court will not speculate and, therefore, denies the claim. Regarding the portion related to an

alleged failure to properly prepare Mrs. Harris to testify, Harris did not testify during these proceedings and has, therefore, failed to meet her burden of proof.

**Paragraph 33:** Harris presented no evidence or argument in support of this claim. In her proposed findings, she merely sets forth the claim as it appears in the amended petition. Moreover, the allegedly improper remark was not made during argument, but was part of a question asked by the prosecutor. The question was not improper.

**Paragraph 34:** This claim fails to comply with Rule 32.6(b). Presumably, it is merely an introduction. To the extent it is intended to assert an independent claim for relief, however, it is dismissed.

**Paragraph 35:** The next several claims bring into question counsel's failure to object to various prosecutorial arguments. Argo and Bowen both testified that they exercised caution when deciding whether to object to arguments of the prosecutor. Mr. Argo stated that "generally I don't think you make a lot of objections in closing, particularly, unless it's just grossly obvious that the evidence is not there. I don't think Judge Thomas is going to sustain one, anyway." (EH. 144, 134) Bowen gave a similar response. (D. 32) This general approach to making objections is reasonable. Moreover, it appears to be especially applicable before Judge Thomas, who did not sustain a single objection made during closing argument. In this context, the Court reviews and denies all claims regarding a failure to object to allegedly improper argument. Moreover, because the comment set forth in paragraph 35 was not improper, no showing of prejudice can be made. *See Harris*, 632 So. 2d at 533.

**Paragraph 36:** Harris has separated this claim into five parts - each is addressed separately. (1) Harris complains that she was denied effective assistance based upon

16

trial counsel's failure to object to "the prosecution describ[ing] Alonzo Trimble as having 'absolutely nothing to gain by testifying.'" Because the comment was not improper, Harris cannot demonstrate prejudice. *See Harris*, 632 So. 2d at 532; *see also Id.* at 523. (2) Harris complains that she was denied effective assistance based upon trial counsel's failure to object to the prosecutor's comment that "Freddie Patterson had 'nothing to gain.'" This claim is denied. "The . . . comment . . . [was a] proper inference[] from the evidence." *Harris*, 632 So. 2d at 532. (3) Harris complains that trial counsel did not object when "the prosecution claimed that '[t]here's no evidence that Lorenzo McCarter had a criminal record' (R. 901), when in fact Mr. McCarter had both prior convictions and arrests. (RR. 32)" This claim is denied. "[T]here was no evidence before the jury of any convictions . . . ." *Harris*, 632 So. 2d at 533. (4) Harris alleges that she was denied effective assistance of counsel when trial counsel did not object to the comment that Mr. McCarter would "have his day in court." This claim is denied. *See Harris*, 632 So. 2d at 532 (rejecting claim that comment of prosecutor in question was improper). (5) Harris next contends that she was denied the effective assistance of counsel when trial counsel did not object to the prosecutor's comment that "Mr. Trimble 'has not changed [his] story at all.'" This claim is rejected. The Court of Criminal Appeals reviewed the comment and found no error. *See Harris*, 632 So. 2d at 533-34.

Paragraph 37: In addition to her claim that trial counsel did not "adequately" object to evidence concerning the victim's occupation, Harris also complains that trial counsel did not "adequately" object to evidence concerning the victim's insurance policy. Harris has provided no guidance as to what would constitute an "adequate" objection and has, therefore, failed to comply with Rule 32.6(b). Moreover, because she has failed to

17

present any evidence or argument to support the claim, she has not met her burden of proof. The Court of Criminal Appeals rejected the underlying claim - the prosecutor improperly emphasized the victim's occupation. *See Harris*, 632 So. 2d at 525-26. Finally, the claim that counsel did not "adequately" object to evidence regarding insurance proceeds, is directly refuted by the record. (R. 546, 552-55, 580, 882).

**Paragraph 38:** In support of this claim, Harris cites three specific comments made by the prosecutor. On the basis set forth in Paragraph 35, and due to the lack of any contrary evidence, there was no deficient performance. Also, because each comment was reviewed on direct appeal, Harris cannot show prejudice. *See Harris*, 632 So. 2d at 533.

**Paragraph 39:** This claim fails to comply with Rule 32.6(b). Additionally, Harris failed to meet her burden of proof. Alternatively, insofar as the claim relates to a failure to "prepare" Harris, it is denied. Harris did not testify at the hearing and, therefore, has presented no evidence to demonstrate that her testimony would have differed had she been "adequately prepared." The claim is additionally – and alternatively – denied on the merits, insofar as it relates to the character witnesses. Trial counsel called a number of character witnesses during the guilt phase. Harris condemns trial counsel for not asking "questions that would have elicited exculpatory information," but presented no evidence in support of the allegation. Although one witness, who testified at trial, also testified at the hearing, nothing in her testimony was "exculpatory." (EH. 226-230)

**Paragraphs 40-42:** These claims are denied for the reasons set forth *supra* in section C.1.

**Paragraph 43:** This claim is denied based on Harris's failure to meet her burden of proof as required by Rule 32.3 and the reasons set forth *supra* in paragraph 17(ii) of this order.

18

**Paragraph 44:** Harris contends that "trial counsel failed to argue effectively that there was insufficient evidence . . . given the fact that the $100 check from Mr. McCarter to Mrs. Harris was evidence of repayment of a loan." Harris, however, offers nothing regarding what would have constituted an "effective" argument. The claim fails to comply with Rule 32.6(b). Moreover, both Argo and Bowen argued that the check proved Harris's innocence during closing argument. (R. 886, 885)

**Paragraphs 45, 46:** The claims set forth in paragraphs 45 and 46 of the amended petition allege that counsel were ineffective for "fail[ing] to argue that the prosecutor did not prove" Harris's knowledge of the various benefits she stood to receive upon the victim's death. This claim is completely without merit. Trial counsel made such an argument on several occasions. (R. 546, 552-55, 580, 882)

**Paragraph 47:** Harris failed to meet her burden of proof regarding this claim. Moreover, she cannot demonstrate prejudice. *Harris*, 632 So. 2d at 515 (finding "trial court's charge concerning jury unanimity . . . proper").

**Paragraph 48:** Harris presented no evidence in support of this claim. Moreover, as Harris pointed out in her brief to the Court of Criminal Appeals, "[d]efense counsel made this point about knowledge again and again to the court and objected to this entire category of evidence introduced by the state. (R. 551, 555, 580) The objections were continually overruled." (Harris' brief at p. 108, n. 63) Finally, Harris cannot demonstrate prejudice. *Harris*, 632 So. 2d at 537 (rejecting claim that "the trial court failed to instruct the jury that the State was required to prove that [Harris] knew about her husband's insurance and retirement benfits").

19

**Paragraph 49:** Harris failed to present any evidence in support of this claim. The record reflects that trial counsel did object to the instruction at issue. Harris has failed to show deficient performance. Moreover, because the instruction was not improper, no prejudice can be shown. *See Harris*, 632 So. 2d at 537 (rejecting claim that "the trial court did not adequately instruct the jury on the lesser-included offense of murder").

**Paragraph 50:** Harris has failed to present any evidence establishing deficient performance. Additionally, she failed to demonstrate prejudice. "[A]lthough [Harris] argues that the trial court's instruction on corroboration of accomplice testimony was insufficient, a review of the charge establishes that [Harris]'s claim is without merit." *Harris*, 632 So. 2d at 538.

**Paragraph 51:** Harris failed to present any evidence in support of this claim and the complaint regarding the instruction in question was raised on direct appeal. (Harris's direct appeal brief at p. 117) The Court of Criminal Appeals referenced the claim as follows: "The other claimed errors by [Harris] in the trial court's oral charge to the jury are either legally incorrect or do not constitute plain error." *Harris*, 632 So. 2d at 538 (footnotes omitted). This claim is denied.

### 3. Penalty Phase Claims

Regarding their preparation for the penalty phase, both Argo and Bowen testified that they had a good understanding of the purpose of the penalty phase. (D. 32, EH. 146) They were familiar with the statutory mitigation and knew they were not limited to those factors. (D. 33, 146) Neither attorney had, however, a clear recollection of what was done in order to investigate for a possible penalty phase. (EH. 87, D. 36) The Court will not consider trial counsel's inability to recall in favor of a finding of ineffective

20

assistance. Where the record is unclear, the Court will assume that counsel acted in a manner consistent with the counsel required by the Sixth Amendment.

The record does demonstrate that Argo met with several members of Harris's family before the trial. (EH. 92-92) Although the group meeting stuck out in his mind, his "recollection was that there was meetings with different members." (EH. 94) Argo additionally recalled talking to Harris's employers and members of her church, including Dale Huff, the minister of First Baptist Church. (EH. 87, 132-33) Bowen stated that he recalled asking Harris about her background specifically for the purpose of investigating possible mitigating evidence. (D. 36) Adrienne Ivey, one of Harris's witnesses at the Rule 32 hearing, testified that she was contacted before the trial. (EH. 178) Counsel did not call Ms. Ivey to testify. Her testimony demonstrates, however, that counsel did investigate and seek out possible mitigation witnesses.

The investigation into possible mitigating evidence is how counsel found some of the character witnesses who testified during the guilt phase. (D. 36) Trial counsel presented five witnesses at the guilt phase who could fairly be classified as "character witnesses." (R. 681-689) Both Bowen and Argo testified that the testimony of these witnesses was intended to be mitigation as well as straight character evidence. (EH. 122, D. 35-36)

Trial counsel discussed whether to recall the character witnesses during the penalty phase (EH. 123) and made a strategic decision not to do so. (D. 42) "Which witnesses, if any, to call, and when to call them is the epitome of a strategic decision, and it is one that [courts] will seldom, if ever, second guess." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995). Moreover, when the jury returned its verdict, a number of

21

the jurors were very emotional and crying. (R. 1044) Taking advantage of that atmosphere and moving to obtain a sentencing recommendation as soon as possible likely benefited Harris. Counsel's decision "was successful; the jury recommended, by a vote of 7-5, that [Harris] be sentenced to life imprisonment without parole." *Boyd v. State*, 746 So. 2d 364 (Ala. Crim. App. 1999).

Trial counsel made a strategic decision not to present a defense based upon evidence of abuse Harris had allegedly suffered at the hands of the victim. Bowen stated that he did not really consider presenting such evidence at the penalty phase because Harris "was still maintaining, and even maybe to the trial judge, that she was not guilty." (D. 38) Counsel continued to attack the State's case against Harris throughout the penalty phase. (R. 994-1000) Counsel additionally attempted to assert the weaknesses in the State's case as a mitigating circumstance by submitting a proposed instruction to the Court. (Petitioner's exhibit 17) "[Harris's] lawyer's effectiveness at the sentencing stage is strongly evidenced by the jury's decision to recommend not death, but life without parole." *Tarver v. Hopper*, 169 F.3d 710, 714 (11th Cir. 1999). The strategy continued into the sentencing hearing before the trial court. Bowen testified that one of the "biggest things [he] wanted to do was to convince the presentence officer that [Harris] was a person of good moral character and get his testimony to that effect. That was a big, big thing, because we had a seven-five recommendation of life without . . . and . . . I thought . . . if I can get the presentence guy to come on in here and speak really high of her, I've got a good shot." (D. 34) Bowen obtained favorable testimony from Edward Fawbush, the parole officer who prepared Harris's presentence report and entered a recommendation of life without parole. (R. 1020-30) Counsel also filed a written

22

memorandum with the Court, setting forth why life without parole was the appropriate sentence. (SR. 17) In arguing to the trial judge regarding the proper sentence, counsel continued to stress any weaknesses in the State's case. Counsel's focus on "residual doubts" represented a trial strategy that has been deemed reasonable by federal courts interpreting the Sixth Amendment. *See Tarver*, 169 F.3d at 715. Harris has failed to meet her burden of proving that her counsel was "acting outside the wide range of reasonable assistance" and, therefore, has failed to show that trial counsel's performance at the penalty phase constituted deficient performance.

Alternatively, Harris has failed to demonstrate prejudice as required by *Strickland*. She has not shown a reasonable probability that, had the evidence she presented at the Rule 32 hearing been presented at trial, the outcome would have been different. Much of the testimony was either irrelevant, too remote to weigh heavily against the death penalty, or cumulative to the evidence presented at the trial, including Harris's testimony. Additionally, much of it was cumulative to the mitigation found by the trial court. "Had the testimony presented at the Rule 32 hearing . . . been presented at the sentencing hearing it is highly unlikely that the trial court would have been persuaded to sentence [Harris] differently." *Boyd v. State*, 746 So. 2d 364 (Ala. Crim. App. 1999).

The sentencing court's decision to override the jury's recommendation supports a finding of no prejudice. In determining the appropriate sentence, the trial court found that "[Harris'] attorneys did a thorough job of presenting non-statutory mitigating circumstance evidence, and this Court has considered all of it." *Harris*, 632 So. 2d at 542. Despite the finding of this mitigation, the sentencing court held that the one

23

aggravating circumstance *far outweighed* the mitigation and, on direct appeal, the Court of Criminal Appeals agreed with that finding. *Harris*, 632 So. 2d at 542-43.

Harris contends that the mental health testimony presented during these proceedings, establishes the existence of the following two statutory mitigating circumstances: (1) The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance; and (2) The defendant acted under extreme duress or under the substantial domination of another person. First, as was discussed extensively above in section C.1 of this order, counsel's failure to request funds for a mental health expert does not constitute deficient performance and, therefore, the failure to present the evidence in question does not amount to ineffective assistance of counsel. Second, also for reasons set forth in section C.1, the Court does not credit the testimony or diagnoses of Drs. Loring and Shaffer. Finally, even crediting the testimony, the Court would still find that Harris has failed to prove her claim. According to Harris and her experts, the disorders she allegedly suffers from had absolutely nothing to do with the commission of the crime. (EH. 294) In fact, they testified that the disorder would have prevented her from committing it. Based upon the testimony of Harris's own experts, her alleged mental disorders were not a factor in her committing the murder. The testimony would not have changed the outcome of the trial.

Judge Thomas heard the evidence presented at trial and, even though the jury recommended a sentence of life without parole, he determined that death was the appropriate sentence. The Court cannot find that there is a reasonable probability that the additional evidence presented in these proceedings would have altered that decision.

24

**Paragraphs 54-57:** To the extent that these paragraphs fault counsel for a failure to investigate and present evidence during the penalty phase before the jury, the claims are rejected for the reasons set forth immediately above in section C.3 of the order. To any extent this portion of the petition contains claims regarding testimony or evidence addressed elsewhere, any relevant portions of the order are incorporated by reference.

**Paragraph 58:** This claim fails to comply with Rule 32.6(b) and is denied. There are other claims in the petition, however, that fall under the very general contentions set forth. To the extent that other portions of this order are applicable to the claim above, they are incorporated by reference.

**Paragraphs 59-63:** Harris has failed to meet her burden of proof. She has not shown that there is a reasonable probability that, if trial counsel had objected to the allegedly improper comments, the result of the trial would have been different.

**Paragraph 64:** This claim is simply inaccurate. Trial counsel repeatedly argued that the mitigation outweighed the sole aggravating circumstance.

**Paragraphs 65-67:** These claims are denied based upon the reasoning set forth in section C.3, *supra*. Additionally, within the claims, Harris refers to evidence and various actions of counsel that are addressed elsewhere in this order. Any relevant portions of this order are incorporated by reference. "Section 13A-5-47, *Ala. Code* 1975, does not provide for the presentation of additional evidence at sentencing by the trial court. Therefore, trial counsel did not err in failing to do so." *Boyd v. State,* 746 So. 2d 364.

**Paragraphs 68-69:** Harris failed to present any evidence in support of the claim. Second, a presentence report is entirely hearsay but admissible under § 13A-5-47, *Ala. Code* 1975. The portion of the claim asserting that counsel performed an inadequate

25

cross-examination is equally without merit. The author of the report was called by defense counsel and there was, therefore, no cross-examination. (R. 1017) Moreover, counsel succeeded in obtaining some highly favorable testimony from the witness.

**Paragraphs 70-74:** These claims are all denied based upon Harris's failure to meet her burden of proof. She has not shown that there is a reasonable probability that, if trial counsel had made the objections in question, the result of the trial would have been different. Additionally, an attorney is not required to assert objections that have no merit.

### 4. Claims Regarding Appellate Counsel

This claim is set forth in paragraphs 75-80 of the Amended Petition. None of the substantive claims rise to a level required for a finding of prejudice. Because this Court finds that Harris has failed to prove deficient performance, however, there is no need to evaluate each specific claim for a finding of prejudice. Harris has presented no evidence in support of this claim and, therefore, failed to meet her burden of proof. Ruth E. Friedman and Bryan A. Stevenson represented Harris on appeal. Many people would consider Stevenson and Friedman to be experts in the realm of capital litigation. They represented Harris in the Court of Criminal Appeals, the Alabama Supreme Court, and were even successful in obtaining certiorari review in the United States Supreme Court.

Friedman and Stevenson filed briefs in the State courts, asserting more than twenty issues at each level. The quality of the issues raised may be best demonstrated by the fact that the majority of the claims in Harris's amended petition are direct appeal claims simply re-couched in terms of ineffective assistance of counsel. The representation Harris received on appeal was "not outside the wide range of reasonable

26

professional assistance." Because Harris has failed to prove deficient performance on the part of appellate counsel, the specific claims set forth in paragraphs 76-79 are denied.

## CONCLUSION

Harris's conviction and sentence are the result of a fair trial wherein she received all constitutional privileges to which she was entitled, including effective representation of counsel. It is therefore, ORDERED, ADJUDGED, AND DECREED that Harris's First Amended Rule 32 petition is due to be and is hereby denied.

DONE and ORDERED this the _16_ day of _April_, 2002.

_William A. Shashy_
William A. Shashy
Circuit Judge

Stuart W. Gold
CRAVATH, SWAINE & MOORE
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019

William R. Blanchard, Esq.
BLANCHARD & CALLOWAY, P.C.
505 South Perry Street
Montgomery, AL 36104

Michael B. Billingsley
Office of the Attorney General
Alabama State House
11 South Union Street
Montgomery, AL 36130
(334) 242-7408

27

# EXHIBIT   B

Westlaw.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
(Cite as: --- So.2d ----)

▶

Harris    v.    StateAla.Crim.App.,2004.Only    the
Westlaw citation is currently available.
Court of Criminal Appeals of Alabama.
Louise HARRIS
v.
STATE.
**CR-01-1748.**

Oct. 29, 2004.
Opinion Overruling Rehearing May 27, 2005.
Certiorari Denied (as to State)Oct. 21,
2005Alabama Supreme Court 1041437.

**Background:** After defendant's capital murder
conviction was affirmed by the United States
Supreme Court, 513 U.S. 504, 115 S.Ct. 1031, 130
L.Ed.2d    1004,    defendant    petitioned    for
postconviction relief. The Montgomery Circuit
Court, No. CC-88-1237.60,William A. Shashy, J.,
denied petition. Defendant appealed.

**Holdings:** The Court of Criminal Appeals held that:

(1)*Batson* challenge was procedurally barred from
postconviction review;

(2) ineffective assistance claim based on lack of
continuity of counsel was procedurally barred;

(3) defendant failed to state a claim that counsel
was ineffective during guilt phase of trial;

(4) prosecutor's comments during closing regarding
witness testimony were proper inferences from the
evidence;

(5) defense counsel was not ineffective by failing to
make objections during closing;

(6) trial court correctly instructed jury regarding
convictions based on accomplice testimony; and

(7) defense counsel was ineffective by failing to
investigate defendant's past for mitigation evidence
for penalty phase.

Affirmed in part, reversed in part, and remanded;
applications for rehearing overruled.

Cobb, J., concurred in part and dissented in part in
an opinion joined by Shaw, J.

Wise, J., concurred in part and dissented in part in
an opinion, and adhered to original concurrence in
part and dissent in part on overruling of rehearing.

Baschab, J., concurred in the result in an opinion.

Certiorari granted in part and quashed in part, Ala.,
--- So.2d ----.

**[1] Criminal Law 110 ⬚1427**

110 Criminal Law
    110XXX Post-Conviction Relief
        110XXX(A) In General
            110k1427 k. Matters Which Either Were
or Could Have Been Adjudicated Previously, in
General. Most Cited Cases
Claims presented in a petition for postconviction
relief but not pursued on appeal are deemed to be
abandoned. (Per curiam opinion of one Judge with
three Judges concurring in part and one in the
result).

**[2] Criminal Law 110 ⬚1028**

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

110 Criminal Law
   110XXIV Review
     110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
       110XXIV(E)1 In General
         110k1028 k. Presentation of Questions in General. Most Cited Cases
New claims presented for the first time on appeal are not properly before the appellate court. (Per curiam opinion of one Judge with three Judges concurring in part and one in the result).

**[3] Criminal Law 110 ⟊1130(5)**

110 Criminal Law
   110XXIV Review
     110XXIV(I) Briefs
       110k1130 In General
         110k1130(5) k. Points and Authorities. Most Cited Cases
Claims listed in an appellate brief that do not include supporting argument, as required by appellate rules, are not properly before the Court of Criminal Appeals. (Per curiam opinion of one Judge with three Judges concurring in part and one in the result). Rules App.Proc., Rule 28(a)(10).

**[4] Criminal Law 110 ⟊1139**

110 Criminal Law
   110XXIV Review
     110XXIV(L) Scope of Review in General
       110k1139 k. Additional Proofs and Trial De Novo. Most Cited Cases
When the facts are undisputed and an appellate court is presented with pure questions of law, that court's review in a postconviction relief proceeding is de novo. (Per curiam opinion of one Judge with three Judges concurring in part and one in the result). Rules Crim.Proc., Rule 32.1 et seq.

**[5] Criminal Law 110 ⟊1147**

110 Criminal Law
   110XXIV Review
     110XXIV(N) Discretion of Lower Court
       110k1147 k. In General. Most Cited Cases
When there are disputed facts in a postconviction proceeding resolved by the circuit court the

standard of review on appeal is whether the trial Judge abused his discretion when he denied the petition. (Per curiam opinion of one Judge with three Judges concurring in part and one in the result). Rules Crim.Proc., Rule 32.1 et seq.

**[6] Criminal Law 110 ⟊1134(6)**

110 Criminal Law
   110XXIV Review
     110XXIV(L) Scope of Review in General
       110k1134 Scope and Extent in General
         110k1134(6) k. Theory and Grounds of Decision in Lower Court. Most Cited Cases
In postconviction proceedings if the circuit court is correct for any reason, even though it may not be the stated reason, the Court of Criminal Appeals will not reverse a denial of the petition. (Per curiam opinion of one Judge with three Judges concurring in part and one in the result).

**[7] Criminal Law 110 ⟊1439**

110 Criminal Law
   110XXX Post-Conviction Relief
     110XXX(A) In General
       110k1435 Consideration Despite Waiver or Other Bar
         110k1439 k. Cause. Most Cited Cases
Defendant was not entitled to retroactive postconviction review of her *Batson* challenge based on an Alabama Supreme Court decision released after affirmance of defendant's convictions; the Supreme Court decision did not constitute a new principle of constitutional law or a new rule of constitutional criminal procedure, but rather merely clarified issues relating to a *Batson* challenge, and, thus, defendant's *Batson* claim, which was raised and addressed on appeal, was procedurally barred from postconviction review. (Per curiam opinion of one Judge with three Judges concurring in part and one in the result). Rules Crim.Proc., Rule 32.2(a)(2, 4).

**[8] Jury 230 ⟊33(5.15)**

230 Jury
   230II Right to Trial by Jury
     230k30 Denial or Infringement of Right

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

230k33 Constitution and Selection of Jury
230k33(5) Challenges and Objections
230k33(5.15)    k.    Peremptory
Challenges. Most Cited Cases
A prima facie case of racial discrimination must
actually be established for purposes of a *Batson*
challenge, which challenges a prosecutor's use of
peremptory challenges to eliminate potential jurors
based on race, before the trial court can use
statistics to negate the challenge. (Per curiam
opinion of one Judge with three Judges concurring
in part and one in the result).

**[9] Jury 230 ☜33(5.15)**

230 Jury
230II Right to Trial by Jury
230k30 Denial or Infringement of Right
230k33 Constitution and Selection of Jury
230k33(5) Challenges and Objections
230k33(5.15)    k.    Peremptory
Challenges. Most Cited Cases
A defendant making a *Batson* challenge bears the
burden of proving a prima facie case of purposeful
or intentional discrimination and, in the absence of
such proof, the prosecution is not required to state
its reasons for its peremptory challenges. (Per
curiam opinion of one Judge with three Judges
concurring in part and one in the result).

**[10] Jury 230 ☜33(5.15)**

230 Jury
230II Right to Trial by Jury
230k30 Denial or Infringement of Right
230k33 Constitution and Selection of Jury
230k33(5) Challenges and Objections
230k33(5.15)    k.    Peremptory
Challenges. Most Cited Cases
It is important that the defendant come forward with
facts, not just numbers alone, when asking the trial
court to find a prima facie case of racial
discrimination in the use of peremptory challenges
under *Batson*. (Per curiam opinion of one Judge
with three Judges concurring in part and one in the
result).

**[11] Criminal Law 110 ☜1158(3)**

110 Criminal Law
110XXIV Review
110XXIV(O) Questions of Fact and Findings
110k1158 In General
110k1158(3) k. Relating to Jury. Most
Cited Cases
A trial court's ruling on a *Batson* objection is
entitled to great deference, and the Court of
Criminal Appeals will not reverse the trial court's
*Batson* ruling unless it is clearly erroneous. (Per
curiam opinion of one Judge with three Judges
concurring in part and one in the result).

**[12] Jury 230 ☜33(5.15)**

230 Jury
230II Right to Trial by Jury
230k30 Denial or Infringement of Right
230k33 Constitution and Selection of Jury
230k33(5) Challenges and Objections
230k33(5.15)    k.    Peremptory
Challenges. Most Cited Cases
Defendant failed to make a prima facie showing of
racial discrimination on the part of prosecutor in
exercising peremptory challenges as required to
support a *Batson* challenge, where defendant
offered only numbers and no facts to support her
claims. (Per curiam opinion of one Judge with three
Judges concurring in part and one in the result).

**[13] Criminal Law 110 ☜1429(1)**

110 Criminal Law
110XXX Post-Conviction Relief
110XXX(A) In General
110k1428 Presentation of Issue in Prior
Proceedings
110k1429 In General
110k1429(1) k. In General. Most
Cited Cases
Defendant's claim of ineffective counsel based on
an alleged lack of continuity of counsel was
procedurally barred in postconviction relief
petition, where claim could have been raised at trial,
but was not. (Per curiam opinion of one Judge with
three Judges concurring in part and one in the
result). U.S.C.A. Const.Amend. 6; Rules
Crim.Proc., Rule 32.2(a)(3).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----                                                          Page 4

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

**[14] Criminal Law 110 ☜641.13(2.1)**

110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in
General
         110k641 Counsel for Accused
            110k641.13        Adequacy        of
Representation
               110k641.13(2) Particular Cases and
Problems
                  110k641.13(2.1) k. In General.
Most Cited Cases
Trial counsel is not ineffective for having an
objection overruled or a motion denied. (Per curiam
opinion of one Judge with three Judges concurring
in part and one in the result). U.S.C.A.
Const.Amend. 6.

**[15] Criminal Law 110 ☜641.13(2.1)**

110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in
General
         110k641 Counsel for Accused
            110k641.13        Adequacy        of
Representation
               110k641.13(2) Particular Cases and
Problems
                  110k641.13(2.1) k. In General.
Most Cited Cases
Defense counsel was not ineffective for failing to
vigorously pursue a motion to change venue based
on pretrial publicity, where there was no evidence
that any juror had been prejudiced against
defendant due to the publicity and defense counsel's
decision was a strategic one. (Per curiam opinion of
one Judge with three Judges concurring in part and
one in the result). U.S.C.A. Const.Amend. 6.

**[16] Criminal Law 110 ☜641.13(2.1)**

110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in
General
         110k641 Counsel for Accused
            110k641.13        Adequacy        of

Representation
               110k641.13(2) Particular Cases and
Problems
                  110k641.13(2.1) k. In General.
Most Cited Cases
Defendant failed to state a claim for ineffective
assistance of counsel based on counsel's alleged
failure to question prospective jurors regarding their
views of adultery, where defendant failed to present
any evidence in support of the claim and the record
indicated that counsel submitted written proposed
voir dire questions to the trial court regarding
defendant's adulterous relationship. (Per curiam
opinion of one Judge with three Judges concurring
in part and one in the result). U.S.C.A.
Const.Amend. 6; Rules Crim.Proc., Rules 32.3,
32.6(b).

**[17] Criminal Law 110 ☜641.13(2.1)**

110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in
General
         110k641 Counsel for Accused
            110k641.13        Adequacy        of
Representation
               110k641.13(2) Particular Cases and
Problems
                  110k641.13(2.1) k. In General.
Most Cited Cases
Trial counsel cannot be held to be ineffective for
failing to forecast changes in the law. (Per curiam
opinion of one Judge with three Judges concurring
in part and one in the result). U.S.C.A.
Const.Amend. 6.

**[18] Criminal Law 110 ☜641.13(2.1)**

110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in
General
         110k641 Counsel for Accused
            110k641.13        Adequacy        of
Representation
               110k641.13(2) Particular Cases and
Problems
                  110k641.13(2.1) k. In General.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----                                                                    Page 5

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

Most Cited Cases
Defense counsel was not ineffective in failing to support *Batson* challenge with a Supreme Court case that was decided after defendant's trial and appeal. (Per curiam opinion of one Judge with three Judges concurring in part and one in the result). U.S.C.A. Const.Amend. 6.

**[19] Criminal Law 110 ☞641.13(6)**

110 Criminal Law
    110XX Trial
        110XX(B) Course and Conduct of Trial in General
            110k641 Counsel for Accused
                110k641.13 Adequacy of Representation
                    110k641.13(2) Particular Cases and Problems
                        110k641.13(6) k. Evidence; Procurement, Presentation and Objections. Most Cited Cases
Defendant failed to present evidence demonstrating prejudice based on counsel's alleged deficient performance in developing an adequate defense strategy, and, thus, defendant failed to establish a claim for ineffective assistance of counsel, where witnesses that defendant claimed were not adequately cross-examined did not testify at defendant's postconviction relief hearing. (Per curiam opinion of one Judge with three Judges concurring in part and one in the result). U.S.C.A. Const.Amend. 6.

**[20] Criminal Law 110 ☞641.13(2.1)**

110 Criminal Law
    110XX Trial
        110XX(B) Course and Conduct of Trial in General
            110k641 Counsel for Accused
                110k641.13 Adequacy of Representation
                    110k641.13(2) Particular Cases and Problems
                        110k641.13(2.1) k. In General. Most Cited Cases
Defendant failed to present evidence of her defense counsel's alleged ineffective performance regarding

the deputies that were present in the courtroom during defendant's murder trial, in which the victim was a deputy, where counsel objected to the presence of the deputies, but that objection was overruled. (Per curiam opinion of one Judge with three Judges concurring in part and one in the result). U.S.C.A. Const.Amend. 6; Rules Crim.Proc., Rules 32.3, 32.6(b).

**[21] Criminal Law 110 ☞641.13(2.1)**

110 Criminal Law
    110XX Trial
        110XX(B) Course and Conduct of Trial in General
            110k641 Counsel for Accused
                110k641.13 Adequacy of Representation
                    110k641.13(2) Particular Cases and Problems
                        110k641.13(2.1) k. In General. Most Cited Cases
Defendant failed to state a claim for ineffective assistance of counsel based on alleged defective performance in failing to adequately object to the presence of the victim's family in the courtroom and in allowing State to emphasize that victim was a law enforcement officer, where defendant failed to present any evidence to support her claim and the substantive underlying issue was rejected on direct appeal. (Per curiam opinion of one Judge with three Judges concurring in part and one in the result). U.S.C.A. Const.Amend. 6; Rules Crim.Proc., Rules 32.3, 32.6(b).

**[22] Criminal Law 110 ☞641.13(6)**

110 Criminal Law
    110XX Trial
        110XX(B) Course and Conduct of Trial in General
            110k641 Counsel for Accused
                110k641.13 Adequacy of Representation
                    110k641.13(2) Particular Cases and Problems
                        110k641.13(6) k. Evidence; Procurement, Presentation and Objections. Most Cited Cases

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----                                                    Page 6

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

Defendant failed to state a claim for ineffective assistance of counsel based on alleged defective performance in failing to adequately object to testimony of victim's sister, where defendant failed to present any evidence to support her claim and the substantive issue underlying issue was rejected on direct appeal. (Per curiam opinion of one Judge with three Judges concurring in part and one in the result). U.S.C.A. Const.Amend. 6; Rules Crim.Proc., Rules 32.3, 32.6(b).

**[23] Criminal Law 110 ☞1042**

110 Criminal Law
    110XXIV Review
        110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
            110XXIV(E)1 In General
                110k1042 k. Sentence or Judgment. Most Cited Cases
Defendant waived on appeal her claim in postconviction relief petition that the prosecution was improperly allowed to present gruesome photographs, where defendant raised issue for the first time on appeal. (Per curiam opinion of one Judge with three Judges concurring in part and one in the result).

**[24] Criminal Law 110 ☞641.13(6)**

110 Criminal Law
    110XX Trial
        110XX(B) Course and Conduct of Trial in General
            110k641 Counsel for Accused
                110k641.13    Adequacy    of Representation
                    110k641.13(2) Particular Cases and Problems
                        110k641.13(6) k. Evidence; Procurement, Presentation and Objections. Most Cited Cases
Defendant failed to state a claim for ineffective assistance of counsel based on alleged defective performance in failing to object to pre-death photographs of the victim, where defendant failed to present any evidence suggesting error or prejudice in counsel's failure to object and the substantive underlying issue was rejected on direct appeal. (Per

curiam opinion of one Judge with three Judges concurring in part and one in the result). U.S.C.A. Const.Amend. 6; Rules Crim.Proc., Rules 32.3, 32.6(b).

**[25] Criminal Law 110 ☞641.13(2.1)**

110 Criminal Law
    110XX Trial
        110XX(B) Course and Conduct of Trial in General
            110k641 Counsel for Accused
                110k641.13    Adequacy    of Representation
                    110k641.13(2) Particular Cases and Problems
                        110k641.13(2.1) k. In General. Most Cited Cases
Defendant failed to state a claim for ineffective assistance of counsel based on alleged defective performance in failing to object to prosecutor's reference in question to "breaking God's law," where defendant failed to present any evidence suggesting error or prejudice in counsel's failure to object. (Per curiam opinion of one Judge with three Judges concurring in part and one in the result). U.S.C.A. Const.Amend. 6; Rules Crim.Proc., Rules 32.3, 32.6(b).

**[26] Criminal Law 110 ☞720(5)**

110 Criminal Law
    110XX Trial
        110XX(E) Arguments and Conduct of Counsel
            110k712 Statements as to Facts, Comments, and Arguments
                110k720 Comments on Evidence or Witnesses
                    110k720(5) k. Credibility and Character of Witnesses. Most Cited Cases
Prosecutor's comment that witness had nothing to gain from testifying was a proper inference from the evidence, and, thus, defendant's counsel was not ineffective in failing to object to prosecutor's comment, where witness was not suspected of being involved in murder, and there was no evidence of any bargains made in exchange for testimony. (Per curiam opinion of one Judge with one Judge

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

concurring in part and one in the result). U.S.C.A. Const.Amend. 6; Rules Crim.Proc., Rules 32.3, 32.6(b).

**[27] Criminal Law 110 ☞720(5)**

110 Criminal Law
   110XX Trial
      110XX(E) Arguments and Conduct of Counsel
         110k712 Statements as to Facts, Comments, and Arguments
           110k720 Comments on Evidence or Witnesses
             110k720(5) k. Credibility and Character of Witnesses. Most Cited Cases
Prosecutor's statement that witness did not change his testimony regarding his identification of defendant's voice was proper argument, and, thus, defendant's counsel was not ineffective in failing to object to prosecutor's comment, where witness's confusion regarding the identification stemmed from misunderstanding the prosecutor's question. (Per curiam opinion of one Judge with three Judges concurring in part and one in the result). U.S.C.A. Const.Amend. 6; Rules Crim.Proc., Rules 32.3, 32.6(b).

**[28] Criminal Law 110 ☞720(5)**

110 Criminal Law
   110XX Trial
      110XX(E) Arguments and Conduct of Counsel
         110k712 Statements as to Facts, Comments, and Arguments
           110k720 Comments on Evidence or Witnesses
             110k720(5) k. Credibility and Character of Witnesses. Most Cited Cases
Prosecutor's comment that witness, who was in the car with hired killers and who testified against defendant, had nothing to gain by testifying, even though witness had pending charges against him, was a proper inference from the evidence, and, thus, defense counsel was not deficient in failing to object to comment, where evidence showed that witness was not an accomplice to murder. (Per curiam opinion of one Judge with three Judges

concurring in part and one in the result). U.S.C.A. Const.Amend. 6; Rules Crim.Proc., Rules 32.3, 32.6(b).

**[29] Criminal Law 110 ☞720(5)**

110 Criminal Law
   110XX Trial
      110XX(E) Arguments and Conduct of Counsel
         110k712 Statements as to Facts, Comments, and Arguments
           110k720 Comments on Evidence or Witnesses
             110k720(5) k. Credibility and Character of Witnesses. Most Cited Cases
Prosecutor's comment that there was no evidence that witness had a criminal record was a proper inference from the evidence, and, thus, defense counsel was not deficient in failing to object to comment, where there was no evidence before the jury of any convictions. (Per curiam opinion of one Judge with one Judge concurring in part and one in the result). U.S.C.A. Const.Amend. 6; Rules Crim.Proc., Rules 32.3, 32.6(b).

**[30] Criminal Law 110 ☞720(9)**

110 Criminal Law
   110XX Trial
      110XX(E) Arguments and Conduct of Counsel
         110k712 Statements as to Facts, Comments, and Arguments
           110k720 Comments on Evidence or Witnesses
             110k720(7) Inferences from and Effect of Evidence in Particular Prosecutions
               110k720(9) k. Homicide. Most Cited Cases
Prosecutor's comment that alleged hired killer would have his day in court was not misleading, and, thus, defense counsel was not ineffective in failing to object to comment, even though there was an agreement between the killer and the State, where the agreement was that the State would not seek the death penalty in alleged killer's capital murder trial and did not involve the dropping of charges. (Per curiam opinion of one Judge with one

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

Judge concurring in part and one in the result). U.S.C.A. Const.Amend. 6; Rules Crim.Proc., Rules 32.3, 32.6(b).

**[31] Criminal Law 110 ⚖641.13(2.1)**

110 Criminal Law
   110XX Trial
     110XX(B) Course and Conduct of Trial in General
       110k641 Counsel for Accused
         110k641.13 Adequacy of Representation
           110k641.13(2) Particular Cases and Problems
            110k641.13(2.1) k. In General. Most Cited Cases
Trial counsel's failure to object to prosecutor's comments in closing argument that defendant had been drinking the night of victim's murder was a matter of sound legal strategy in light of the trial Judge's failure to sustain any objections made during closing arguments, and, thus, counsel was not deficient. (Per curiam opinion of one Judge with one Judge concurring in part and one in the result). U.S.C.A. Const.Amend. 6; Rules Crim.Proc., Rules 32.3, 32.6(b).

**[32] Criminal Law 110 ⚖641.13(2.1)**

110 Criminal Law
   110XX Trial
     110XX(B) Course and Conduct of Trial in General
       110k641 Counsel for Accused
         110k641.13 Adequacy of Representation
           110k641.13(2) Particular Cases and Problems
            110k641.13(2.1) k. In General. Most Cited Cases
Trial counsel's failure to object to prosecutor's comments in closing argument that defendant wanted to kill victim because he was getting a car loan was a matter of sound legal strategy in light of the trial Judge's failure to sustain any objections made during closing arguments, and, thus, counsel was not deficient. (Per curiam opinion of one Judge with one Judge concurring in part and one in the

result). U.S.C.A. Const.Amend. 6; Rules Crim.Proc., Rules 32.3, 32.6(b).

**[33] Criminal Law 110 ⚖641.13(2.1)**

110 Criminal Law
   110XX Trial
     110XX(B) Course and Conduct of Trial in General
       110k641 Counsel for Accused
         110k641.13 Adequacy of Representation
           110k641.13(2) Particular Cases and Problems
            110k641.13(2.1) k. In General. Most Cited Cases
Trial counsel's failure to object to prosecutor's comments in closing argument that defendant had moved out of her in-laws house to carry on an affair with alleged hired killer was a matter of sound legal strategy in light of the trial Judge's failure to sustain any objections made during closing arguments, and, thus, counsel was not deficient. (Per curiam opinion of one Judge with one Judge concurring in part and one in the result). U.S.C.A. Const.Amend. 6; Rules Crim.Proc., Rules 32.3, 32.6(b).

**[34] Criminal Law 110 ⚖641.13(2.1)**

110 Criminal Law
   110XX Trial
     110XX(B) Course and Conduct of Trial in General
       110k641 Counsel for Accused
         110k641.13 Adequacy of Representation
           110k641.13(2) Particular Cases and Problems
            110k641.13(2.1) k. In General. Most Cited Cases
Trial counsel's failure to object to prosecutor's comments in closing argument that inferred that co-defendants, who exercised their Fifth Amendment rights, would have implicated defendant in murder based on testimony from other co-defendant, who did not exercise such rights, was a matter of sound legal strategy in light of the trial Judge's failure to sustain any objections made during closing arguments, and, thus, counsel was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----                                                                    Page 9

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

not deficient. (Per curiam opinion of one Judge with one Judge concurring in part and one in the result). U.S.C.A. Const.Amend. 6; Rules Crim.Proc., Rules 32.3, 32.6(b).

**[35] Criminal Law 110 &#8734;641.13(6)**

110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in General
         110k641 Counsel for Accused
            110k641.13 Adequacy of Representation
               110k641.13(2) Particular Cases and Problems
                  110k641.13(6) k. Evidence; Procurement, Presentation and Objections. Most Cited Cases
Trial counsel made effective use during closing argument of evidence concerning check that alleged hired killer gave to defendant, and, thus, counsel's performance was not deficient. (Per curiam opinion of one Judge with three Judges concurring in part and one in the result). U.S.C.A. Const.Amend. 6; Rules Crim.Proc., Rules 32.3, 32.6(b).

**[36] Criminal Law 110 &#8734;780(3)**

110 Criminal Law
   110XX Trial
      110XX(G) Instructions: Necessity, Requisites, and Sufficiency
         110k780 Testimony of Accomplices and Codefendants
            110k780(3) k. Sufficiency in General. Most Cited Cases
The trial court correctly instructed jury that a conviction for a felony offense could not be based on the testimony of an accomplice unless the testimony was corroborated by other evidence, and, thus, trial counsel was not deficient in failing to make an objection given that there was nothing to object to. (Per curiam opinion of one Judge with one Judge concurring in part and one in the result). U.S.C.A. Const.Amend. 6; Code 1975, § 12-21-222 ; Rules Crim.Proc., Rules 32.3, 32.6(b).

**[37] Criminal Law 110 &#8734;1173.2(6)**

110 Criminal Law
   110XXIV Review
      110XXIV(Q) Harmless and Reversible Error
         110k1173 Failure or Refusal to Give Instructions
            110k1173.2 Instructions on Particular Points
               110k1173.2(6) k. Testimony of Accomplices and Codefendants. Most Cited Cases
Any error in failing to instruct the jury on the need for corroborative evidence in basing a conviction on the testimony of an accomplice is harmless when the testimony of the accomplice has been corroborated. (Per curiam opinion of one Judge with one Judge concurring in part and one in the result). Code 1975, § 12-21-222.

**[38] Criminal Law 110 &#8734;1042**

110 Criminal Law
   110XXIV Review
      110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
         110XXIV(E)1 In General
            110k1042 k. Sentence or Judgment. Most Cited Cases
Defendant waived on appeal her argument that defense counsel's aggregate errors required that she be given a new trial, where failed to raise the issue in the trial court on her postconviction relief petition. (Per curiam opinion of one Judge with three Judges concurring in part and one in the result).

**[39] Criminal Law 110 &#8734;641.13(1)**

110 Criminal Law
   110XX Trial
      110XX(B) Course and Conduct of Trial in General
         110k641 Counsel for Accused
            110k641.13 Adequacy of Representation
               110k641.13(1) k. In General. Most Cited Cases
In order to obtain a reversal of a death sentence on the ground of ineffective assistance of counsel, an appellant must show both: (1) that the identified acts or omissions of counsel were deficient, or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----                                                    Page 10

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

outside the wide range of professionally competent assistance, and (2) that the deficient performance prejudiced the defense such that, without the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different. (Per curiam opinion of one Judge with two Judges concurring in part and one in the result). U.S.C.A. Const.Amend. 6.

**[40] Sentencing and Punishment 350H ☞1702**

350H Sentencing and Punishment
   350HVIII The Death Penalty
     350HVIII(E) Factors Related to Offender
      350Hk1702 k. Offender's Character in General. Most Cited Cases
Evidence about the defendant's background and character is relevant as a mitigating factor during the penalty phase of a capital murder trial because of the belief that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse. (Per curiam opinion of one Judge with two Judges concurring in part and one in the result).

**[41] Criminal Law 110 ☞641.13(1)**

110 Criminal Law
   110XX Trial
     110XX(B) Course and Conduct of Trial in General
      110k641 Counsel for Accused
        110k641.13 Adequacy of Representation
          110k641.13(1) k. In General. Most Cited Cases
Strategic legal choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable on grounds of ineffective assistance of counsel, and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. (Per curiam opinion of one Judge with two Judges concurring in part and one in the result). U.S.C.A. Const.Amend. 6.

**[42] Criminal Law 110 ☞641.13(7)**

110 Criminal Law
   110XX Trial
     110XX(B) Course and Conduct of Trial in General
      110k641 Counsel for Accused
        110k641.13 Adequacy of Representation
          110k641.13(2) Particular Cases and Problems
            110k641.13(7) k. Post-Trial Procedure and Review. Most Cited Cases
In any ineffectiveness of counsel case, a particular decision not to investigate the defendant's life and background for purposes of mitigation must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. (Per curiam opinion of one Judge with two Judges concurring in part and one in the result). U.S.C.A. Const.Amend. 6.

**[43] Criminal Law 110 ☞641.13(7)**

110 Criminal Law
   110XX Trial
     110XX(B) Course and Conduct of Trial in General
      110k641 Counsel for Accused
        110k641.13 Adequacy of Representation
          110k641.13(2) Particular Cases and Problems
             110k641.13(7) k. Post-Trial Procedure and Review. Most Cited Cases
An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence. (Per curiam opinion of one Judge with two Judges concurring in part and one in the result). U.S.C.A. Const.Amend. 6.

**[44] Criminal Law 110 ☞641.13(7)**

110 Criminal Law
   110XX Trial
     110XX(B) Course and Conduct of Trial in General
      110k641 Counsel for Accused
        110k641.13 Adequacy of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

Representation
           110k641.13(2) Particular Cases and Problems
           110k641.13(7) k. Post-Trial Procedure and Review. Most Cited Cases
Defense counsel's decision to not investigate defendant's past for evidence of mitigation for use during penalty phase of capital murder trial, but instead to rely on residual doubt as to guilt and character evidence presented during trial, amounted to deficient performance, even though the jury recommended life in prison, where trial court overrode the jury's recommendation and the evidence indicated that defendant had an extremely troubled past, potentially suffered from battered woman syndrome and post-traumatic stress disorder, and had an IQ that was in the borderline range between normal and retarded. (Per curiam opinion of one Judge with two Judges concurring in part and one in the result). U.S.C.A. Const.Amend. 6

**[45] Sentencing and Punishment 350H ⟶1685**

350H Sentencing and Punishment
    350HVIII The Death Penalty
      350HVIII(D) Factors Related to Offense
        350Hk1685 k. Claim of Innocence or Residual Doubt as to Guilt. Most Cited Cases
Residual doubt about guilt is not a mitigating circumstance for purposes of the penalty phase in a capital murder trial. (Per curiam opinion of one Judge with two Judges concurring in part and one in the result).

**[46] Criminal Law 110 ⟶641.13(7)**

110 Criminal Law
    110XX Trial
      110XX(B) Course and Conduct of Trial in General
        110k641 Counsel for Accused
          110k641.13 Adequacy of Representation
           110k641.13(2) Particular Cases and Problems
           110k641.13(7) k. Post-Trial Procedure and Review. Most Cited Cases
In a challenge to the imposition of a death sentence,

the prejudice prong of the *Strickland* inquiry into ineffective assistance of counsel focuses on whether the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. (Per curiam opinion of one Judge with two Judges concurring in part and one in the result). U.S.C.A. Const.Amend. 6
.

**[47] Criminal Law 110 ⟶641.13(7)**

110 Criminal Law
    110XX Trial
      110XX(B) Course and Conduct of Trial in General
        110k641 Counsel for Accused
          110k641.13 Adequacy of Representation
           110k641.13(2) Particular Cases and Problems
           110k641.13(7) k. Post-Trial Procedure and Review. Most Cited Cases
Defendant was prejudiced by defense counsel's deficient performance in failing to investigate her past and present mitigation evidence during the penalty phase of capital murder trial, and, thus, counsel was ineffective; the only aggravating factor was that the murder was committed for pecuniary gain and the only statutory mitigating factor presented was defendant's lack of a criminal record, but had the jury heard testimony regarding defendant's physical abuse, low IQ, and troubled past they might have found that the offense was committed while the defendant was under the influence of extreme emotional disturbance, and that she acted under extreme duress, which findings might have tipped the balance of aggravating circumstance and mitigating circumstances further in favor of life in prison and prevented the trial Judge from overriding the jury's recommendation of life imprisonment. (Per curiam opinion of one Judge with two Judges concurring in part and one in the result). U.S.C.A. Const.Amend. 6; Code 1975, § § 13A-5-49(6), 13A-5-51(1, 2, 5).

**[48] Criminal Law 110 ⟶1042**

110 Criminal Law
    110XXIV Review

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----                                                                    Page 12

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
    110XXIV(E)1 In General
        110k1042 k. Sentence or Judgment. Most Cited Cases
Defendant waived on appeal her argument that circuit court abused its discretion in refusing to consider the testimony of criminal defense attorney in postconviction relief hearing, where defendant failed to raise issue in the trial court by way of a post-trial motion. (Per curiam opinion of one Judge with three Judges concurring in part and one in the result). Rules Crim.Proc., Rule 32.1 et seq.

**[49] Criminal Law 110 ☞641.13(1)**

110 Criminal Law
    110XX Trial
      110XX(B) Course and Conduct of Trial in General
        110k641 Counsel for Accused
          110k641.13 Adequacy of Representation
            110k641.13(1) k. In General. Most Cited Cases
Even if counsel committed what appears in retrospect to have been a tactical error, that does not automatically mean that petitioner did not receive an adequate defense in the context of the constitutional right to counsel; an accused is not entitled to error-free counsel. (Per curiam opinion of one Judge with three Judges concurring in part and one in the result). U.S.C.A. Const.Amend. 6.

**[50] Criminal Law 110 ☞1042**

110 Criminal Law
    110XXIV Review
      110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
        110XXIV(E)1 In General
          110k1042 k. Sentence or Judgment. Most Cited Cases
Defendant waived on appeal her argument that circuit court abused its discretion by refusing to consider evidence in her motion to supplement the record in connection with postconviction petition, where she did not raise the issue in the circuit court.

**[51] Criminal Law 110 ☞1429(2)**

110 Criminal Law
    110XXX Post-Conviction Relief
      110XXX(A) In General
        110k1428 Presentation of Issue in Prior Proceedings
          110k1429 In General
            110k1429(2) k. Post-Conviction Proceeding Not a Substitute for Appeal. Most Cited Cases
Defendant's postconviction claim that the trial court erred in improperly correcting its sentencing order was procedurally barred, where the claim was raised at trial and could have been raised on appeal, but was not. Rules Crim.Proc., Rule 32.2(a)(2, 3).

**[52] Criminal Law 110 ☞1177**

110 Criminal Law
    110XXIV Review
      110XXIV(Q) Harmless and Reversible Error
        110k1177 k. Sentence and Judgment and Proceedings After Judgment. Most Cited Cases
Any error in holding of Court of Criminal Appeals, on capital murder defendant's initial appeal, that defendant had waived appellate review of her claim of error with respect to circuit court's refusal to consider testimony of expert witness, by failing to raise such claim before circuit court after that court's ruling, was harmless, where Court of Criminal Appeals also found that testimony of expert was insufficient to support finding of ineffective assistance of counsel. U.S.C.A. Const.Amend. 6.

**[53] Criminal Law 110 ☞1177**

110 Criminal Law
    110XXIV Review
      110XXIV(Q) Harmless and Reversible Error
        110k1177 k. Sentence and Judgment and Proceedings After Judgment. Most Cited Cases
Any error in holding of Court of Criminal Appeals, on capital murder defendant's initial appeal, that defendant had waived appellate review of her claim of error with respect to circuit court's refusal to consider documents proffered in defendant's motion to supplement record, by failing to raise such claim

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----                                                                    Page 13

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

before circuit court after that court's ruling, was harmless, where content of documents at issue was before circuit court by reason of incorporation thereof in post-hearing submissions.

**[54] Criminal Law 110 ☞1134(3)**

110 Criminal Law
   110XXIV Review
      110XXIV(L) Scope of Review in General
         110k1134 Scope and Extent in General
            110k1134(3) k. Questions Considered in General. Most Cited Cases
Capital murder defendant's claim of error with respect to her trial counsel's allegedly ineffective failure to secure votes for life sentence sufficient to persuade trial court not to override such recommendation was rendered moot by grant of new sentencing hearing on appeal. U.S.C.A. Const.Amend. 6.

**[55] Criminal Law 110 ☞1177**

110 Criminal Law
   110XXIV Review
      110XXIV(Q) Harmless and Reversible Error
         110k1177 k. Sentence and Judgment and Proceedings After Judgment. Most Cited Cases
Court of Criminal Appeals' erroneous application of relation-back doctrine, in holding that capital murder defendant had waived appellate review of her claim of ineffective assistance of trial counsel arising out of counsel's allowing prosecutor to misstate number of blacks on jury, was harmless, where Court of Criminal Appeals also reached merits of defendant's claim. U.S.C.A. Const.Amend. 6.

William R. Blanchard, Montgomery; and Stuart W. Gold, New York, New York, for appellant.
William H. Pryor, Jr., atty. gen., and Tracy Daniel and Jeremy W. McIntire, asst. attys. gen., for appellee.
William H. Pryor, Jr., and Troy King, attys. gen., and Tracy Daniel and Jeremy W. McIntire, asst. atty. gen., for appellee, on rehearing.
PER CURIAM.
**\*1** On July 13, 1989, Louise Harris was convicted

in the Montgomery Circuit Court of murder made capital because it was committed for a pecuniary or other valuable consideration or pursuant to a contract or for hire, an offense made capital by § 13A-5-40(a)(7), Ala.Code 1975.

**\*1** The facts underlying Harris's conviction are as follows.
**\*1** "The appellant was indicted for two counts of capital murder in the murder of Isaiah Harris: murder for pecuniary gain or pursuant to a contract for hire and murder of a deputy sheriff while the deputy was on duty. Following the introduction of the State's evidence, the appellant moved that the second count of the indictment be dropped, because she argues, the State failed to prove that Harris was on duty at the time of the offense. The trial court granted this motion, and the case went to the jury only on the first count of the indictment. The jury found the appellant guilty as charged in the first count of the indictment and recommended that she be sentenced to life imprisonment without the possibility of parole, seven jurors voting for life without parole and five voting for death by electrocution. Thereafter, a sentencing hearing was held before the trial court, after which the court ordered that the appellant be sentenced to death by electrocution.
**\*1** "The record indicates that the appellant was involved in an affair with Lorenzo McCarter, a codefendant, while she was married to Harris. The appellant and Harris had experienced marital problems in the past, which the victim apparently believed he had solved when he promised to buy the appellant a house. The record indicates that the appellant asked McCarter to hire someone to kill her husband. McCarter approached a co-employee about doing 'the job'; however, the co-employee refused and told his supervisor about the solicitation. McCarter then approached Michael Sockwell and Alex Hood, other codefendants, to commit the offense. McCarter knew that Sockwell owned a gun. Prior to the offense, the appellant met with the three men and was shown the gun. Sockwell and Hood were paid $ 100 in advance to commit the offense, with the promise that more money would be paid upon completion of the murder. The State presented evidence of the existence of various insurance policies on the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

victim's life, with the appellant specified as the beneficiary.

**\*1** "The victim, who worked the night shift as a jailer, left his home at approximately 11:00 p.m. to go to work, after being awakened by the appellant a little later than usual. Immediately after Harris left home, the appellant paged McCarter on his beeper, giving the message that her husband was leaving. There was evidence that the appellant had paged McCarter on his beeper many times in the past to arrange liaisons. When he received the message in the instant case, McCarter was seated in Hood's car, located across the street from the entrance to the subdivision in which Harris and appellant lived. Also present in the car were Alex Hood and Freddie Patterson. Patterson was unaware of the conspiracy. Sockwell was hidden behind the hedge located at the entrance to the subdivision. Harris was driving to work in his own 1979 black Ford Thunderbird automobile. When Harris stopped at the stop sign at the entrance of the subdivision, Sockwell shot him once in the face at close range with a shotgun. As a result, the lower half of the victim's face was blown off, leaving his teeth, tongue, and 'matter' from his face blown across the car. After the shot, the victim's vehicle traveled slowly across the highway and came to a stop in a ditch.

**\*2** "When the victim failed to arrive at work by 11:25 p.m., a co-employee telephoned his home twice and spoke with the appellant. There was testimony that the appellant offered no assistance and that her speech was slow or sluggish. Two men, returning from work, discovered the victim's body shortly after midnight and telephoned the Montgomery Police Department. After the police arrived at the scene and identified the victim, several officers of the police department and employees of the Montgomery County Sheriff's Department went to the house of the victim and the appellant to notify the appellant of the victim's death. There was testimony that, upon being notified of the victim's death, the appellant began screaming and sobbing, but she shed no tears. Moreover, she became completely calm instantly in order to answer questions. A member of the Montgomery County Sheriff's Department, who knew both the appellant and the victim, testified that she asked the appellant why she did not appear to be upset, and that the appellant responded that

she and the victim had been experiencing marital problems for some time. She also told the witness that she had engaged in several extramarital affairs, the current one being with Lorenzo McCarter. The appellant stated that she was in love with McCarter. In response to questions asked by an investigator with the sheriff's department, she responded that McCarter's car was broken down in the vicinity, and when asked if McCarter could have killed the victim, the appellant responded, 'If he did kill him I didn't tell him to.' At trial, McCarter elected to testify against the appellant, in exchange for the prosecutor's promise not to seek the death penalty in his case."

**\*2** *Harris v. State,* 632 So.2d 503, 508-09 (Ala.Crim.App.1992).

**\*2** The jury recommended by a vote of 7-5 that Harris be sentenced to life in prison without the possibility of parole. The trial court rejected the jury's recommendation and sentenced Harris to death. This Court affirmed Harris's conviction and sentence of death. *Harris v. State,* 632 So.2d 503 (Ala.Crim.App.1992). The Alabama Supreme Court affirmed this Court's judgment, *Ex parte Harris,* 632 So.2d 543 (Ala.1993). The United States Supreme Court granted certiorari review in part, *Harris v. Alabama,* 512 U.S. 1234, 114 S.Ct. 2736, 129 L.Ed.2d 858 (1994),[FN1] and affirmed the Supreme Court's judgment, *Harris v. Alabama,* 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).

**\*2** This Court's certificate of judgment was issued on November 18, 1993. On June 22, 1995, Harris, through counsel, filed the instant Rule 32, Ala. R.Crim. P., petition.[FN2] On August 27, 1998, the circuit court issued an order summarily dismissing several of Harris's claims as being procedurally barred, but granted Harris leave to amend the petition as to several claims that the court found to be insufficiently pleaded. On November 23, 1998, Harris filed an amended petition. Ultimately, the circuit court dismissed all of Harris's claims except for her claim that the prosecution had used its peremptory challenges to exclude African-Americans from jury service because of their race in violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

Page 15

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

her claims that she had received ineffective assistance of counsel at trial and on appeal. On July 26 and 27, 1999, a hearing was conducted on those claims. Additional testimony, in the form of a deposition, was taken on July 28, 1999, and was provided to the circuit court. On October 3, 2001, closing arguments were heard and on April 16, 2002, the circuit court issued an order denying the amended petition. Harris appeals.

**\*3** Before addressing Harris's claims on appeal, we note the following principles that apply to this Court's review of a circuit court's denial of a Rule 32 petition. Because Harris was convicted of capital murder, her direct appeal not only included review of the issues presented by Harris, but also the record was searched for "plain error." *Ex parte Harris,* 632 So.2d at 544; *Harris v. State,* 632 So.2d at 542. Thus, "even though this petition challenges a capital conviction and a death sentence, there is no plain-error review on an appeal from the denial of a Rule 32 petition." *Dobyne v. State,* 805 So.2d 733, 740 (Ala.Crim.App.2000), *aff'd,* 805 So.2d 763 (Ala.2001), citing *Pierce v. State,* 851 So.2d 558, 563 (Ala.Crim.App.1999), *rev'd on other grounds,* 851 So.2d 618 (Ala.2002). " 'In addition, "the procedural bars of Rule 32 apply with equal force to all cases, including those in which the death penalty has been imposed." *State v. Tarver,* 629 So.2d 14, 19 (Ala.Crim.App.1993).' " *Williams v. State,* 783 So.2d 108, 112 (Ala.Crim.App.2000)(quoting *Brownlee v. State,* 666 So.2d 91, 93 (Ala.Crim.App.1995)).

**\*3** [1][2][3] Claims presented in a petition but not pursued on appeal are deemed to be abandoned. See, e.g., *Brownlee v. State,* 666 So.2d 91, 93 (Ala.Crim.App.1995)(holding that "[w]e will not review issues not listed and argued in brief"). New claims presented for the first time on appeal are not properly before the appellate court. See *Arrington v. State,* 716 So.2d 237, 239 (Ala.Crim.App.1997) (holding that "[a]n appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition"). Claims listed in an appellate brief that do not include supporting argument, as required by Rule 28(a)(10), Ala. R.App. P., are not properly before this Court.

**\*3** [4][5][6] "[W]hen the facts are undisputed and an appellate court is presented with pure questions of law, that court's review in a Rule 32 proceeding is de novo." *Ex parte White,* 792 So.2d 1097, 1098 (Ala.2001). However, where there are disputed facts in a post-conviction proceeding resolved by the circuit court "[t]he standard of review on appeal ... is whether the trial judge abused his discretion when he denied the petition. *Ex parte Heaton,* 542 So.2d 931 (Ala.1989)." *Elliott v. State,* 601 So.2d 1118, 1119 (Ala.Crim.App.1992). Notwithstanding the criteria for review, this Court has consistently held in postconviction proceedings that: "[i]f the circuit court is correct for any reason, even though it may not be the stated reason, we will not reverse its denial of the petition. See *Roberts v. State,* 516 So.2d 936 (Ala.Cr.App.1987)." *Reed v. State,* 748 So.2d 231, 233 (Ala.Crim.App.1999).

## I.

**\*3** As in her petition, Harris first claims on appeal that the circuit court erred in denying relief on her claim that the prosecution exercised peremptory strikes against black venire-members in violation of *Batson.* Harris also claims that the procedural bars of Rule 32, Ala. R.Crim. P., do not apply to her *Batson* claim.

**\*4** Harris argues that at trial she established a prima facie case of purposeful racial discrimination by the state in its exercise of peremptory strikes in violation of *Batson.* The circuit court denied relief on this claim, finding that it was procedurally barred because it was raised and addressed adversely to Harris at trial and on direct appeal. See Rules 32.2(a)(2), and 32.2(4), Ala. R.Crim. P. We agree with the ruling of the circuit court.
**\*4** "In *Batson* [*v. Kentucky,* 476 U.S. 79 (1986) ], the United States Supreme Court held that 'the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.' 476 U.S. at 89."

**\*4** *Raspberry v. State,* 615 So.2d 657, 657

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

(Ala.Crim.App.1992). Harris contends on appeal, as she did at trial, that the Montgomery County prosecutor "used 12 of 19 peremptory strikes to eliminate 12 of 18 total black veniterpersons," thus, she says establishing an "overwhelming" pattern of discriminatory strikes when taken "in conjunction with other factors." (Harris's appellate brief at p. 16.) [FN3]

**\*4** [7] Harris's *Batson* claim was presented at trial, was raised on appeal, and has been reviewed for error. The circuit court correctly ruled in its final order that Harris's *Batson* claim was procedurally barred because it had been raised and addressed at trial and because it had been raised and addressed on direct appeal. See Rules, 32.2(a)(2) and (4), Ala. R.Crim. P.

**\*4** However, Harris argues that these procedural bars should not apply in her case because, she says, her *Batson* claim was rejected by this Court and the Alabama Supreme Court in reliance on dicta from *Harrell v. State,* 571 So.2d 1270, 1271 (Ala.1990)(" Harrell II") that was rejected in *Ex parte Thomas,* 659 So.2d 3 (Ala.1994), *while* Harris's case was pending on certiorari review in the United States Supreme Court.

**\*4** The Alabama Supreme Court in *Harrell II* stated: "When the evidence shows only that blacks were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully established venire, an inference of discrimination has not been created." 571 So.2d at 1271.

**\*4** After the release of this Court's opinion in *Harris* and its opinion in *Ex parte Harris,* the Alabama Supreme Court released *Thomas,* which clarified the above language from *Harrell II* and which is summarized below.

**\*4** "[I]n *Ex parte Thomas,* 659 So.2d 3 (Ala.1994), the Court rejected th[e above] language in *Harrell II.* Specifically, the Court disapproved this statement to the extent that it had been construed to preclude a finding of a prima facie *Batson* violation. The Court disapproved this statement as it has been applied in these instances, because such applications prevent a defendant from using a factor *indicating* discrimination that was approved in both

*[Ex parte] Branch* [, 526 So.2d 609 (1987),] and *Batson.* Such an application was not the Court's intent. Even before *Thomas* was decided in 1994, this Court, in *Ex parte Bird,* 594 So.2d 676 (Ala.1991), considered the dictum of *Harrell II* but did not construe it to mean that a defendant cannot make a prima facie case if the percentage of blacks on the jury is greater than the percentage that was on the venire."

**\*5** *Nix v. Chilton County Comm'n,* 667 So.2d 719, 720-21 (Ala.1995).

**\*5** Harris argues that she is entitled to a review of her *Batson* claim following *Thomas.* She asserts:
**\*5** "Precedent dictates that *Thomas* be applied to [her] Rule 32 application. It is clear that *Batson* and its progeny apply retroactively to Alabama cases ' pending' at the time those decisions were rendered. This principle was firmly established in *Ex parte Jackson,* 516 So.2d 768 (Ala.1986), in which the Alabama Supreme Court rejected the *Swain [Swain v. Alabama,* 380 U.S. 202 (1965)] standard and applied *Batson* retroactively.
**\*5** "....
**\*5** "... Because *Thomas* was decided while Harris's case was pending before the United States Supreme Court, that is, before it was final, she is entitled to receive the benefit of the *Thomas* standard. *Ex parte Floyd,* 571 So.2d 1234, 1235 (Ala.1990).

**\*5** (Harris's appellate brief at pp. 21-22.)

**\*5** Moreover, Harris argues:
**\*5** "Because the *Thomas* standard was not articulated until [her] case was pending before the United States Supreme Court, her post-conviction petition was the first time that this claim could have been raised or considered....
**\*5** "Until a court reviews Mrs. Harris's *Batson* claim under the proper standard, it has not been ' addressed' within the meaning of Rule 32. Mrs. Harris's evidence clearly establishes a *prima facie* case of purposeful racial discrimination. For the Court not to consider her *Batson* claim would result in a manifest injustice."

**\*5** (Harris's appellate brief at pp. 24-25.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----                                                                    Page 17

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

**\*5** Thus, according to Harris, because her direct appeal was not final, as that term is defined in *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), when *Ex parte Thomas* was released, she is entitled to have her *Batson* claim reviewed in accordance with the precedent set forth in *Ex parte Thomas.* We disagree.

**\*5** "In *Griffith v. Kentucky,* the Supreme Court addressed the retroactive application of *Batson,* and held that *Batson* would apply to all cases that were still pending on direct appeal and were not 'final' at the time *Batson* was decided." *Ex parte Floyd,* 571 So.2d 1234, 1236 (Ala.1990)(footnote omitted). In reaching its decision that *Batson* should apply retroactively, the *Griffith* court determined that *Batson* established a new rule of constitutional criminal procedure and recognized that " '[a] new rule of constitutional criminal procedure is normally applied retroactively to all cases pending [on] direct review when the rule is announced.' " *Poole v. State,* 846 So.2d 370, 376 (Ala.Crim.App.2001), quoting *Clark v. State,* 621 N.W.2d 576, 578 (N.D.2001) citing in turn *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987). The *Griffith* court defined "final" as "a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied." *Griffith v. Kentucky,* 479 U.S. at 321 n. 6, 107 S.Ct. 708.

**\*6** The *Ex parte Thomas* court's rejection of certain language in *Harrell II* is quite different from *Batson's* complete break from the precedent long established in *Swain v. Alabama.*

**\*6** "The rule in *Batson v. Kentucky* is an explicit and substantial break with prior precedent. In *Swain v. Alabama,* the Court held that, although the use of peremptory challenges to strike black jurors on account of race violated the Equal Protection Clause, a defendant could not establish such a violation solely on proof of the prosecutor's action at his own trial. 380 U.S. [202,] at 220-226 [(1965)] . *Batson* overruled that portion of *Swain,* changing the standard for proving unconstitutional abuse of peremptory challenges."

**\*6** *Allen v. Hardy,* 478 U.S. 255, 258-59, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986).

**\*6** Thus, the United States Supreme Court in *Allen,* and the Alabama Supreme Court in *Ex parte Floyd,* permitted retroactive review of cases not yet final on direct appeal because *Batson* represented "a new rule for the conduct of criminal prosecutions." *Griffith v. Kentucky,* 479 U.S. at 328, 107 S.Ct. 708.

**\*6** The Alabama Supreme Court's clarification in *Ex parte Thomas* of the analysis set forth in *Harrell II* did not constitute a new principle of constitutional law or a new rule of constitutional criminal procedure.

**\*6** "In *Thomas,* the Alabama Supreme Court held that the mere fact that the percentage of blacks on the jury is equal to or exceeds the percentage of blacks on the venire cannot negate what would otherwise be a prima facie case of racial discrimination. In other words, if a trial court would otherwise have found a prima facie case of racial discrimination, the court cannot find that no prima facie case exists solely because the percentage of blacks on the jury exceeds the percentage of blacks on the venire. *Implicit in this holding is the requirement that a prima facie case of racial discrimination was actually established before the trial court used 'statistics' to negate it.* Thus, contrary to Perkins's contention, *Thomas* does not prevent the trial court from considering statistics, along with the numerous other factors set out in *Ex parte Branch,* 526 So.2d 609 (Ala.1987), in denying a defendant's *Batson* motion. In *Thomas,* the Supreme Court specifically stated:

**\*6** " 'We emphasize that our disapproval of the construction that has been given *Harrell II* [*Harrell v. State,* 571 So.2d 1270 (Ala.1990), cert. denied, 499 U.S. 984, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991) ] does not mean that an increased percentage of blacks on the jury can never be a circumstance to be considered in ruling whether a discriminatory use of peremptory strikes has been shown. *In a proper case, the fact that the percentage of blacks on the jury is higher than the percentage of blacks on the venire may be a factor to be considered in deciding whether a prima facie case of discrimination has been made or rebutted.* However, where, as here, the prosecutor has used such a large portion of his strikes against blacks as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----                                                                        Page 18

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

to indicate a pattern of striking blacks from the venire, the fact that the jury has a higher percentage of blacks than the venire had does not mean that no prima facie case of discrimination has been made.'
**\*7** "659 So.2d at 8 (emphasis added)."

**\*7** *Perkins v. State,* 808 So.2d 1041, 1075 (Ala.Crim.App.1999)(first emphasis added), *aff'd,* 808 So.2d 1143 (Ala.2001), vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002).

**\*7** Thus, because the *Ex parte Thomas* Court merely clarified the misconception that statistics favorable to the state negate a prima facie showing of racial discrimination and did not establish a new rule of criminal procedure, Harris was not due retroactive postconviction review of her *Batson* challenge. Thus, the circuit court correctly found the claim to be procedurally barred.

**\*7** [8][9][10][11] Moreover, "a prima facie case of racial discrimination [must] actually [be] established before the trial court [can] use[ ] ' statistics' to negate it." *Perkins v. State,* 808 So.2d at 1075, *aff'd,* 808 So.2d 1143 (Ala.2001), vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002). At Harris's trial Harris offered mere numbers to establish a prima facie case of discrimination by the State during jury selection.
**\*7** " ' "A defendant making a *Batson* challenge bears the burden of proving a prima facie case of purposeful or intentional discrimination and, in the absence of such proof, the prosecution is not required to state its reasons for its peremptory challenges. *Ex parte Branch,* 526 So.2d 609, 622 (Ala.1987).
**\*7** " ' " ...."
**\*7** " ' 'Procedurally, the party alleging racial discrimination in the use of peremptory challenges bears the burden of establishing a prima facie case of discrimination. *Ex parte Branch,* 526 So.2d 609, 622 (Ala.1987). " 'It is important that the defendant come forward with *facts,* not just numbers alone, when asking the (trial) court to find a prima facie case.' " *Mitchell v. State,* 579 So.2d 45, 48 (Ala.Crim.App.1991), cert. denied, 596 So.2d 954 (Ala.1992), quoting *United States v. Moore,* 895

F.2d 484, 485 (8th Cir.1990).'
**\*7** "*McElemore v. State,* 798 So.2d 693, 695-96 (Ala.Crim.App.2000). ' "A trial court's ruling on a *Batson* objection is entitled to great deference, and we will not reverse the trial court's *Batson* ruling unless it is clearly erroneous. *Ex parte Branch,* 526 So.2d 609 (Ala.1987)." ' *McElemore v. State,* 798 So.2d at 695 (quoting *Pressley v. State,* 770 So.2d 143, 144 (Ala.2000))."

**\*7** *Fitch v. State,* 851 So.2d 103, 123-24 (Ala.Crim.App.2001). *See also Adams v. State,* [Ms. CR-98-0496, August 29, 2003] --- So.2d ---- (Ala.Crim.App.2003)(pursuant to a plain-error review, there was no inference of gender discrimination in violation of *J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), where prosecutor used 80% of peremptory strikes to remove females in violation of *J.E.B.* " Numbers alone are not sufficient to establish a prima facie case of discrimination."), citing *Boyd v. State,* 715 So.2d 825 (Ala.Crim.App.1997), *aff'd,* 715 So.2d 852 (Ala.1998).

**\*7** [12] As in *Fitch,* Harris offered only numbers, no facts, to support her claim that the principles of *Batson* had been violated. The trial court correctly ruled that the evidence before the court did not establish a prima facie showing of purposeful or intentional discrimination by the State in its exercise of peremptory strikes. Thus, the trial court correctly denied the *Batson* motion.

**\*8** Based on the above, the circuit court's denial of relief on Harris's *Batson* claim based on procedural bars is affirmed.

## II.

**\*8** Harris contends that the circuit court erred in denying her relief, after a hearing, on her claims that she was denied effective assistance of counsel during the guilt phase of her trial.[FN4]
**\*8** "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
(Cite as: --- So.2d ----)

**\*8** *Wiggins v. Smith,* 539 U.S. 510, 511, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), citing *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### A.1

**\*8** [13] Harris contends that trial counsel was ineffective at the guilt phase of the trial because, Harris argues, counsel failed to maintain continuity in representation. In her petition Harris argued that she was unable to form a strong bond with any of her appointed counsel because inadequate compensation for appointed counsel forced a succession of counsel to withdraw from the case.

**\*8** The circuit court correctly summarily dismissed this claim pursuant to Rule 32.2(a)(3), as a claim challenging the continuity of counsel that could have been, but was not, raised at trial.

### A.2.

**\*8** Harris contends that trial counsel was ineffective at the guilt phase of the trial because, Harris argues, counsel failed to obtain adequate compensation for her defense.

**\*8** [14] Trial counsel did file a motion seeking "reasonable and adequate compensation for counsel" for representing Harris as a capital defendant. The trial court denied this motion. *Harris v. State,* 632 So.2d at 509. "Trial counsel is not ineffective for having an objection overruled or a motion denied." *Boyd v. State,* 746 So.2d 364, 402 (Ala.Crim.App.1999). Thus, there is no merit to this claim.

### A.3.

**\*8** [15] Harris contends that trial counsel was ineffective for failing to protect her right to an impartial jury because, she says, *after filing* a motion for a change of venue based on pretrial publicity, counsel elected not to vigorously pursue the motion and it was denied.

**\*8** The substantive claim underlying this claim of ineffective assistance of counsel was presented at trial, raised on appeal, and reviewed for error. This court held on direct appeal that Harris had failed **\*8** "to prove that the community was saturated with prejudicial publicity.
**\*8** "....
**\*8** "Moreover, the appellant has failed to prove that there existed any actual prejudice against her. The jurors who indicated that they had any knowledge of the case were questioned individually concerning the extent of their knowledge, the source of that knowledge, and the ability to disregard the information and decide the case based upon the facts presented in court. No juror remaining on the venire indicated that he or she could not decide the case based on the facts presented and on the law as instructed by the court. Thus, there was no actual prejudice demonstrated by the appellant resulting from pretrial publicity. *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)."

**\*9** *Harris v. State,* 632 So.2d at 517-18.

**\*9** In addition to the ruling on direct appeal, which precludes a showing of the prejudice necessary to establish ineffective assistance of counsel, before trial each prospective juror swore that he or she was able to decide Harris's case on the evidence despite any prior knowledge of the case. "The fact that the prospective jurors were not wholly ignorant of the facts and issues in petitioner's case did not establish the actual prejudice necessary for a change of venue." *Heath v. State,* 536 So.2d at 149, citing *Ex Parte Grayson,* 479 So.2d 76, 80 (Ala.1985); *Lokos v. State,* 434 So.2d 818, 827-828 (Ala.Crim.App.1982), *aff'd,* 434 So.2d 831 (Ala.1983). Harris made no showing at her Rule 32 hearing that any juror had been prejudiced against her by pretrial publicity. Thus, the circuit court correctly ruled that Harris failed to meet her burden of proof pursuant to Rule 32.3, Ala. R.Crim. P., because Harris failed to prove any prejudice as required by *Strickland.*

**\*9** Moreover, the circuit court ruled on the merits that counsel's decision not to vigorously pursue a change of venue was a strategic one. We agree. In his deposition, Bowen, one of Harris's trial attorneys, testified that he filed a motion requesting

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

Page 20

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

a change of venue but that upon reflection of the circumstances of the case, decided not to vigorously pursue a change of venue. Bowen provided the following reasons for not vigorously pursuing a change of venue despite the significant newspaper and television coverage concerning the case.

**\*9** "The motion was really ... an extremely tough call from my point of view. The Alabama law is that you transfer to the next county, free of exception. You're surrounded by Macon, Elmore, Autauga, Lowndes, Crenshaw.... Autauga is seventy-five to eighty percent white.... We really didn't want to do that. Not that this was really a black-white case, but we felt like as many black females as we could get on the jury, the better off we were.

**\*9** "... Let's say we might have won a transfer to Macon. But I believe Mr. Isiah Harris's family was from Macon County.... I just recall that in my mind, one of our decisions on that. The same thing with Elmore is it was predominantly white, although the black-white ratio was higher in Elmore than Autauga. Lowndes probably would have been the preferred county.

**\*9** "But, truthfully, it was hard to get. If you were to make the motion for change of venue, you were really playing a game of Russian roulette, so to speak. In other words, if you had gotten Autauga, you would probably be in worse shape than you were-... in my opinion, than you were in Montgomery. If you had gotten Lowndes, you would have been in ... probably a better situation. But, know, the point you had to make on that is that although we filed that motion-... *I really felt in the back of my mind we had the most racially balanced county that we could get in Montgomery.*

**\*10** "Now, there was a problem, of course, because this was a Montgomery County deputy sheriff that was killed, and that was always a problem. But when you get down to whether you want Autauga County as opposed to Montgomery County, you know, I'm not sure I want Autauga County. *I think I'm more inclined to go with Montgomery County because it's a racially balanced county,* you know, roughly 50 percent-50 percent. And so there was a number of things that we thought about and that I thought about in this regard.

**\*10** "*So we did make the motion. We did go through the motion. We did think that we ought to-But after thinking about it, after halfway thinking*

*about that thing and realizing that we may get sent to Autauga County, it was a scary thought.* It really was a scary thought. It was a tough decision to make.

**\*10** "Q. [Rule 32 counsel]: So ... you didn't include any of the press coverage-

**\*10** "A: Right.

**\*10** "Q:-*because you weren't so sure that you wanted to win the motion?*

**\*10** "A.... We originally started out, well, we need to do this because it's a deputy sheriff, and it's got a lot of press. But then again, you know, the press that you get from Montgomery, it spills over into some of the other counties, also.

**\*10** "And then you understand that we're trying this case to win. We've got a racially balanced county, whereas we may end up with a racially imbalanced county detrimental to ... what we're presenting.... It was a tough call. So I think in the middle of that, I got the feeling that I'm really not so sure that I want to go forward with this motion the way I originally presented it.

**\*10** "In hindsight you think, well ... maybe that was error, but we were trying to win the case.

**\*10** (Rule 32 hearing, vol. 18, pp. 142-45.)(Emphasis added.)

**\*10** Based on counsel's testimony, this court finds that counsel's strategic decision was made after reasonable consideration of options. " 'Strategic choices made after thorough investigation of relevant law and facts are virtually unchallengeable. ' " *Bui v. State,* 717 So.2d 6, 23 (Ala.Crim.App.1997)(quoting *Lawley,* 512 So.2d 1370, 1372 (Ala.1987)). We will refrain from using hindsight in evaluating trial counsel's decisions and affirm the circuit court's ruling on the merits.

**\*10** Based on the above, we hold that the circuit court's ruling was correct.

### A.4.

**\*10** [16] Harris contends that trial counsel was ineffective at the guilt phase of the trial because, Harris argues, counsel failed to conduct an adequate voir dire of the jury. Harris argues that four

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----                                                                    Page 21

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

jurors-B.E., E.B., M.K.L., and S.M.-"were closely related to individuals who worked in law enforcement, but were not asked if that would bias them where the victim was a law enforcement officer." (Harris's brief on appeal at p. 62.) Additionally, Harris argues, "none of the jurors were questioned about their views on adultery, a sensitive issue on which the State was sure to focus-and one that clearly affected the sentencing court.... Harris had a right to have both issues explored." (Harris's brief on appeal at p. 62.)

**\*11** The circuit court ruled that "Harris failed to present any evidence in support of this claim." (Rule 32 Record, vol. 9, page 1705.) We agree. This claim of ineffectiveness amounts to nothing more than a bare allegation, unsupported by any factual basis; accordingly, it fails to satisfy either the burden-of-proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P. Additionally the circuit court ruled on the merits finding that "the record refutes any claim of deficient performance on the part of trial counsel. The voir dire of the jury panel was conducted by the trial court.... Defense counsel submitted, however, 'proposed voir dire questions,' covering the subjects Harris sets forth in the claim." (Rule 32 Record vol. 9, pp. 1705-06.) The record on direct appeal supports the circuit court's ruling. The record on direct appeal reflects that counsel submitted two separate sets of written proposed voir dire questions to the trial court. The written questions included a question to the jury panel regarding Harris's adulterous relationship with Lorenzo McCarter. "Trial counsel is not ineffective for having an objection overruled or a motion denied." *Boyd v. State,* 746 So.2d 364, 402 (Ala.Crim.App.1999).

**\*11** Thus, Harris has not shown how her trial counsel's conduct was deficient or how the outcome of her trial would have been different had her trial counsel performed differently regarding this claim. See, e.g., *Williams v. State,* 782 So.2d 811, 825 (Ala.Crim.App.2000); *Brooks v. State,* 695 So.2d 176, 182 (Ala.Crim.App.1996). Therefore, Harris has failed to state a claim of ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Because Harris failed to state a claim upon which relief could be granted, denial of this claim was appropriate.

### A.5.

**\*11** Harris contends that trial counsel were ineffective at the guilt phase of the trial because, Harris argues, counsel failed to properly litigate the State's alleged discriminatory use of peremptory challenges in jury selection.

**\*11** Harris first claims that trial counsel allowed the prosecutor to misstate the numbers necessary to assess whether a pattern existed of strikes based on race.

**\*11** Specifically, Harris argues:
**\*11** "Trial counsel based its *Batson* motion exclusively on the (incorrect) facts that the State used 11 of its 19 peremptory challenges to strike all but 6 of 18 black venire members.... But in fact the State used 12 of 19 peremptory challenges to strike all but 5 of the 18 black veniremembers.... Counsel misstated the numbers to Mrs. Harris's disadvantage. ... Indeed, with only 4 blacks on the petit jury (the fifth was an alternate) the judge, even applying the *Harrell [v. State,* 571 So.2d 1270 (Ala.1990) ] standard, would likely have required the State to justify its strikes. Moreover, the trial court was searching for more evidence than a pattern of strikes .... But counsel presented nothing else, despite having filed its motion earlier.... Several other indicia of discriminatory conduct by the prosecution were available but ignored by defense counsel.... The failure to do so was plainly ineffective assistance."

**\*12** (Harris's brief on appeal at pp. 62-63.)

**\*12** As to this argument the circuit court ruled as follows:
**\*12** "Harris additionally contends that the trial counsel were ineffective for allowing the prosecutor to 'misstate' the number of blacks on the jury. This claim is denied. First, this claim does not appear in the amended petition for relief and is, therefore, denied due to Harris's failure to comply with the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

rules of procedure. Alternatively, it is denied because the number of blacks on the jury-as represented by the prosecutor, the trial court, and the defense counsel-was correct.... The following jury members, including the alternate, were African American: E.T., J.C., B.E., S.M., A.T., and P.C. Every one of these jurors is denoted as being black on petitioner's exhibits 44 and 47. Moreover, petitioner's exhibit 48-Mr. Argo's notes from the ' jury selection process'-also indicates that B.E. was African American. The Court credits the perceptions and observations of trial counsel, the trial judge, and the District Attorney-each of whom had substantial interest in observing the racial makeup of the jury."

**\*12** (Rule 32 record, vol. 9 at p. 1707.)

**\*12** We agree with the circuit court's ruling both on procedural grounds and on the merits. Harris's claim that trial counsel were ineffective for allowing the prosecutor to misstate the number of blacks on the jury was not raised in her original petition or in her amended petition, but was raised for the first time at the July 26, 1999, hearing on her Rule 32 petition. Because Harris was allowed to file an amended petition in order to fully present her claims of ineffective assistance of counsel, we do not consider this claim to relate back to the original petition. Thus, the claim was presented outside the limitations period and is procedurally barred pursuant to Rule 32.2(c), Ala. R.Crim. P. See *DeBruce v. State,* 890 So.2d 1068, 1094 (Ala.Crim.App.2003)("These claims would be timely if they related back to claims raised in the timely filed petition; however, the claims raised in the second amended petition did not relate back to any claims raised in the original petition. See *Charest v. State,* 854 So.2d 1102 (Ala.Crim.App.2002)"). Moreover, the record also supports the circuit court's findings that jurors E.T., J.C., B.E., S.M., A.T., and P.C., are black.

**\*12** Harris also claims that counsel were ineffective for failing to adequately support her *Batson* motion. According to Harris, in addition to the alleged pattern of strikes offered by the defense to establish a threshold prima facie case of discrimination, the " other indicia of discriminatory conduct by the

prosecution" that were omitted by the defense in making its *Batson* motion were 1) the "history of purposeful discrimination by Ms. [Ellen] Brooks [the district attorney] and the Montgomery County District Attorney's Office," and 2) "of those persons struck, no other shared characteristic emerges" other than race. (Harris's brief at pp. 17 and 18.)

**\*13** To prevail on a claim of ineffective assistance of counsel based on counsel's failure to make an adequate *Batson* objection, Harris must first show that there was a prima facie case of purposeful discrimination by the prosecutor in selecting the jury. *Ex parte Frazier,* 758 So.2d 611, 616 (Ala.1999).

**\*13** [17][18] At the time of trial, *Batson* motions were considered in light of *Harrell* II. As stated previously, *Harrell* II held that "[w]hen the evidence shows only that blacks were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully established venire, an inference of discrimination has not been created." 571 So.2d at 1271. Thus, because the trial court found that the jury reflected a greater percentage of blacks than the percentage of blacks in Montgomery County, counsel had no reason to pursue the *Batson* motion beyond the statistical offer that was made. [FN5] That the above quoted portion of *Harrell* II was later overruled by *Ex parte Thomas,* 659 So.2d 3 (Ala.1994), does not render counsel's performance ineffective. "[T]rial counsel cannot be held to be ineffective for failing to forecast changes in the law." *Dobyne v. State,* 805 So.2d 733, 748 (Ala.Crim.App.2000) citing *State v. Tarver,* 629 So.2d 14, 18-19 (Ala.Crim.App.1993).

**\*13** Moreover, on direct appeal, we considered whether the history of discriminatory practices by the Montgomery County District Attorney's Office in striking a jury was a factor in establishing a prima facie case of racial discrimination in Harris's case and found that it was not. See *Harris v. State,* 632 So.2d 503, 513 (Ala.Crim.App.1992).

**\*13** Thus, Harris has not proven that trial counsel's conduct was deficient. Therefore, Harris has failed to establish ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

2052, 80 L.Ed.2d 674 (1984), in counsel's pursuit of the *Batson* claim.

#### A.6.

**\*13** [19] Harris contends that trial counsel were ineffective at the guilt phase of the trial because, Harris argues, counsel failed to develop an adequate defense strategy based on the following:

**\*13** a. Counsel's interviews with Harris and her family were perfunctory. Counsel did not follow up on evidence of abuse or other evidence to find out what effect that evidence might have had on Harris's mental state or how it would affect the State's characterization of Harris as the mastermind behind her husband's murder or how it could explain her behavior on the night of the murder.

**\*13** b. Counsel made no attempt to demonstrate any motive for McCarter to kill Mr. Harris, leaving the State to assert that McCarter acted because Harris asked him to.

**\*13** c. Counsel's cross-examination of McCarter, Investigator Huggins, Officer Santina Jenkins, and Officer Dorinda Hinton was ineffective in that counsel failed to reduce the probative force of their testimony implicating Harris in the murder.

**\*13** d. Counsel ignored cross-examination points and overlooked mental-health issues that cast doubt on Harris's ability to participate in this crime. The State's theory was that Harris spent months planning her husband's murder.

**\*14** e. Counsel did nothing to rebut the State's implication that because Harris shed no tears over her husband's death and that she was faking her grief, which the State further implied was a sign of guilt.

**\*14** f. Counsel failed to rebut unhelpful testimony; for example counsel failed to cross-examine Officer Jenkins, even though she worked with Mr. Harris and was probably biased toward the prosecution; failed to cross-examine McCarter on his plea agreement with the State, his alcoholism, his heavy drug use, his tendency toward blackouts, or his criminal convictions. Counsel also failed to impeach McCarter's statement that he knew Mr. Harris from one card game when McCarter also knew Mr. Harris from jail.

**\*14** The circuit court essentially ruled that Harris failed to meet her burden of proof as to claims a, c, d, e. Also, to the extent that those claims related to abuse suffered by Harris, the circuit court ruled that the record reflected that counsel had information about abuse "but made a strategic decision not to pursue it." (Rule 32 record, vol. 9, p. 1708.) Moreover, counsel's decision not to bring abuse into the guilt phase of the trial was in part the result of a directive from Harris. As to claims b, c, and f, the circuit court also ruled that these witnesses did not testify at the Rule 32 proceedings. Thus, the circuit court correctly found that, without deciding whether counsel's performance was deficient, Harris presented no evidence demonstrating prejudice as required by *Strickland.*

**\*14** Thus, Harris has not shown how her trial counsel's representation was ineffective under *Strickland* or how the outcome of her trial would have been different had her trial counsel performed differently regarding this claim. See, e.g., *Williams v. State,* 782 So.2d 811, 825 (Ala.Crim.App.2000); *Brooks v. State,* 695 So.2d 176, 182 (Ala.Crim.App.1996). Therefore, Harris has failed to establish ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), in developing a defense strategy.

**\*14** The circuit court's ruling in this regard on Harris's Rule 32 petition was correct.

#### A.7.

**\*14** Harris contends that trial counsel was ineffective at the guilt phase of the trial because, Harris argues, counsel failed to challenge alleged misconduct by the state.

#### a.

**\*14** [20] Harris claims on appeal that there were "a number of uniformed sheriff's officers present in the courtroom during the trial." Moreover, according to Harris, "the bailiffs in the courtroom were connected with the Sheriff's Department and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

Page 24

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

interacted significantly with the jury." (Harris's brief at p. 68.) In her amended petition, Harris presented this claim as follows:
**\*14** "Trial counsel failed to object to the presence of an excessive number of uniformed sheriff's officers and bailiffs connected with the sheriff's department in the courtroom that were prejudicial to Harris in light of the fact that the victim was a deputy sheriff."

**\*14** (Rule 32 record, vol. 6, p. 1059.)

**\*15** The circuit court disposed of this claim, ruling:
**\*15** "Harris did not present any support of this claim. She failed to demonstrate that there were in fact, what she deems an 'excessive number of uniformed officers and bailiffs' present. Additionally, trial counsel did 'object to members of the Sheriff's Department [escorting the jurors]' and that motion was denied.... Finally, the underlying issue was rejected by the Court of Criminal Appeals and the Alabama Supreme Court. See, *Harris,* 632 So.2d at 518."

**\*15** (Rule 32 record, vol. 9, p. 1709.) The record supports the trial court's findings that there is no basis for this claim. Thus, this claim amounts to nothing more than a bare allegation, unsupported by any factual basis; accordingly, it fails to satisfy either the burden-of-proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.

**\*15** Moreover, the substantive issue underlying this claim was presented at trial, was raised on appeal, and has been reviewed for error. On direct appeal we ruled as follows regarding the substantive claim:
**\*15** "The appellant argues that it was error for sheriff's deputies to manage and be in charge of the jurors during their sequestration and deliberations, in light of the fact that the victim was a deputy sheriff. The record reveals that the appellant objected on this ground at trial, and that the trial court responded that the deputies had long been assigned to court detail and that the trial court was familiar with them. The trial court further stated that the deputies were 'well aware of their responsibilities.' There is no indication or claim by the appellant of any improper behavior by the

deputies in this regard or of any improper communications between the deputies and the jury. Thus, there is no evidence of prejudice to the appellant."

**\*15** *Harris v. State,* 632 So.2d at 518. "Trial counsel is not ineffective for having an objection overruled or a motion denied." *Boyd v. State,* 746 So.2d 364, 402 (Ala.Crim.App.1999).

**\*15** Thus, Harris has not alleged how her trial counsel's conduct was deficient or how the outcome of her trial would have been different had her trial counsel performed differently regarding this claim. See, e.g., *Williams v. State,* 782 So.2d 811, 825 (Ala.Crim.App.2000); *Brooks v. State,* 695 So.2d 176, 182 (Ala.Crim.App.1996). Therefore, Harris has failed to state a claim of ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because Harris failed to state a claim upon which relief could be granted, denial of this claim was appropriate.

b.

**\*15** [21] Harris claims that counsel was ineffective by allowing the State to emphasize to the jury the fact that Mr. Harris was a law-enforcement officer and because the State referred to members of Mr. Harris's family in front of the jury. Harris asserted in her brief that "[f]our jurors were related to law enforcement officers.... The victim, Isaiah Harris, was a law enforcement officer, a fact the State emphasized, even after the line-of-duty count was stricken.... And the State referred to members of Mr. Harris's family during the trial in the presence of the jury." (Harris's brief on appeal at p. 68.)

**\*16** Specifically, in her petition, Harris presented the following claims:
**\*16** "26. Trial counsel failed to object adequately to the presence of the victim's family in the courtroom, including and most importantly the victim's sister sitting at the prosecution table.... Counsel did not communicate to the court that the presence of the victim's family would function to engender the jury's passion and sympathy for the victim and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

would result in prejudice to Harris and denial of her right to a fair trial. The combination of the presence of members of the sheriff's department and the victim's family members was particularly prejudicial because four jurors were related to law enforcement officers. The likelihood that the presence of the victim's family and fellow officers in court would inflame the passion of the jurors against Harris was not raised adequately.
**\*16** "27. Trial counsel failed to object adequately to improper testimony by and improper references to members of the victim's family during the trial.... The prosecutor drew attention to family members by asking the court's permission for them to leave even though proceedings were open and public."

**\*16** (Rule 32 Record, vol. 6, p. 1060.)

**\*16** In response to these claims, the circuit court ruled:
**\*16** "Harris failed to present any evidence in support of these claims and has, therefore, failed to meet her burden of proof. The claims are additionally dismissed for failure to comply with Rule 32.6(b). Moreover, the underlying issues were rejected on direct appeal. See *Harris,* 632 So.2d 525. The claims are denied."

**\*16** (Rule 32 Record, vol. 9, pp. 1709-1710.)

**\*16** Thus, the record supports the circuit court's ruling that Harris's claims are unsupported by any factual basis; accordingly, they fail to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.

**\*16** Moreover, the substantive issue underlying this claim was presented at trial, was raised on appeal, and has been reviewed for error. On direct appeal, we ruled that "the presence of the victim's family and evidence of victim impact did not constitute error." *Harris v. State,* 632 So.2d at 525.

**\*16** Thus, Harris has not alleged how her trial counsel's conduct was deficient or how the outcome of her trial would have been different had her trial counsel performed differently regarding this claim. See, e.g., *Williams v. State,* 782 So.2d 811, 825

(Ala.Crim.App.2000); *Brooks v. State,* 695 So.2d 176, 182 (Ala.Crim.App.1996). Therefore, Harris has failed to state a claim of ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because Harris failed to state a claim upon which relief could be granted, denial of this claim was appropriate.

c.

**\*16** [22] Harris claims that trial counsel were ineffective by allowing the State to question Mr. Harris's sister regarding irrelevant matters for, Harris says, the sole purpose of engendering sympathy for Mr. Harris and creating bias against Harris. In her petition, Harris alleged:
**\*17** "28. Trial counsel failed to object adequately to the testimony of the victim's sister regarding irrelevant matters, such as the victim's age, his overtime work at Christmas and how many children he had.... That testimony was immaterial and served only to inflame the jury's sympathy for the victim."

**\*17** (Rule 32 Record, vol. 6, p. 1060.)

**\*17** In response to this claim, the circuit court ruled:
**\*17** "Harris failed to present any evidence in support of these claims and has, therefore, failed to meet her burden of proof. The claims are additionally dismissed for failure to comply with Rule 32.6(b). Moreover, the underlying issues were rejected on direct appeal. See *Harris,* 632 So.2d 525. The claims are denied."

**\*17** (Rule 32 Record, vol. 9, p. 1710.) The record supports the circuit court's ruling that this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.

**\*17** Moreover, the substantive issue underlying this claim was presented at trial, was raised on appeal, and has been reviewed for error. On direct appeal, we ruled that "the presence of the victim's family and evidence of victim impact did not constitute

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

error." *Harris v. State,* 632 So.2d at 525.

**\*17** Thus, Harris has not alleged how her trial counsel's conduct was deficient or how the outcome of her trial would have been different had her trial counsel performed differently regarding this claim. See, e.g., *Williams v. State,* 782 So.2d 811, 825 (Ala.Crim.App.2000); *Brooks v. State,* 695 So.2d 176, 182 (Ala.Crim.App.1996). Therefore, Harris has failed to state a claim of ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because Harris failed to state a claim upon which relief could be granted, denial of this claim was appropriate.

                    d.

**\*17** Harris claims that trial counsel were ineffective for failing to object to the State's presentation of " gruesome photographs of Mr. Harris dead in his car.. .. As a contrast, and to further evoke passion and prejudice, the state introduced pre-death photographs." (Harris's brief at p. 69.) According to Harris, "none of the photographs served a legitimate purpose." (Harris's brief at page 69.)

**\*17** Specifically, in her petition, Harris presented the following claim: "Trial counsel failed to object to the improper admission of pre-death photos of the victim." (Rule 32 Record, vol. 6, page 1060.) In response to this claim, the circuit court ruled:
**\*17** "Harris has asserted nothing to support her contention that the admission of the photograph in question was improper. Her claim is, therefore, dismissed for failure to comply with Rule 32.6(b). Additionally, a claim that the introduction of the photograph was improper was rejected on direct appeal. See *Harris,* 632 So.2d at 530-31. Counsel is not ineffective for failing to assert on objection that has no merit."

**\*18** (Rule 32 Record, vol. 9, p. 1710.)

**\*18** [23] Harris raises for the first time on appeal the claim that the State was improperly allowed to present gruesome photographs. New claims that petitioner presents for the first time on appeal are

not properly before us. See *Arrington v. State,* 716 So.2d 237, 239 (Ala.Crim.App.1997)(holding that " [a]n appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition").

**\*18** [24] Harris presented nothing at the Rule 32 hearing suggesting error or prejudice in trial counsel's failure to object to the pre-death photograph of Isaiah Harris. Thus, the record supports the circuit court's ruling that this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.

**\*18** Moreover, the substantive issue underlying this claim was presented at trial, was raised on appeal, and has been reviewed for error. On direct appeal, we ruled that a photograph of the victim taken when he was alive was relevant and admissible "as it tended to identify the victim, especially in light of the condition of the victim's face after having been shot. As such, the introduction of this photograph during the guilt phase was not an Eighth Amendment violation." *Harris v. State,* 632 So.2d at 531.

**\*18** Thus, Harris has not alleged how her trial counsel's conduct was deficient or how the outcome of her trial would have been different had her trial counsel performed differently regarding this claim. See, e.g., *Williams v. State,* 782 So.2d 811, 825 (Ala.Crim.App.2000); *Brooks v. State,* 695 So.2d 176, 182 (Ala.Crim.App.1996). Therefore, Harris has failed to state a claim of ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), as to this issue. The circuit court's ruling was correct.

                    e.

**\*18** [25] Harris claims that trial counsel was ineffective for failing to object to the State's reference before the jury to Harris's "breaking God's law." (Rule 32 Record, vol. 6, p. 1062, quoting p.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

Page 27

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

690 of record on direct appeal.) In response to this claim, the circuit court ruled:

**\*18** "Harris presented no evidence or argument in support of this claim. In her proposed findings, she merely sets forth the claim as it appears in the amended petition. Moreover, the allegedly improper remark was not made during argument, but was part of a question asked by the prosecutor. The question was not improper."

**\*18** (Rule 32 Record, vol. 9, p. 1711.) We agree with the ruling of the circuit court.

**\*18** During the guilt phase of the trial the defense called Hyram Knight as a character witness for Harris. Mr. Knight testified on direct examination that Harris was "a good churchgoer ... [and] an all ' round good member of the church" and that she had a good reputation in the community for truth and honesty. (Direct Appeal Record vol. 4, p. 689.) On cross-examination the following exchange occurred:
**\*19** Q. [by the prosecutor]: Mr. Knight, you did not know of her affair while she was married to Isaiah Harris?
**\*19** "A. No.
**\*19** "Q. Would that change you opinion, if she was a good member of your church?
**\*19** "A. No, it wouldn't.
**\*19** "Q. It wouldn't matter to you that she was breaking God's law?
**\*19** "A. (Witness shakes head from side to side.)
**\*19** "Ms. Brooks [the prosecutor]: Thank you.
**\*19** "Mr. Argo [defense attorney]: That's all. Thank you, Mr. Knight."

**\*19** (Direct Appeal Record vol. 4, pp. 689-90.)

**\*19** Harris presented nothing at the Rule 32 hearing suggesting deficient performance or prejudice in trial counsel's failure to object to the above exchange. Thus, the record supports the circuit court's ruling that this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.

**\*19** Thus, Harris has not alleged how her trial counsel's conduct was deficient or how the outcome

of her trial would have been different had her trial counsel performed differently regarding this claim. See, e.g., *Williams v. State,* 782 So.2d 811, 825 (Ala.Crim.App.2000); *Brooks v. State,* 695 So.2d 176, 182 (Ala.Crim.App.1996). Therefore, Harris has failed to state a claim of ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), as to this claim. The circuit court's ruling was correct.

f.

**\*19** Harris claims that trial counsel was ineffective for failing to "challenge" *by way of rebuttal* during closing arguments numerous alleged instances of the State's "playing to the jury's passion and bias" by "refocus[ing] the jury on the facts ... that there was very little, if any, credible evidence to connect Harris to Mr. McCarter's plan to murder Mr. Harris. " (Harris's brief at p. 70.) We note that in her petition, Harris claimed that "[t]rial *counsel made no objection* to any of these false and misleading statements" during the State's closing. (Rule 32 Record, vol. 6, page 1064.) These are different claims. New claims that petitioner presents for the first time on appeal are not properly before us. See *Arrington v. State,* 716 So.2d 237, 239 (Ala.Crim.App.1997)(holding that "[a]n appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition"). However, in an abundance of caution we will review the claims placed before the circuit court. Harris presented 10 specific instances where Harris claims counsel were ineffective in this regard.

**\*19** [26] 1. Harris claimed in her petition that trial counsel failed to object to the prosecution's misleading statement that "Alonzo Trimble had ' absolutely nothing to gain by testifying' ... although he had charges pending against him at the time he became involved in the case and was on probation at the time of trial." (Harris's brief at p. 70.)

**\*20** Relying on this Court's opinion on direct appeal, the circuit court ruled that the prosecutor's comment "was not improper" thus, "Harris cannot demonstrate prejudice. See, *Harris,* 632 So.2d at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

Page 28

532; see also *Id.* at 523." (Rule 32 Record, vol. 9, p. 1712.)

**\*20** The substantive claim underlying this claim was raised on appeal and has been reviewed for error. On direct appeal, we ruled
**\*20** "The prosecutor's comment that State's witness . . . Trimble had nothing to gain w[as a] proper inference[ ] from the evidence. The evidence showed ... that Trimble was in no way suspected of being involved [in the murder]. Moreover, there is no evidence of any bargains made in exchange for Trimble's testimony. These comments by the prosecutor were also proper as reply in kind to defense counsel's previous argument that [Trimble was] biased and had a motive for testifying for the State."

**\*20** *Harris v. State,* 632 So.2d at 532.

**\*20** Thus, there is no merit to Harris's assertion that counsel was ineffective in this regard. Moreover, Harris presented nothing at the Rule 32 hearing suggesting deficient performance or prejudice in trial counsel's failure to object to the prosecutor's comment. Thus, this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.

**\*20** [27] 2. Harris claimed in her petition that trial counsel failed to object to the prosecution's misleading statement that "Mr. Trimble 'has not changed [his] story at all' about the alleged telephone call made to him by Mrs Harris ... although he had significantly" changed his story. (Harris's brief at p. 70.) The circuit court rejected this claim, finding that "[t]he Court of Criminal Appeals reviewed the comment and found no error. See *Harris,* 632 So.2d at 533-34." (Rule 32 Record, vol. 9, p. 1712.)

**\*20** The substantive claim underlying this claim was presented at trial, raised on appeal, and reviewed for error. On direct appeal, we ruled:
**\*20** "The prosecutor's statement that Trimble did not change his testimony concerning his voice identification of Harris was a proper argument.

Although Trimble initially testified that the appellant was not identified as 'the voice' on the telephone, subsequently, during a conference outside the presence of the jury, Trimble testified that he had misunderstood the trial court's initial question concerning the identification. Although an inference could be drawn that the witness intentionally changed his testimony, it is also possible that he misunderstood the question."

**\*20** *Harris v. State,* 632 So.2d at 533-34.

**\*20** Harris presented nothing at the Rule 32, Ala. R.Crim. P., hearing suggesting deficient performance or prejudice in trial counsel's failure to object to the prosecutor's comment. Thus, this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.

**\*21** [28] 3. Harris claimed in her petition that trial counsel failed to object to the prosecution's misleading statement that "Freddie Patterson had ' nothing to gain' by testifying, ... although he had charges pending against him at the time he first talked to authorities." (Harris's brief at p. 70.) The circuit court denied this claim, finding " '[t]he ... comment.. [was a] proper inference[ ] from the evidence.' *Harris,* 632 So.2d at 532." (Rule 32 Record vol. 9, 1712.)

**\*21** The substantive issue underlying this claim was presented at trial, was raised on appeal, and has been reviewed for error. On direct appeal, this Court ruled:
**\*21** "The prosecutor's comment that State's witness Patterson had no reason to lie ... [was a] proper inference[ ] from the evidence. The evidence showed that Patterson was not an accomplice to the murder.... Th[is] comment[ ] by the prosecutor [was] also proper as reply in kind to defense counsel's previous argument that [Patterson was] biased and had a motive for testifying for the State."

**\*21** *Harris v. State,* 632 So.2d at 532.

**\*21** Thus, there is no merit to Harris's underlying

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

claim in this regard. Moreover, Harris presented nothing at the Rule 32 hearing suggesting deficient performance or prejudice in trial counsel's failure to object to the prosecutor's comment. This claim, therefore, is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.

**\*21** [29] 4. Harris claimed in her petition that trial counsel failed to object to the prosecution's allegedly misleading statement that " '[t]here's no evidence that Lorenzo McCarter had a criminal record,' ... although Mr. McCarter had prior convictions and arrests." (Harris's brief at p. 70.) Relying on this Court's opinion on direct appeal, the circuit court denied relief on this claim, ruling that " '[t]here was no evidence before the jury of any convictions.' *Harris*, 632 So.2d 533." (Rule 32 Record vol. 9, p. 1712.)

**\*21** The substantive claim underlying this claim was presented on appeal and has been reviewed for error. On direct appeal, this Court ruled:
**\*21** "The prosecutor's comments that there was no evidence that McCarter had a criminal conviction and that McCarter had made consistent statements concerning the murder since his arrest were proper inferences from the evidence. The record indicates that there was no evidence before the jury of any convictions, although McCarter had admitted that Harris got him 'out' when he had been charged with driving under the influence. Moreover, McCarter's statements had not significantly changed since he had admitted his guilt."

**\*21** *Harris v. State,* 632 So.2d at 533.

**\*21** Harris presented nothing at the Rule 32 hearing suggesting that this Court's ruling on direct appeal was in error. Thus, this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P. Thus, Harris has not shown deficient performance or prejudice in trial counsel's failure to object to the prosecutor's comment.

**\*22** [30] 5. Harris claimed in her petition that trial counsel failed to object to the prosecution's allegedly misleading statement that "Mr. McCarter would 'have his day in Court, I assure you' ... although he had a plea agreement with the State." (Harris's brief at p. 70.) The circuit court denied this claim, relying on this Court's ruling on direct appeal that the prosecutor's comment was proper.

**\*22** The substantive claim underlying this claim was presented on appeal and has been reviewed for error. When this claim was presented as a substantive issue on direct appeal, this Court ruled:
**\*22** "The appellant also argues that the prosecutor's statement that Lorenzo McCarter would 'have his day in court' was not a proper inference from the evidence. However, the record indicates that the agreement made by the State, in order to gain McCarter's testimony, was that the State would not seek the death penalty in McCarter's capital murder trial. There was no evidence that the charges against McCarter would be dropped or that McCarter would plead guilty to the capital offense. Moreover, even if McCarter were to plead guilty, the State would still have to prove his guilt. See § 13A-5-42, *Code of Alabama* 1975."

**\*22** *Harris v. State,* 632 So.2d at 532.

**\*22** Harris presented nothing at the Rule 32 hearing suggesting deficient performance or prejudice in trial counsel's failure to object to the prosecutor's comment. Thus, this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.

**\*22** [31] 6. Harris claimed in her petition that trial counsel failed to object to the "prosecutorial misconduct" of the prosecution's allegedly inventing the following facts: that "Harris had been drinking when a sergeant called her to say that Mr. Harris had not arrived at work ..., although the State's witness, Officer Ralph Burton, testified that it sounded as if Harris was asleep when he called." (Harris's brief at p. 70.) The circuit court found trial counsel's decision to "exercise[ ] caution" in making objections during closing arguments to be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

sound strategy in light of the trial judge's failure to sustain any objections made during closing arguments. Thus, absent any evidence to the contrary, the circuit court correctly ruled that trial c ounsel's performance had not been deficient in this regard.

**\*22** Moreover, the substantive claim underlying this claim was presented on appeal and has been reviewed for error. On direct appeal, this Court ruled:

**\*22** "The prosecutor's comment that the appellant had possibly been drinking or was otherwise intoxicated when she was called concerning the victim's whereabouts on the night of his murder was a proper inference from the evidence. There was testimony that the appellant's speech was slurred and sluggish during the telephone call and, when questioned the witness, who had placed the call, stated that he was uncertain whether this could have been the result of a state of intoxication."

**\*23** *Harris v. State,* 632 So.2d at 533.

**\*23** Harris presented nothing at the Rule 32 hearing suggesting deficient performance or prejudice in trial counsel's failure to object to the prosecutor's comment. Thus, this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.

**\*23** [32] 7. Harris claimed in her petition that trial counsel failed to object to the "prosecutorial misconduct" of the prosecution's allegedly inventing the following facts: "Harris wanted to kill her husband because he was getting a car loan ..., although there was no evidence Harris knew of any loan." (Harris's brief at p. 71.) The circuit court found trial counsel's decision to "exercise[ ] caution " in making objections during closing arguments to be sound strategy in light of the trial judge's failure to sustain any objections made during closing arguments. Thus, absent any evidence to the contrary, we conclude that the circuit court correctly ruled that trial counsel's performance had not been deficient in this regard.

**\*23** The substantive issue underlying this claim was presented on appeal and has been reviewed for error. When presented as a substantive issue on direct appeal, this Court ruled:

**\*23** "The prosecutor's comment that the appellant wanted the victim killed by Friday because of a car loan was also a proper inference from the evidence. Trimble testified that the appellant had stated she wanted the victim killed by Friday because he was dipping into his insurance policies in order to build an addition onto their house. There was also testimony that the appellant knew that her husband was in the process of purchasing an automobile for her daughter. The prosecutor further stated that the car loan did not 'come through' as a reply in kind to defense counsel's argument during his closing statement, wherein he stated:

**\*23** " 'Look at this loan application that they've made a big to-do over. Take this back and look at it. Sergeant Harris was buying a car for Louise's daughter. Eight hundred and fifty dollars. They have been trying to tell you all this time she had to get him killed before he got the eight hundred and fifty dollars. Now this is real important to them. They struggled to get this in. They-you know, they brought witnesses up here and they got it in and here it is. Take this application back and look at it. If you don't know from your own experience, this application is going to tell you. When you go down to get a loan at the Credit Union you have credit life on it, and it's right there-credit life. Now what does that mean? We all know if Sergeant Harris had gotten the eight hundred and fifty dollars and then been killed, the loan would have been paid for and they would have had another car in the family.' "

**\*23** *Harris v. State,* 632 So.2d at 533.

**\*23** Harris presented nothing at the Rule 32, Ala. R.Crim. P., hearing suggesting deficient performance or prejudice in trial counsel's failure to object to the prosecutor's comment. Thus, this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.

**\*24** [33] 8. Harris claimed in her petition that trial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

counsel failed to object to the "prosecutorial misconduct" of the prosecution's allegedly inventing the following facts: "Harris moved out of her in-laws' house in order to carry on an affair with Mr. McCarter ..., although Harris had moved out of the house owned by her in-laws before she met Mr. McCarter." (Harris's brief at p. 71.) The circuit court found trial counsel's decision to "exercise [ ] caution" in making objections during closing arguments to be sound strategy in light of the trial judge's failure to sustain any objections made during closing arguments. Thus, absent any evidence to the contrary, we conclude that the circuit court correctly ruled that trial counsel's performance had not been deficient in this regard.

**\*24** The substantive claim underlying this claim was presented on appeal, and reviewed for error. When presented as a substantive issue on direct appeal, this Court ruled:

**\*24** "The comment by the prosecutor that the appellant moved out of her mother-in-law's house so that she could have the privacy in which to carry on an affair was a reasonable inference from the evidence. There was evidence presented that the appellant was very unhappy with the fact that she was living with the victim's mother, and there was also evidence that the appellant had been involved in other extramarital affairs prior to the one with Lorenzo McCarter."

**\*24** *Harris v. State,* 632 So.2d at 533.

**\*24** Harris presented nothing at the Rule 32, Ala. R.Crim. P., hearing suggesting deficient performance or prejudice in trial counsel's failure to object to the prosecutor's comment. Thus, this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.

**\*24** [34] 9. Harris claimed in her petition that trial counsel failed to correct what she says was the prosecutor's mischaracterization that "without their agreement with McCarter, he 'would have taken the 5th amendment, just like [Sockwell and Hood], because he was guilty and involved, and he told you,

' the obvious point being that Messrs. Sockwell and Hood would implicate (and their silence did implicate) Harris.... Harris's counsel did not object or seek corrective instruction." (Harris's brief at p. 71.) The circuit court ruled as follows:

**\*24** "Argo and Bowen both testified that they exercised caution when deciding whether to object to arguments of the prosecutor. Mr. Argo stated that 'generally I don't think you make a lot of objections in closing, particularly, unless it's just grossly obvious that the evidence is not there. I don't think Judge Thomas is going to sustain one, anyway.... Bowen gave a similar response.... This general approach to making objections is reasonable. Moreover, it appears to be especially applicable before Judge Thomas, who did not sustain a single objection made during closing argument. In this context, the Court reviews and denies all claims regarding a failure to object to allegedly improper argument. Moreover, because the comment set forth in [the instant claim] was not improper, no showing of prejudice can be made. See *Harris,* 632 So.2d at 533.'"

**\*25** (Rule 32 Record vol. 9, p. 1711.)

**\*25** The substantive issue underlying this claim was presented on appeal and has been reviewed for error. On direct appeal, this Court ruled:

**\*25** "The prosecutor's reference to the fact that Alex Hood and Michael Sockwell invoked their Fifth Amendment right to remain silent was made pursuant to her explanation of the agreement made by the State to obtain McCarter's testimony. Although the appellant argues that this comment was error under *Ex parte Tomlin,* 540 So.2d 668 (Ala.1988), the present case is readily distinguishable. In *Ex parte Tomlin,* the Alabama Supreme Court held that it was prosecutorial error for the State to repeatedly refer during closing argument to the fact that the defendant's wife could not be called to testify. The Court held that this comment implied that the defendant's wife was not testifying because she knew something that would implicate her husband. In the present case, two witnesses took the stand and refused to testify in front of the jury. Moreover, no close relationship exists between these witnesses and the appellant, which would lead to the inference that these

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

witnesses knew that the appellant was guilty and were refusing to testify in order to protect her. More reasonably, these witnesses' refusal to testify would have been a matter of self-protection. Because the jury was well aware of the fact that the two witnesses refused to testify, the prosecutor was merely commenting on the evidence."

*25 *Harris v. State,* 632 So.2d at 532-33.

*25 Harris presented nothing at the Rule 32, Ala. R.Crim. P., hearing suggesting deficient performance or prejudice in trial counsel's failure to object to the prosecutor's comment. Thus, this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.

*25 [35] 10. Harris claims in footnote 79 of her brief on appeal that trial counsel was ineffective for failing to "address effectively that Harris received a $100 check from Mr. McCarter because he was repaying a loan she made him to fix his car (the $100 she gave him that he claimed was to hire Messrs. Sockwell and Hood.)" (Harris's brief at p. 67.)

*25 The circuit court disposed of this claim as follows: "Regarding the check, Harris failed to present any evidence or argument in support of the allegation and, therefore, demonstrate prejudice. Moreover, there was no deficient performance. Trial counsel made effective use of it during closing argument." (Rule 32 Record, vol. 9, p. 1710.)

*25 Harris presented nothing at the Rule 32 hearing suggesting deficient performance or prejudice in trial counsel's failure to object to the prosecutor's comment. Thus, this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R.Crim. P.

*26 Thus, as to ineffective assistance of counsel claims 1 through 10, Harris has not shown how her trial counsel's conduct was deficient or how the

outcome of her trial would have been different had his trial counsel performed differently regarding these claims. See, e.g., *Williams v. State,* 782 So.2d 811, 825 (Ala.Crim.App.2000); *Brooks v. State,* 695 So.2d 176, 182 (Ala.Crim.App.1996). Therefore, Harris has failed to establish ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The circuit court's rulings were correct.

g.

*26 Harris claims that trial counsel were ineffective because they failed to ensure that the trial court properly instructed the jury.

*26 [36] 1. Harris claims that trial counsel were ineffective when counsel failed to request a jury charge stating that accomplice testimony must be corroborated by *independent* evidence that connects the defendant with the offense. According to Harris, the trial court incorrectly charged: " '[a] conviction for a felony offense cannot be had on the testimony of an accomplice or of numerous accomplices unless such testimony is corroborated by other evidence tending to connect the defendant with the commission of the offense.' " (Harris's brief at p. 72, quoting the record on direct appeal at vol. 5, pp. 937-38.) The circuit court ruled:
*26 "Harris failed to present any evidence in support of this claim and the complaint regarding the instruction in question was raised on direct appeal. (Harris's direct appeal brief at p. 117)....
This claim is denied."

*26 (Rule 32 Record vol. 9, p. 1715.)

*26 We find no merit to this claim. Section 12-21-222, Ala.Code 1975, provides:
*26 "A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----                                                    Page 33

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

**\*26** The given charge followed the substance of the statute. Thus, trial counsel had no grounds on which to base an objection and the trial court correctly held that trial counsel was not ineffective. Thus, the circuit court correctly denied the claim.

**\*26** [37] Moreover, any "error of failing to instruct the jury on the need for corroborative evidence is harmless when the testimony of the accomplice has been corroborated." *Zieglar v. State,* 886 So.2d 127, 142 (Ala.Crim.App.2003). The substantive issue underlying this claim was raised on appeal and has been reviewed for error. Regarding acc omplices, we ruled on direct appeal that "neither Patterson nor Trimble were accomplices." *Harris v. State,* 632 So.2d at 537. We further ruled on direct appeal that "the question of complicity constituted a question of fact for the jury to decide and, by its verdict, it is clear that it found sufficient corroboration of accomplice testimony." *Id.* Also on direct appeal we found that accomplice testimony was sufficiently corroborated by the following testimony:

**\*27** "Patterson was present with the majority of the coconspirators during the commission of the offense. He testified to a female voice broadcasting over McCarter's beeper the message 'He is leaving.' Trimble testified that he was solicited by the appellant to commit the offense. Moreover, she was implicated by her conduct upon learning of her husband's death and by her statement that, if McCarter committed the offense, she did not tell him to do so. Moreover, she admitted to her affair with McCarter and to having had marital problems with the victim.

**\*27** " '....'

**\*27** "... The State presented corroborative evidence to connect the appellant with the commission of the offense."

**\*27** *Harris v. State,* 632 So.2d at 537.

**\*27** Harris presented nothing at the Rule 32 hearing suggesting deficient performance in trial counsel's failure to object or prejudice as a result of that failure. Thus, this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R.Crim. P., or the specificity requirements of Rule

32.6(b), Ala. R.Crim. P.

**\*27** Thus, Harris has not alleged how her trial counsel's conduct was deficient or how the outcome of her trial would have been different had her trial counsel performed differently regarding this claim. See, e.g., *Williams v. State,* 782 So.2d 811, 825 (Ala.Crim.App.2000); *Brooks v. State,* 695 So.2d 176, 182 (Ala.Crim.App.1996). Therefore, Harris has failed to state a claim of ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The circuit court's ruling was correct.[FN6]

**\*27** [38] 2. Harris contends that all of trial counsel's errors, in the aggregate, require that Harris be given a new trial. This claim was not presented to the circuit court. See *Arrington v. State,* 716 So.2d 237, 239 (Ala.Crim.App.1997)(holding that "[a]n appellant cannot raise an issue on appeal from the denial of a Rule 32 petition which was not raised in the Rule 32 petition"). Therefore this issue is not reviewable.

**\*27** Moreover, even if the claim were properly before us, we note that Harris would not be entitled to relief on this claim.

**\*27** " ' " '[E]ffectiveness of counsel does not lend itself to measurement by picking through the transcript and counting the places where objections might be made.' " *Stringfellow v. State,* 485 So.2d 1238, 1243 (Ala.Cr.App.1986). "Even though there were several instances where counsel could have objected, 'that does not automatically mean that the [appellant] did not receive an adequate defense in the context of the constitutional right to counsel.' *Ex parte Lawley,* 512 So.2d 1370, 1373 (Ala.1987). " *O'Neil v. State,* 605 So.2d 1247, 1250 (Ala.Cr.App.1992). As this Court observed in *Graham v. State,* 593 So.2d 162, 166 (Ala.Cr.App.1991):

**\*27** " ' "The lawyer whose performance the appellant now attacks zealously and vigorously defended the appellant. No particular decision to object or not object, even if it is a bad decision, is in itself proof that counsel's performance fell below acceptable professional standards." ' "

**\*28** *DeBruce v. State,* 890 So.2d 1068, 1090

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

(Ala.Crim.App.2003)(quoting *Daniels v. State,* 650 So.2d 544, 555 (Ala.Crim.App.1994)).

### III.

**\*28** [39] Harris contends that the circuit court erred in denying her relief, after a hearing, on her claims that she was denied effective assistance of counsel during the penalty phase of the trial.

**\*28** "In order to obtain a reversal of [a] *death sentence* on the ground of ineffective assistance of counsel, [an appellant] must show both (1) that the identified acts or omissions of counsel were deficient, or outside the wide range of professionally competent assistance, and (2) that the deficient performance prejudiced the defense such that, without the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different. *Bolender v. Singletary,* 16 F.3d 1547, 1556-57 (11th Cir.) (citing *Strickland,* 466 U.S. [668] at 687, 104 S.Ct. [2052] at 2064 [ (1984) ] ), *cert. denied,* [513] U.S. [1022], 115 S.Ct. 589, 130 L.Ed.2d 502 (1994)."

**\*28** *Baxter v. Thomas,* 45 F.3d 1501, 1512-13 (11th Cir.1995)(emphasis added).

**\*28** Concerning the presentation of mitigating evidence during the penalty phase, the United States Supreme Court in *Wiggins v. Smith,* 539 U.S. 510, 522-23, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), held that the "principal concern in deciding whether [counsel] exercised [the] 'reasonable professional judgmen [t],' " required by *Strickland,* is "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [defendant's] background was *itself reasonable.*" *Wiggins,* 539 U.S. at 522-23, 123 S.Ct. 2527. It is within the framework announced in *Wiggins* that we analyze counsel's preparation for the penalty phase in Harris's case.

**\*28** Harris contends in her petition, as she does on appeal, that trial counsel's decision to forgo an investigation into possible mitigating evidence constituted deficient performance. She also contends that she suffered prejudice as a result of

counsel's deficient performance because, she says, the abundance of available mitigating evidence, if it had been presented to the trial court, would have persuaded more jurors to vote in favor of life imprisonment without parole. She also argues that the mitigating evidence that could have been presented would have outweighed the one aggravating factor found to exist by the trial court in imposing death and would have led to the trial court's imposing a sentence of life imprisonment without parole.

**\*28** In denying this claim on the merits, the circuit court found that neither counsel had "a clear recollection of what was done in order to investigate for a possible penalty phase." (Rule 32 Record vol. 9, p. 1716.) However, the circuit court determined that it would "not consider trial counsel's inability to recall in favor of a finding of ineffective assistance. Where the record is unclear, the court [would] assume that counsel acted in a manner consistent with the counsel required by the Sixth Amendment." (Rule 32 Record vol. 9, p. 1716.) The court found that counsel made a reasonable "strategic decision" to adopt the testimony of the guilt-phase character witnesses as mitigating evidence in the penalty phase. The circuit court found this strategy to be acceptable, apparently, because some jurors where crying when the guilty verdict was returned and it was reasonable that counsel wanted to "[t]ake [ ] advantage of that atmosphere" in the penalty phase. (Rule 32 Record vol. 9, p. 1717.) The court found that counsel made a reasonable "strategic decision" by declining to present evidence of abuse Harris allegedly suffered as evidence at the penalty phase mitigating a death sentence. The circuit court reasoned that this was acceptable because Harris continued to maintain her innocence during the penalty phase and because "[c]ounsel continued to attack the state's case against Harris throughout the penalty phase." (Rule 32 Record, vol. 9, p. 1717.) The circuit court concluded by finding that counsel's effectiveness was evidenced by the fact that the jury recommended a sentence of life imprisonment without parole.

**\*29** The circuit court also found that counsel's efforts before the sentencing judge were successful

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

because the presentence officer presented favorable testimony for Harris and he recommended that she be sentenced to life imprisonment without parole. The circuit court also found it to be reasonable strategy that counsel relied on "residual doubt" to stress to the sentencing judge the weaknesses in the State's case. Based on the above, the circuit court found that Harris had not met her burden of proving that counsel's performance was deficient in this regard.

**\*29** The circuit court concluded by finding that Harris failed to demonstrate that she suffered prejudice as a result of counsel's alleged deficient performance. The circuit court found that Harris failed to establish that there was a "reasonable probability that, had the evidence she presented at the Rule 32 hearing been presented at trial, the outcome would have been different." (Rule 32 Record, vol. 9, p. 1718.) The circuit court found that " [m]uch of the testimony was· either irrelevant, too remote to weigh heavily against the death penalty, or cumulative to the evidence presented at the trial, including Harris's testimony." (Rule 32 Record, vol. 9, p. 1718.) Citing to *Boyd v. State,* 746 So.2d 364 (Ala.Crim.App.1999), the circuit court opined that even had the testimony presented at the Rule 32 hearing been presented at the sentencing hearing it is unlikely that the trial court would have sentenced Harris differently because the sentencing court found that counsel "did a thorough job of presenting non-statutory mitigating circumstance evidence" and because the "sentencing court held that the one aggravating circumstance *far outweighed* the mitigation and, on direct appeal, the Court of Criminal Appeals agreed with that finding. *Harris,* 632 So.2d at 542-43." (Rule 32 Record vol. 9, p. 1719.)

**\*29** Finally, the circuit court did not credit the testimony of Dr. Martha T. Loring and Dr. Robert D. Shaffer regarding the nature of Harris's mental health. The circuit court continued by stating that even if it did credit the testimony of Dr. Loring and Dr. Shaffer, "the disorders [Harris] allegedly suffers from had absolutely nothing to do with the commission of the crime ... [and] were not a factor in her committing the murder. The testimony would not have changed the outcome of the trial." (Rule

32 Record vol. 9, p. 1719.) The circuit court concluded: "The court cannot find that there is a reasonable probability that the additional evidence presented in these proceedings would have altered that decision." (Rule 32 Record vol. 9, p. 1719.) We disagree.

*Deficient Performance*

**\*29** "To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.' [*Strickland v. Washington,* 466 U.S. 668] at 688 [ (1984) ]. We have declined to articulate specific guidelines for appropriate attorney conduct and instead have emphasized that ' [t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.' *Ibid.*"
**\*30** *Wiggins v. Smith,* 539 U.S. at 521, 123 S.Ct. 2527.

**\*30** [40] First we note that "Alabama's sentencing scheme broadly allows the accused to present evidence in mitigation." *Ex parte Smith,* [Ms. 1010267, March 14, 2003] --- So.2d ----, ---- (Ala.2003).
**\*30** "To determine the appropriate sentence, the sentencer must engage in a 'broad inquiry into all relevant mitigating evidence to allow an individualized determination.' *Buchanan v. Angelone,* 522 U.S. 269, 276 (1998). Alabama's sentencing scheme broadly allows the accused to present evidence in mitigation. *Jacobs v. State,* 361 So.2d 640, 652-53 (Ala.1978). See § 13A-5-45(g), Ala.Code 1975 ('The defendant shall be allowed to offer any mitigating circumstance defined in Sections 13A-5-51 and 13A-5-52.'). '[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts t hat are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.' *California v. Brown,* 479 U.S. 538, 545 (1987) (O'Connor, J., concurring specially)."

**\*30** *Ex parte Smith,* [Ms. 1010267, March 14,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

Page 36

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

2003] --- So.2d ----, ---- (Ala.2003). Thus, the circuit court's finding that the evidence of Harris's background was too remote in time to be admissible was an abuse of discretion.

**\*30** Second we note that,

**\*30** " 'An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence.' *Porter v. Singletary,* 14 F.3d 554, 557 (11th Cir.), *cert. denied,* 513 U.S. 1009, 115 S.Ct. 532, 130 L.Ed.2d 435 (1994). The failure to do so 'may render counsel's assistance ineffective.' *Bolender [v. Singletary* ], 16 F.3d [1547] at 1557 [ (11th Cir.1994) ]."

**\*30** *Baxter v. Thomas,* 45 F.3d at 1513.

**\*30** Eric Bowen, Harris's lead counsel at trial, testified at the Rule 32, Ala. R.Crim. P., proceeding via a deposition. Bowen testified that he "assume[d] " that he and Argo met with Harris's relatives to ascertain information helpful to the defense but " [he] really can't recall it." (Volume 18 of Rule 32 hearing at p. 37.) However, Bowen testified that, before trial, he asked Harris to write a synopsis of her life. Based on the synopsis, one of Bowen's initial meetings with Harris concerned the option of pursuing a battered-woman defense during the *guilt* phase of the trial. Bowen said that he felt that "we could probably prove ... [that Harris had been beaten by three husbands], if it really did occur, by talking to family members, people that might know." (Volume 18 of Rule 32 hearing at p. 16.) However, Bowen stated that Harris categorically rejected that defense for the guilt phase and " unequivocally den[ied] any involvement in the murder of her husband." (Volume 18 of Rule 32 hearing at pp. 17, 28.) [FN7] Based on Harris's statements to her attorneys, the theory of defense during the guilt phase of the trial was "that [Harris] had no part in the killing of [her] husband," and that McCarter implicated Harris in the murder so that he could make a deal with the district attorney to save his own life. (Volume 18 of Rule 32 hearing at p. 24.)

**\*31** As strategy for the penalty phase, Bowen stated that he understood that "literally anything" could be

presented as mitigation evidence during the penalty phase. He asserted that before trial he did ask Harris "about her background specifically for the purpose of investigating possible mitigating evidence." (Volume 18 of Rule 32 hearing at pp. 33 and 36.) According to Bowen, that is how he found out about Mrs. Louise Starr, a character witness presented during the guilt phase of the trial.[FN8] However, there was no investigation into Harris's life history or of her abusive relationships. Bowen stated that " [he] never considered the evidence of abuse" for purposes of mitigation because "I think that would have been opposed to [Harris's] wishes because I think at the penalty stage, she was still maintaining, and even maybe to the trial judge, that she was not guilty." (Volume 18 of Rule 32 hearing at p. 38.) Thus, Harris's penalty-phase strategy was to maintain her innocence before the jury, also known as fostering "residual doubt" as to her guilt, and presenting of evidence showing her good character. However, Bowen stated that he did not know if presenting evidence of spousal abuse during the penalty phase would have been against Harris's wishes because "*[w]e didn't discuss that, so I can't really tell you that it was against [Harris's] wishes.*" (Volume 18 of the Rule 32 hearing at p. 77.)(Emphasis added.)

**\*31** As to the physical abuse allegedly suffered by Harris, Bowen stated that he was not aware that John Wesley Robinson, Harris's first husband, had " struck her and otherwise abused her during their marriage." (Volume 18 of the Rule 32 hearing at p. 71.) Bowen was not aware that Jesse Lee Hall, Harris's common-law husband, "beat her during their relationship." (Volume 18 of the Rule 32 hearing at p. 72.) He did not know that Hall was so violent that he was later convicted for the beating death of a subsequent wife, Annie Bledsoe. (Volume 18 of the Rule 32 hearing at p. 75.) Bowen stated that had he known that Harris had been abused by Robinson and Hall he might have presented the information during the penalty phase.

**\*31** Bowen likewise was not aware that McCarter had abused and threatened Harris. (Volume 18 of the Rule 32 hearing at p. 77.)

**\*31** Bowen did not investigate for possible

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

mitigating evidence even though there was information noted in his case file suggesting the existence of mitigating evidence in addition to that of physical abuse suffered by Harris in her relationships with men. Bowen testified that his case file included a competency report on Harris from Taylor Hardin Secure Medical Facility. This report stated that Harris had been raped when she was 10 or 11 years old. Bowen testified that he was sure he read the report before trial. He could not provide a reason for not presenting at the penalty phase the fact of the rape and conceded that the presentation of evidence that Harris was raped as a child during the penalty phase "would have been okay." (Rule 32 Record vol. 18, p. 60.)

**\*32** Another fact contained in the Taylor Hardin report was the fact that Harris's father had been " ambushed after getting out of the car or driving up to a gate or stopped" and that Harris had discovered his body. (Rule 32 Record vol. 18, p. 60.) [FN9] Bowen was aware of this incident, but he felt that it was too close factually to the instant case to present during the penalty phase as evidence in mitigation. This may have been a sound strategic decision; however, the jury learned the circumstances of her father's death during the guilt phase of the trial and Bowen never considered the fact that Harris discovered the body of her murdered father worthy of garnering sympathy during the penalty phase.

**\*32** Bowen did not recall whether he knew that Harris's sister had died in her arms when Harris was 14, even though this information was noted in his case file. However, Bowen stated that if he had known this fact "I think really that I probably might have" used it as mitigating evidence. (Volume 18 of the Rule 32 hearing at p. 64, 66). Despite the fact that the event was traumatic, Bowen stated that he probably would not have presented during the penalty phase evidence that Harris's house had burned down when she was 14 years old, around Christmas, shortly after her sister had died. Bowen considered this "a fortuitous event like that may not have registered with me at the time." (Volume 18 of the Rule 32 hearing at p. 67.) Bowen stated that he probably read in his case file that Harris's younger brother had drowned, but he did not recall knowing that Harris had seen the body being

recovered from the river. He stated that if he had recalled that event he probably would have presented it during the penalty phase "as to trauma and things like that that she might have suffered." (Volume 18 of the Rule 32 hearing at p. 68.)

**\*32** Thus, Bowen did not conduct any investigation as to possible mitigating evidence based on the synopsis of her life she prepared, his conversations with Harris, or any other information in counsel's case file. Instead, Bowen's strategy for the penalty phase was to adopt[FN10] all the character evidence from the guilt phase. Five character witnesses had testified during the guilt phase-Eddie Bell, Hyram Knight, Louise Starr, Peggy Warner, and Helen Green. However, Bowen correctly conceded that their testimony was "quite limited" to "Harris's general reputation in the community, very general, and reputation for telling the truth." (Volume 18 of Rule 32 hearing at page 48 and 49.) Specifically, Bowen stated:

**\*32** "As far as the character evidence, we had Mrs. Louise Starr, Bart Starr's mother. We had a lady who had been maybe on top of her profession in the financial world who knew Louise Harris. We had some other folks, you know, maybe from the church. We had what we thought were really good character witnesses that had known Ms. Harris for a long period of time, and so obviously we had that in mind, I mean, not just for the guilt stage but also for the sentencing stage."

**\*33** (Volume 18 of Rule 32 hearing at page 35-6.) The record from the direct appeal reflects that the trial court granted Harris latitude in questioning four of these five character witnesses. In addition to asserting that they knew Harris to have a good reputation in the community for telling the truth and being honest, Bell and Knight, both of whom had known Harris since she was a very young child, testified regarding Harris's active participation in the church and that she was a hard worker; Starr, who had known Harris since she was a young teenager, was allowed to testify that Harris had always been well thought of in the community, that she was active in school, and that she had played in the school band, and sang in the church choir; Warner, for whom Harris had done housework for 10 years, testified that Harris was a hard and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

trustworthy worker whom Warner "absolutely" trusted to keep her child. (Record on direct appeal vol. 4, p. 695.)

**\*33** Knox Argo, cocounsel with Bowen, testified at the hearing on Harris's Rule 32, Ala. R.Crim. P., petition. Argo testified that he had little recollection of what happened in the case 10 years ago, but that he did remember "talking to some of [Harris's] employers, and seemed like one of the church members." (Volume 15 of Rule 32 hearing at p. 87.) He stated that he had "[a] vague recollection" of meeting with Harris's family members in his office before her trial but not a strong recollection. (Volume 15 of Rule 32 hearing at p. 92.) Argo stated that he did not recall "anything about the substance of that meeting." (Volume 15 of Rule 32 hearing at p. 93.) Argo stated that he recalled a conversation with Bowen concerning offering additional witnesses at the penalty phase but he did not recall the specifics of the conversation. (Volume 15 of Rule 32 hearing at p. 123.) However, Argo did not recall any discussions about what should be done regarding mitigating evidence. (Volume 15 of Rule 32 hearing at p. 121.) He stated that the evidence presented during the guilt phase regarding Harris's general reputation in the community for telling the truth by witnesses Eddie Bell, Hyram Knight, Louise Starr, Peggy Warner, and Helen Green "was basically mitigation." (Volume 15 of Rule 32 hearing at p. 122.)

**\*33** No investigation into possible mitigating evidence was conducted, even though several documents recovered from Argo's case file indicated the existence of possible mitigating evidence. An emergency-room medical record obtained from Argo's file indicated that Harris had stated as the reason for her visit to the emergency room that her husband had hit her in the head with a cooking pot. (Volume 15 of Rule 32 hearing at pp. 124-25.) Another document contained in Argo's case file reflected that Harris's house burned down two days after Christmas when she was 14; that John Wesley Robinson, her first husband, had beat her; and that Jesse Lee Hall, her common-law husband, had abused alcohol and had beat her. (Volume 15 of Rule 32 hearing at p. 127). Argo did recall a document from his file reflecting that there

had been a divorce proceeding between Harris and the victim where Harris had accused the victim of beating her. (Volume 15 of Rule 32 hearing at p. 114.) A municipal court complaint in Argo's file alleged that the victim had hit Harris with a cooking pot and that he had pulled his .357 Magnum pistol on her. (Volume 15 of Rule 32 hearing at p. 129.) A notation in Argo's file indicated that Harris had told Argo that McCarter had a drinking problem and that he had threatened Harris's daughter. (Volume 15 of Rule 32 hearing at pp. 130, 132.) None of the information above was investigated as possible mitigating evidence, nor was it presented during the penalty phase of Harris's trial.

**\*34** Argo explained that the point of the defense, other than obtaining an acquittal, was to get Harris a sentence of life imprisonment without parole, which he and Bowen had accomplished during the penalty phase before the jury. However, counsel's satisfaction with the jury recommendation of life in prison without the possibility of parole completely discounted the fact that the penalty phase of a capital murder trial is a two-part process, in the second part of which the trial court had the option of overriding the jury's recommendation based on the trial court's independent weighing of the aggravating circumstances against the mitigating circumstance. Moreover, Harris argued at the Rule 32, Ala. R.Crim. P., hearing that it was vitally important to acquire at least eight votes for a sentence of life imprisonment as opposed to death because the trial judge in her case, Judge Randall Thomas, had a history of overriding a jury's recommendation of life imprisonment without the possibility of parole where less than eight jurors had voted for a sentence of life imprisonment. See *Acres v. State,* 548 So.2d 459, 460 (Ala.Crim.App.1987) (Judge Thomas overrode a jury's 7-5 recommendation of life imprisonment); *Hooks v. State,* 534 So.2d 329, 332 (Ala.Crim.App.1987) (Judge Thomas overrode a jury's 7-5 recommendation of life imprisonment); *Wagner v. State,* 555 So.2d 1141, 1141-42 (Ala.Crim.App.1989)(Judge Thomas did not override a jury's 8-4 recommendation for life imprisonment). Argo stated that he did not recall whether he was aware of Judge Thomas's record of overriding jury recommendations. (Volume 15 of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Rule 32 hearing at p. 135.) Thus, counsel's achievement during the penalty phase before the jury did not complete the task required of counsel in representing Harris during the penalty phase of her capital-murder trial.

**\*34** Harris's counsel decided to rely on residual doubt during the penalty phase. That is, counsel decided to maintain during the penalty phase that Harris was innocent. Here, as in *Wiggins v. Smith,* 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), counsel portrayed the decision to forgo the investigation and the presentation of mitigating evidence as a strategic decision protected from a hindsight review. Harris's case is very similar to *Wiggins.* In *Wiggins* the United States Court of Appeals for the Fourth Circuit ruled that counsel knew enough about Wiggins's background from available records to make a "reasonable strategic decision to focus on [Wiggins's] direct responsibility " for the killing during the penalty phase of the trial. *Wiggins,* 539 U.S. at 519, 123 S.Ct. 2527. In rejecting the reasoning of the Fourth Circuit Court of Appeals, the United States Supreme Court held:
**\*34** "[C]ounsel were not in a position to make a reasonable strategic choice as to whether to focus on Wiggins' direct responsibility, the sordid details of his life history, or both, because the investigation supporting their choice was unreasonable."

**\*34** *Wiggins,* 539 U.S. at 536, 123 S.Ct. 2527. In *Wiggins,* the United States Supreme Court held that counsel was ineffective because counsel had failed to adequately investigate the petitioner's life and had failed to call expert witnesses to testify regarding Wiggins's background even though counsel possessed information that should have prompted them to do so.

**\*35** [41][42] Thus, a strategic decision that is based on an incomplete investigation may not be strategic or reasonable.
**\*35** " '[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel

has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.*' "

**\*35** *Wiggins,* 539 U.S. 510, 521-22, 123 S.Ct. 2527 (quoting *Strickland v. Washington,* 466 U.S. at 690-91, 104 S.Ct. 2052 (emphasis added)).**\*35** " *The United States Court of Appeals for the Eleventh Circuit has held that trial counsel's failure to investigate the possibility of mitigating evidence is, per se, deficient performance. See Horton v. Zant,* 941 F.2d 1449, 1462 (11th Cir.1991) ('our case law rejects the notion that a "strategic" decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them'), *cert. denied,* 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992); see, also, *Jackson v. Herring,* 42 F.3d 1350, 1366-68 (11th Cir.) ('Although counsel need not "investigate every evidentiary lead," *he must gather enough knowledge of the potential mitigation evidence to arrive at an "informed judgment" in making [the decision not to present such evidence].... [A] legal decision to forgo a mitigation presentation cannot be reasonable if it is unsupported by sufficient investigation.*') (emphasis added; citations omitted), *cert. dismissed,* 515 U.S. 1189, 116 S.Ct. 38, 132 L.Ed.2d 919 (1995). Furthermore, trial counsel may be found ineffective for failing to present evidence of adjustment to incarceration, evidence of mental-health problems.... See *Skipper v. South Carolina,* 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (holding that a capital defendant *must* be permitted at the penalty phase of his trial to introduce evidence of adjustment and good behavior while incarcerated); *Horton v. Zant,* supra (counsel found ineffective for not presenting evidence of adjustment to incarceration); *Blanco v. Singletary,* 943 F.2d 1477 (11th Cir.1991), *cert. denied,* 504 U.S. 943, 112 S.Ct. 2282, 119 L.Ed.2d 207 (1992) (counsel found ineffective for failing to introduce evidence that defendant had mental-health problems and a very low IQ and had suffered from various bouts of paranoia and depression);...."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

Page 40

**\*35** *Ex parte Land,* 775 So.2d 847, 853-54 (Ala.2000)(emphasis on "must" in original; other emphasis added). As reflected above, counsel decided to rely on only residual doubt and the character evidence presented during the guilt phase of the trial, without conducting a meaningful investigation into the existence of possible mitigating evidence. Because counsel's investigation was inadequate, counsel was unaware of the significant available mitigating evidence that could have been presented on behalf of Harris during the penalty phase of the trial.

**\*36** Moreover, in addition to the information obtained from Harris and that contained in counsel's case files, the following evidence, which was presented at the Rule 32 hearing through the testimony of family, friends, and mental-health experts, was readily discoverable and available to be presented at the penalty phase as evidence mitigating a death sentence.

**\*36** Willie J. McPherson, Harris's younger brother, testified at the hearing. He testified that because Harris was older than he, Harris had taken care of him when he was a child while their mother worked. She cooked and cleaned for the entire family, which included eight children. He testified that when Harris was 16 she married John Wesley Robinson ("Buddy"). Willie said that during Harris's four-year marriage to Robinson, she lived about one mile down the road from Willie and that Willie was often at Harris's house. Willie said that Robinson drank and that he hit Harris with his fist and hand and that on one occasion he had also hit Willie. Willie testified that fighting between Harris and Robinson was common and that Harris "got scars like black eyes and her lips and stuff swole up" from Robinson's hitting her. He gave similar testimony regarding Jesse Lee Hall, Harris's common-law husband of approximately 10 years. The circuit court allowed testimony that Hall had killed the woman he lived with after he and Harris has separated-"chopped her up with an axe or something." (Volume 15 of Rule 32 hearing at p. 157.)

**\*36** Willie testified that he also spent a good deal of time with Harris and Isaiah Harris, her third husband and the victim in this case. He recounted that Isaiah Harris drank and that he hit Harris. He said that Harris once summoned him for help at 2:00 a.m. because Isaiah Harris was beating her. On that occasion Isaiah Harris pulled his gun out in front of Harris and Harris's children. On that occasion, not being sure of Isaiah's intentions, everyone ran out of the house and went to Willie's house to spend the night. On another occasion Harris arrived at Willie's house with "her lips ... swole up, and she had bruises on her forehead and everything." (Volume 15 of Rule 32 hearing at p. 159.) Harris told Willie that Isaiah had hit her with a frying pan.

**\*36** Willie McPherson never talked to an investigator for the defense. He said no lawyer for Harris had ever contacted him. He said he tried to talk to the attorneys once when he took his mother to their office but they "ignored" him, like "what [he] had to say just wasn't important." (Volume 15 of Rule 32 hearing at pp. 163, 168-69.) He stated that he attended Harris's trial and would have testified as he did in at the Rule 32 hearing had he been asked to do so.

**\*36** George McPherson, another of Harris's younger brothers, testified at the hearing on Harris's Rule 32 petition. He testified that Harris took care of the family after their older sister died. Harris washed, cooked, and ironed. The family did not have a washing machine so clothes were washed by hand in a washtub. There was no running water. Water was carried from a well located at their cousin's house a "good ways" away from their house. (Volume 15 of Rule 32 hearing at p. 193.) He testified that he saw John Wesley Robinson ("Buddy") "jumping on [Harris], beating her, stuff like that." (Volume 15 of Rule 32 hearing at p. 193.) He also testified that after he was grown, Harris bought his children Christmas presents when he did not have any money. He was not contacted by Harris's attorneys or an investigator, but he said he would have testified at trial if he had been asked to do so.

**\*37** Barbara McPherson is Harris's younger sister. Harris took care of Barbara when they were growing up. She, too, testified that there was no running water or gas where they grew up. She said

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

that when their daddy was shot, Harris and Jesse Lee Hall found his body. Barbara testified that when she was sick and could not take care of her four children, she and her children stayed with Harris. Harris also kept Barbara's children for two months when Barbara's baby was in the hospital. She also brought Barbara meals in the hospital in addition to taking care of the children and continuing to do her own job.

**\*37** Barbara McPherson described Jesse Lee Hall as someone who drank, was "violent" and was a " woman-beater." (Volume 16 of Rule 32 hearing at p. 214.) She testified that she saw Hall beat Harris. Once she saw him pick up a posthole digger and swing it around with the intent to hit Harris on her head but Harris's father saw it in time and intervened. Once, after Harris had left Hall, Hall began begging her to return to him. She refused and he "jumped on her" and had to be pulled off by others present. (Volume 16 of Rule 32 hearing at p. 215.)

**\*37** Barbara McPherson also knew Isaiah Harris. She described his attitude as "I enforce the law, but I ain't got to abide by the law." (Volume 16 of Rule 32 hearing at p. 216.) She testified that she had heard him say that very thing. Barbara stated that once Isaiah was drinking and driving in excess of the speed limit. Barbara said that she told him not to speed but he said "I'm the law. If they stop me, what they going to do?" (Volume 16 of Rule 32 hearing at p. 216.) Barbara said Isaiah was a different person when he drank.

**\*37** Barbara McPherson never heard from defense counsel or an investigator, but she attended Harris's trial and would have testified at Harris's trial if she had been asked to do so.

**\*37** Carolyn Rhodes is Harris's daughter. She was 19 years old at the time of the trial. She lived with her mother and Isaiah Harris. She testified that Harris and Isaiah Harris fought "a lot," usually about twice a week. (Volume 15 of Rule 32 hearing at p. 200.) She characterized the fights as " screaming, hitting on her, mostly he start on her and I also try to keep him from hitting her when she try to get out." (Volume 15 of Rule 32 hearing at p.

200.) She testified that Harris left Isaiah Harris once when he drew his gun on Harris and hit Harris on the head with a frying pan. Rhodes's uncle had to come and get them on that occasion. However, Harris went back to Isaiah Harris after that incident. Rhodes said her mother tried to move out a second time but Isaiah "laid in front of the car, then he went and laid behind the car" so she could not drive away. (Volume 16 of Rule 32 hearing at p. 201.) She said Isaiah Harris "drank every day." (Volume 16 of Rule 32 hearing at p. 201.)

**\*37** Rhodes testified that there was a family meeting with Harris's lawyers one time but that the purpose of the meeting was to pay them. She never heard from them again or from an investigator. Rhodes stated that she attended the trial and that she would have testified at trial as she did at the Rule 32 hearing had she been asked to do so.

**\*38** Jesse L. Robinson is Harris's son. He was 15 years old when she was arrested. He lived with Harris and Isaiah during their marriage. He testified that Harris and Isaiah fought "a lot." (Volume 16 of Rule 32 hearing at p. 222.) Once he saw Isaiah "pull a gun out and he shot in the floor." (Volume 16 of Rule 32 hearing at p. 222.) Once his uncle was taking Robinson home and when they arrived, everybody was outside the house because Isaiah had a gun out. Isaiah began waving it at Robinson and his brother so they had to leave with their uncle. Robinson said that one time Isaiah hit Harris with a frying pan and she had to go to the emergency room. (Volume 16 of Rule 32 hearing at p. 225.) Isaiah drank "anywhere from a twelve pack a day, maybe eighteen. And on special occasions, probably liquor, vodka, something like that." (Volume 16 of Rule 32 hearing at p. 223.) Robinson stated that when he was about 12 years old he ran away from home because he "tired of the fighting" between Harris and Isaiah and "there was nothing I could do about it." (Volume 16 of Rule 32 hearing at p. 223.)

**\*38** Robinson described his mother as loving and caring but "also strict." (Volume 16 of Rule 32 hearing at p. 223.) She encouraged her children to " be the best at what you do." (Volume 16 of Rule 32 hearing at page 223.) She also attended Robinson's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

Page 42

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

football and basketball games when he was young. Robinson was never contacted by an attorney or an investigator. He attended Harris's trial and he would have testified at Harris's trial if he had been asked to do so.

**\*38** Stanley T. Robinson is Harris's son. He lived with Harris and Isaiah during their marriage. He testified that there was a lot of fighting between Harris and Isaiah. Robinson said he saw Isaiah "hit her, you know, cursing at her, getting real violent towards her." (Volume 16 of Rule 32 hearing at p. 231.) He remembers that one time Isaiah Harris pulled a gun on her. During these incidents, he heard Isaiah Harris say things to Harris such as " motherfucker" and say that he was going to "do things" to her and say to her "You're no good." (Volume 16 of Rule 32 hearing at p. 232.) These incidents happened "a number of times." (Volume 16 of Rule 32 hearing at p. 232.) Robinson testified that once Harris said she was going to leave and Isaiah "had a gun on her saying what he was going to do to her" if she did. (Volume 16 of Rule 32 hearing at p. 232.) One time Harris telephoned the police about Isaiah Harris's abuse but they "didn't do nothing" when they got to the house. (Volume 16 of Rule 32 hearing at p. 233.) Robinson guessed that Isaiah drank a 12 pack of beer every two days. He recalled one time that he was with Isaiah when he was drinking and driving too fast. He got stopped for speeding, but the officer let him go when Isaiah showed him his badge.

**\*38** Robinson also knew Lorenzo McCarter, Harris's co-defendant. They worked together at one time. Robinson said that McCarter drank "a lot." (Volume 16 of Rule 32 hearing at p. 234.) McCarter drank at work beginning early in the morning. Robinson stated that McCarter was "a relaxed person" until he began drinking. When McCarter drank "he became kind of vicious-like, got an attitude, real snappy." (Volume 16 of Rule 32 hearing at p. 235.) Robinson described his mother as "a loving caring person ... that would give you her life if she had it to give." (Volume 16 of Rule 32 hearing at p. 235.) Robinson recalled talking to a lawyer as a part of a family group, but not individually and he was not asked to testify at trial. He recalled being asked whether he knew "anybody

that wanted to come or anything is all they ever asked me." (Volume 16 of Rule 32 hearing at p. 235.) Robinson did not talk to an investigator. He attended his mother's trial and would have testified if he had been asked to do so.

**\*39** Helen Green is Harris's friend and has known Harris all her life. They grew up together. She remembered when Harris's older sister, Elizabeth, died. Harris had been close to her sister, and she grieved a lot when Elizabeth died. When Elizabeth died Harris became the oldest child and had to take care of the children because her parents worked. She also remembered when Louise's brother, James, died. Harris was present when they pulled his body from the water after he had drowned.

**\*39** Green described Harris as a "dependable, reliable, a good friend. She's a person with a spirit to help anyone. You know, if she can help you, she will." (Volume 16 of Rule 32 hearing at p. 228.) Green testified that once when Green was down on her luck and having a hard time, Harris fed Green and her children. Green did testify at Harris's trial as a character witness stating that Harris had a good reputation in the community for truth and honesty. (Volume 4 of record on direct appeal at p. 701.) Other than when someone telephoned her who said they wanted to testify, she said that she spent " maybe five, ten minutes" with a lawyer before trial. Green was never asked about Harris's background or personality. No one asked Green to testify at sentencing but she said she would have if she had been asked.

**\*39** Adrienne K. Ivey was food-services director for the First Baptist Church in Montgomery at the time of Isaiah Harris's murder. Harris was her employee for four years at the church and was in charge of the kitchen.[FN11] Ivey testified that there were "so many people at First Baptist Church that love [Harris] so." (Volume 15 of Rule 32 hearing at p. 172.) Ivey stated that Harris was a "very, very, hard worker"; "I was able to confide in [Harris]"; Harris got along with co-workers "great" because "they all respected [Harris] a lot because she knew her job." (Volume 15 of Rule 32 hearing at p. 173.) According to Ivey, Harris had "empathy for other people." Specifically Ivey recounted a young

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

alcoholic whom Harris helped so he would not lose his job in the kitchen and how Harris helped Ivey when Ivey's mother died. Ivey stated that Harris " loved her children"; "was strict on her children"; and was "very protective of her children." (Volume 15 of Rule 32 hearing at p. 177.) She said that Harris was "very definitely" a good mother, "very much so." (Volume 15 of Rule 32 hearing at p. 177.)

**\*39** Ivey said that some attorney telephoned her early one morning and asked her a couple of questions and said he would call her back but he never did. Ivey said that she was not contacted by an investigator. She stated that she did not attend Harris's trial but that she would have testified on Harris's behalf if she had been asked to do so and that "any of the girls in the [church] kitchen would have been happy to testify for [Harris]." (Volume 15 of Rule 32 hearing at p. 179.) Ivey went on to say:

**\*39** "And I'm going to say again, I'm going to reiterate one more time about the fact that our staff, all of them, thought so much of Louise. I cannot emphasize that enough. Because she had been so good to all of them and been such a personable friend to so many people in the church. Any of them would have probably testified if they had been asked."

**\*40** (Volume 15 of Rule 32 hearing at p. 179.)

**\*40** Brenda Law was employed by the Elmore County Sheriff's Department as the administrator of the jail at the time Harris was incarcerated there. Upon her arrest, Harris was taken to the Elmore County jail. Law testified that she noticed bruises on Harris's legs at that time. According to Law, Harris became "a kitchen trusty and helped cook and stuff there." (Volume 16 of Rule 32 hearing at p. 208.) Harris was a "wonderful cook" and " everybody loved her food." (Volume 16 of Rule 32 hearing at p. 208.) She got along well with the other inmates; there were no problems "ever out of [Harris.]" (Volume 16 of Rule 32 hearing at p. 208.) Law testified: "Sometimes we had to watch other women, they were all on the same cell block like on a suicide block, or be kind of upset, sometimes we would put Louise in there to sort of

help and just calm them down." (Volume 16 of Rule 32 hearing at p. 208.) Law said it was her opinion that Harris was "a very sweet lady, very dedicated to whatever she was doing." (Volume 16 of Rule 32 hearing at p. 208.) However, Law said that Harris was "withdrawn" and "didn't talk a lot about her personal life" "other than her kids." (Volume 16 of Rule 32 hearing at pp. 209, 212.) It was also Law's opinion "judging from other people that have been in the jail" that Harris "had been battered and assaulted." (Volume 16 of Rule 32 hearing at p. 209.) Law was not contacted by counsel or by an investigator, but she indicated that she would have testified at Harris's trial if she had been asked to do so.

**\*40** In addition to the above testimony from family and friends, expert testimony was also presented at the Rule 32 hearing concerning Harris's family and life history.

**\*40** Dr. Martha T. Loring is a clinical social worker specializing in battered woman's syndrome [FN12] and post-traumatic stress disorder ("PTSD"), [FN13] and is director of the Center for Mental Health and Human Development in Atlanta, Georgia. Dr. Loring is a "Board Certified Expert in Traumatic Stress with a Diplomate in the American Academy of Experts in Traumatic Stress." (Rule 32 hearing, vol. 16, p. 240.) She spent 30 hours examining Harris. She also personally interviewed numerous individuals, including Harris's family and friends and reviewed various written documents concerning Harris. Dr. Loring concluded after this lengthy evaluation that Harris suffered from PTSD and battered women's syndrome at the time of the murder.

**\*40** Dr. Loring observed several symptoms of PTSD in Harris. She testified that one symptom of PTSD that Harris displayed was the characteristic of avoidance: Harris tried to avoid traumatic memories and found it difficult to talk about them and about her feelings about them. She suffered from dissociation; she had difficulty thinking and experienced a sense of panic. She suffered " flashbacks, intrusive thoughts and numbing, where sometimes her feelings aren't available to her, because they are so painful and she tries to avoid

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

Page 44

them." (Rule 32 hearing, vol. 16, p. 257.) According to Dr. Loring, as symptoms of battered woman syndrome, Harris tried to appease the men who abused her and she exhibited learned helplessness. She displayed an ongoing fear, which caused her to shake and occasionally cry as she discussed incidents, and Harris tried to minimize the traumatic events she had gone through. When pushed hard to remember incidents, Harris would " flail about and try to protect herself ... [with] movements of [her] hands or arms [as if] trying to protect herself of being choked or being shot, or being hit." (Rule 32 hearing, vol. 16, p. 264.)

**\*41** Dr. Robert D. Shaffer, an expert clinical psychologist, performed a dissociative experiences survey ("DES") FN14 on Harris and found that her score of between 30-40 was within "a range typical of most individuals who have [DES]." (Rule 32 Record vol. 16, p. 328.) Shaffer explained that the " general population obtains a score around five." (Rule 32 Record vol. 16, p. 328.) Dr. Shaffer continued that "[t]his score was in a range typically higher than that obtained by most individuals with Post-Traumatic Stress Disorder, and revealed a more severe level of dissociation typical of people with Post-Traumatic Stress Disorder." (Rule 32 Record vol. 16, p. 328.) Dr. Shaffer stated that DES "is what [he] would consider to be an extension of Post-Traumatic Stress Disorder, or an exacerbated condition of Post-Traumatic Stress Disorder, where over the years, a person splits off from their awareness of reality in order to cope." (Rule 32 Record vol. 16, pp. 335-36.)

**\*41** Dr. Shaffer also performed a "Structured Interview of Reported Symptoms," which is a test designed to detect "faking and malingering of symptoms." (Rule 32 Record vol. 16, p. 331.) According to Shaffer, known malingerers score on average 80. Harris scored 11, indicating "that she was much less likely to endorse symptoms, much less likely to report difficulties in problems than the average honest responder." (Rule 32 Record vol. 16, p. 332.) Moreover, according to Dr. Shaffer the test revealed that Harris "tends to deny or minimize everyday problems. She tends to look at the world with a sunny side up, so to speak, and present

herself as composed and competent and capable, rather than having any problems." (Rule 32 Record vol. 16, pp. 332-33.)

**\*41** Dr. Shaffer also conducted an intelligence quotient ("IQ") test on Harris and found her full scale IQ to be 79, "which is in the borderline range [between normal and retarded] of IQ." (Rule 32 Record vol. 16, p. 333.)

**\*41** Dr. Karl Kirkland, a witness called by the State, is an expert in forensic psychology. He spent three to four hours with Harris and reviewed documents relevant to her and reviewed literature on battered-woman syndrome in preparation for his testimony. He determined through tests that Harris read at a fifth-grade level. As a result of his evaluation, Kirkland disagreed with the conclusions of Dr. Loring and Dr. Shaffer regarding their respective diagnoses that Harris suffered from battered-woman syndrome, DES and PTSD. However, Dr. Kirkland stated: "*Certainly, Ms. Harris meets plenty of diagnostic criteria to be called a battered woman. She has had a very difficult, horrendous life. There's no question about that. She has been in numerous battering relationships. In that sense, she meets the criteria to be called a battered woman.*" (Rule 32 Record, vol. 17, p. 401. Emphasis added.) It was Dr. Kirkland's opinion that Harris's "personality strengths" or " strength as an individual" prevented her from developing battered woman syndrome, DES, or PTSD. Dr. Kirkland noted that "[Harris] is clearly a very well-liked person" and commented that the prison warden and several guards dropped by just to speak with her during his interview. (Rule 32 Record, vol. 17, p. 406.)

**\*42** [43][44] " ' "An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence." ' " *Wood v. State,* 891 So.2d 398, 415 (Ala.Crim.App.2004)(opinion on return to remand), (quoting *Daniels v. State,* 650 So.2d 544, 569 (Ala.Crim.App.1994), quoting in turn *Middleton v. Dugger,* 849 F.2d 491, 493 (11th Cir.1988)). Here a reasonable investigation would have disclosed substantial evidence that could have been presented in mitigation. However, because

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

Page 45

counsel did not investigate the existence of mitigating evidence, their decision to rely only on residual doubt, character evidence presented during the trial, and the pre-sentence report was not reasonable. Because counsel failed to investigate, there was essentially nothing for the trial court to weigh in mitigation against the one aggravating circumstance that tipped the scales in favor of imposing a death sentence.

**\*42** "[O]ur principal concern in deciding whether [counsel] exercised 'reasonable professional judgmen[t],' [*Strickland*, 466 U.S. at 691], is not whether counsel should have presented a mitigation case. *Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [defendant's] background was itself reasonable. Ibid.* Cf. *Williams v. Taylor*, [529 U.S. 362] at 415 [(2000)] (O'Connor, J., concurring) (noting counsel's duty to conduct the 'requisite, diligent' investigation into his client's background). In assessing counsel's investigation, we must conduct an objective review of their performance, measured for 'reasonableness under prevailing professional norms,' *Strickland*, 466 U.S., at 688, which includes a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time,' *id.*, at 689 ('[E]very effort [must] be made to eliminate the distorting effects of hindsight')."

**\*42** *Wiggins*, 539 U.S. at 522-23, 123 S.Ct. 2527 (some emphasis added; some emphasis added).

**\*42** As the United States Supreme Court explained in *Wiggins*, the value of counsel's "strategic" decision depends on "the adequacy of the investigations supporting [that] judgment[ ]." *Wiggins*, 539 U.S. at 521, 123 S.Ct. 2527.
**\*42** "Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA)-standards to which we long have referred as 'guides to determining what is reasonable.' *Strickland*, supra, at 688; *Williams v. Taylor*, supra, at 396. The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'

ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added). Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources. Cf. *id.*, 11.8.6, p. 133 (noting that among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history,* prior adult and juvenile correctional experience, and religious and cultural influences) (emphasis added); 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 ('The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing.... Investigation is essential to fulfillment of these functions')."

**\*43** *Wiggins*, 539 U.S. at 524-25, 123 S.Ct. 2527.

**\*43** Here, the record reveals that before the penalty phase of the trial counsel had before them documents, notations, information from family and friends that, if pursued, would have led to the discovery of statutory and nonstatutory mitigating evidence. In summary, it was disclosed at the hearing on the Rule 32, Ala. R.Crim. P., petition that the following facts were readily discoverable for presentation as mitigating evidence:
**\*43** 1. Harris's childhood was spent in *extreme* poverty as the oldest (following the death of her older sibling) of eight children.
**\*43** 2. At age 10 or 11 Harris was raped. (Volume 15 of Rule 32 hearing at p. 110.)
**\*43** 3. When Harris was 14 years old, her older sister suffered a seizure and died in Harris's arms.
**\*43** 4. When Harris was 14 years old, her house burned down two days after Christmas. (Volume 15 of Rule 32 hearing at p. 106.)
**\*43** 5. When Harris was approximately 14 years old, her younger brother drowned and she witnessed authorities pull his body from the water.
**\*43** 6. Harris married at age 16, and between the ages of 16 and 19 she was abused by husband, John Wesley "Buddy" Robinson-even during Harris's pregnancies.
**\*43** 7. Between the ages of 19-27, Harris was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----                                                                                      Page 46

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

abused by her boyfriend, Jesse Lee "Kingsize" Hall. (In 1984 Jesse Lee Hall was incarcerated for the beating death of his then wife, Annie Bledsoe. (Rule 32 Record vol. 18, p. 75.))

*43 8. At approximately age 21, Harris discovered the body of her murdered father and harbors concern that he was murdered by Jesse Lee " Kingsize" Hall.

*43 9. At ages 31-34, Harris was physically abused by her second husband, Deputy Sheriff Isaiah Harris (the victim) who suggested to her that she could do nothing to stop him from abusing her because he was a deputy sheriff.

*43 10. At age 34, Harris was physically abused by her lover, Lorenzo "Bobo" McCarter, who is also a co-defendant in the instant case.

*43 11. In spite of her own hardships, Harris was a good person and helped others in need.

*43 12. Harris may suffer from battered-woman syndrome and PTSD, but at the very least, has suffered harsh experiences throughout her life that contribute to these conditions.

*43 13. Harris's IQ is 79, which is in the borderline range between normal and retarded.

*43 14. Harris had successfully acclimated herself to prison life.


*43 Here, counsel had before them many clues suggesting that Harris's troubled past, yet they declined to investigate those clues for possible use in the penalty phase. Instead, counsel relied on only the sparse testimony of character witnesses,[FN15] who, while adequately painting a picture of Harris as an affable, hard working, Christian woman, completely failed to offer any insight into Harris's psyche or the very difficult life Harris had experienced and particularly in her relationship with Isaiah Harris. As the Federal District Court found in *Wiggins*, "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background." *Wiggins*, 539 U.S. at 525, 123 S.Ct. 2527 (citing *Wiggins v. Corcoran*, 164 F.Supp.2d 538, 559 (D.Md.2001)). By their course of action, counsel hoped to promote the jury's "residual doubt" as to Harris's guilt. Counsel argues that their

strategy was effective because the jury recommended by a vote of 7-5 a sentence of life imprisonment without parole. Counsel's alleged strategy overlooked the trial court's opportunity during the second part of the penalty phase to override the jury's recommendation.

*44 [45] Moreover, despite their initial success in the penalty phase before the jury, counsel's strategy was flawed from its conception.

*44 " ' " ' "[R]esidual doubt" about guilt is not a mitigating circumstance. We have defined mitigating circumstances as facts about the defendant's character or background, or the circumstances of the particular offense, that may call for a penalty less than death. [citations omitted.] "Residual doubt" is not a factor about the defendant or the circumstances of the crime. It is instead a lingering uncertainty about facts, a state of mind that exists somewhere between "beyond a reasonable doubt" and "absolute certainty." ' " ' "

*44 *Melson v. State*, 775 So.2d 857, 899 (Ala.Crim.App.1999)(quoting *Myers v. State*, 699 So.2d 1281, 1283-84 (Ala.Crim.App.1996), *aff'd*, 699 So.2d 1285 (Ala.1997), quoting in turn *Harris v. State*, 632 So.2d 503, 535 (Ala.Crim.App.1992), *aff'd*, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), quoting in turn *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988)).

*44 Harris has affirmatively shown, through testimony and documents presented at her Rule 32 hearing, that there was a wealth of mitigating evidence readily available to counsel that counsel should have investigated before it can be said that counsel's strategy for the penalty phase was a reasonable strategic choice. In other words, counsel made their decision while uninformed as to "the overall character" of potential witnesses testimony. See *Blake v. Kemp*, 758 F.2d 523, 535 (11th Cir.1985). Thus, counsel's alleged defense strategy for the penalty phase-to not investigate for evidence in mitigation but to rely on "residual doubt" as to guilt-was from its conception, deficient performance.

*44 Because we find counsel's performance to be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

Page 47

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

deficient, we must determine whether the deficient performance caused Harris to suffer prejudice.

*Prejudice to Harris*

**\*44** [46] " ' "[I]n a challenge to the imposition of a death sentence, the prejudice prong of the *Strickland* inquiry focuses on whether 'the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' ' "
**\*44** *Wood v. State,* 891 So.2d 398, 414 (Ala.Crim.App.2003)(opinion on return to remand) (quoting *Daniels v. State,* 650 So.2d 544, 568-70 (Ala.Crim.App.1994), quoting in turn *Stevens v. Zant,* 968 F.2d 1076, 1081 (11th Cir.1992)).

**\*44** The only aggravating factor in this case was that the murder was committed for pecuniary gain. § 13A-5-49(6), Ala.Code 1975. The only statutory mitigating factor presented to the jury was that Harris did not have a criminal record. § 13A-5-51(1), Ala.Code 1975. The only nonstatutory mitigating evidence presented to the jury during the penalty phase was the adoption of the character evidence presented during the guilt phase-that Harris attended church, that she worked hard, and that she had a reputation for good character among those who knew her. See § 13A-5-52, Ala.Code 1975. The only mitigating evidence presented to the trial judge during the penalty phase was the testimony and presentence report of Probation Officer Edward G. Fawbush, who recommended Harris be sentenced to life imprisonment without parole. However, the State elicited testimony from Fawbush that questioned the soundness of his recommendation.[FN16]

**\*45** During the penalty phase the State portrayed Harris as a calculating, devious woman who suffered from no emotional distress and who was not a battered woman. (Direct Appeal Record vol. 6, pp. 1002, 1004, 1033). Specifically, during the penalty phase in front of the jury the prosecutor argued: "Did [Harris] act under duress or domination of another? No. She was living safe at home with a lawman at her side protecting her." (Volume 15 of Rule 32 hearing at p. 133, quoting volume 6, p. 1004 of direct appeal.) During the penalty phase in front of the jury the prosecutor argued: "What evidence is there of this mental or emotional distress or disturbance? Absolutely none." (Direct Appeal Record vol. 6, p. 1003). During the penalty phase before the trial judge, the prosecutor argued: "There is no duress or domination.... Also, this is a premeditated crime, unlike a battered woman responding that evening...." (Direct Appeal Record vol. 6, p. 1033). Those comments went unchallenged.

**\*45** The trial court found the following in its sentencing order:
**\*45** " 'In weighing the aggravating and mitigating circumstances, the Court is aware of the nature of the process as defined in Section 13A-5-48. It is not a matter the Court takes lightly. After carefully considering the matter, the Court is convinced that *the one statutory aggravating circumstance found and considered far outweighs all of the non-statutory mitigating circumstances,* and that the sentence ought to be death.' "

**\*45** *Harris v. State,* 632 So.2d at 542 (emphasis added).

**\*45** [47] Harris's IQ of 79 is considered to be on the borderline between normal and retarded. Also, according to Dr. Kirkland, a State witness, Harris's mental condition met "plenty" of the criteria for her to be classified as a battered woman. (Rule 32 Record, vol. 17, p. 401.) Additionally, there was evidence from family and friends supporting what Dr. Kirkland termed as Harris's "very difficult, horrendous life." (Rule 32 Record, vol. 17, p. 401.) Both the jury and the trial court could have found this evidence to be mitigating had it been presented during the penalty phase. Thus, in order to establish the nature of Harris's difficult and horrendous life, as well as the nature of her mental condition before the judge and jury, evidence of her lifelong hardships and abuse was particularly important as mitigating evidence that should have been presented at the penalty phase. This is especially true given the trial judge's history for overriding jury verdicts where less than eight jurors voted for life imprisonment without parole.

**\*45** Had the mitigating evidence discussed in this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

opinion been presented, it is possible that the trial court could have found two additional statutory mitigating factors: that "[t]he capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance," § 13A-5-51(2), Ala.Code 1975 and that "[t]he defendant acted under extreme duress or under the substantial domination of another person," § 13A-5-51(5), Ala.Code 1975. It is possible that the trial court could have found as non-statutory mitigating factors that Harris had a traumatic childhood and that she adjusted well to prison life.

**\*46** In *Baxter v. Thomas,* 45 F.3d 1501, 1515 (11th Cir.1995), the United States Court of Appeals for the Eleventh Circuit stated:
**\*46** "While deficient performance in investigating psychiatric mitigating evidence will not always prejudice the defense, the factors suggesting prejudice in this case are strong. First, only one aggravating circumstance was present: that the crime was committed for the purpose of monetary gain. It is therefore likely that testimony of Baxter's mental retardation and psychiatric history as mitigating evidence would have caused the jury to impose a life sentence in lieu of the death penalty."

**\*46** In *Blake v. Kemp,* 758 F.2d 523 (11th Cir.1985), defense counsel "made no preparations whatsoever for the penalty phase" thinking that Blake would be found not guilty. Here, as in *Blake,* defense counsel's
**\*46** "failure to seek out and prepare any witnesses to testify as to mitigating circumstances ... deprived him of ... an opportunity [to put on mitigating evidence]. This was not simply the result of a tactical decision not to utilize mitigation witnesses once counsel was aware of the overall character of their testimony. Instead, it was the result of a complete failure-albeit prompted by a good faith expectation of a favorable verdict-to prepare for perhaps the most critical stage of the proceedings. We thus believe that the probability that Blake would have received a lesser sentence but for his counsel's error is sufficient to undermine our confidence in the outcome."

**\*46** *Blake v. Kemp,* 758 F.2d at 535.

**\*46** Here, counsel obtained from the jury seven votes for life imprisonment without parole without presenting *any* significant mitigating evidence. " Defense counsel's use of mitigation evidence to complete, deepen, or contextualize the picture of the defendant presented by the prosecution can be crucial to persuading jurors that the life of a capital defendant is worth saving." *Allen v. Woodford,* 366 F.3d 823, 844 (9th Cir.2004). As in *Baxter v. Thomas,* supra, the only aggravating circumstance in Harris's case was that the crime was committed for the purpose of monetary gain. The *Baxter* Court found counsel's failure to investigate Baxter's mental retardation and psychiatric history as mitigating evidence to be deficient performance and prejudicial. The *Baxter* Court found that it was " likely that testimony of Baxter's mental retardation and psychiatric history as mitigating evidence would have caused the jury to impose a life sentence in lieu of the death penalty." *Baxter v. Thomas,* 45 F.3d at 1515. In Harris's case, had the jury been afforded the opportunity to consider evidence of Harris's low IQ and strength of character, together with evidence of her "horrendous " life and her successful acclimation to prison life as mitigating evidence, it is probable that additional jurors would have voted for life imprisonment without parole and that Judge Thomas would not have overridden the jury's a recommendation of life imprisonment without the possibility of parole. Counsel's failed memories concerning discussions about evidence to be presented at the penalty phase suggests that no alternatives where considered before counsel adopted the defense chosen for the penalty phase. No investigation was conducted into possible mitigating evidence because of counsel's ill-advised decision to rely on residual doubt during the penalty phase.

**\*47** Thus, there is a reasonable probability that had counsel conducted a reasonable investigation into possible mitigating evidence, the balance between the aggravating circumstance and the mitigating circumstances would have tipped further in favor of a sentence of life imprisonment without the possibility of parole. Thus, the outcome of Harris's penalty phase would have been different, but for trial counsel's performance. Therefore, Harris's counsel were ineffective at the penalty phase of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

trial.

**\*47** We reverse the circuit court's order as to sentencing and remand this cause to the circuit court for a new penalty-phase hearing before a jury and then an additional hearing before the trial judge.

**\*47** Our resolution of this issue obviates the need to discuss the other issues raised by Harris asserting error during the penalty phase or concerning electrocution as punishment.[FN17]

### IV.

**\*47** Harris contends that the circuit court abused its discretion by refusing to consider the testimony presented by Stephen Glassroth, a criminal defense attorney who testified as an expert at the Rule 32 hearing on behalf of Harris.[FN18] The trial court stated in footnote 1 of its order denying the Rule 32, Ala. R.Crim. P., petition that "the Court did not consider the testimony of Stephen Glassroth due to his failure to consider any direct evidence from trial counsel and, perhaps more importantly, the reasons he gave for not doing so." (Rule 32 Record vol. 9, p. 1697.) Glassroth testified that he did not think it was necessary to speak with trial counsel because "I believe that they would have some explanation trying to ... either explain away their failures or justify what they did." (Rule 32 Record vol. 16, p. 378.)

**\*47** Harris argues the following regarding Glassroth's testimony.
**\*47** "Mr. Glassroth testified that trial counsel failed: to spend enough time with Harris ...; to interview sufficiently Harris's family members, friends and associates ...; to obtain necessary records ...; to follow existing leads ...; and to investigate mental health issues.... He testified also that counsel failed to present sufficient evidence in the penalty and sentencing phases, which prejudiced Harris's defense.... As a result, he testified, trial counsel's performance was objectively unreasonable and deficient."

**\*47** (Harris's brief at p. 75.)

**\*47** [48] Because Harris did not raise this issue in the circuit court by way of post-trial motion, it is deemed waived from appellate review. See *Whitehead v. State,* 593 So.2d 126 (Ala.Crim.App.1991).

**\*47** [49] Moreover, if the circuit court's refusal to consider Glassroth's testimony was error, it was harmless error. As to the guilt phase, we note that the record is replete with testimony pointing out that Harris unequivocally maintained her innocence and pursued a theory of defense consistent with that position. " 'There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.' " *DeBruce v. State,* 890 So.2d at 1081 (quoting *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.) Here, defense counsel pursued a defense consistent with the account of the facts presented to them by Harris. "Defense counsel made a reasoned, strategic decision not to argue inconsistent, alternative theories of defense"-such as that Harris was completely innocent and alternatively that Harris suffered from battered women's syndrome. *Johnson v. State,* 612 So.2d 1288, 1296 (Ala.Crim.App.1992). "[D]efense counsel's reasoned, strategic decision was not outside 'the wide range of reasonable professional assistance.' " *Johnson v. State,* 612 So.2d at 1297 (quoting *Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. 2052). Because that theory proved unsuccessful does not mean that Glassroth's opinions are conclusive and establish the requirements of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
**\*48** " 'Even if counsel committed what appears in retrospect to have been a tactical error, that does not automatically mean that petitioner did not receive an adequate defense in the context of the constitutional right to counsel.' *Ex parte Lawley,* 512 So.2d 1370 (Ala.1987). ' "An accused is not entitled to error-free counsel." ' *Stringfellow [v. State],* 485 So.2d [1238] at 1243 [ (Ala.Crim.App.1986) ]."

**\*48** *Hutchins v. State,* 568 So.2d 395, 397 (Ala.Crim.App.1990).

**\*48** As to the penalty phase, for the reasons's set

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

forth in Part III, above, we found counsel's performance to have been deficient and to have resulted in prejudice during the penalty phase and are remanding this cause for new sentencing hearing.

## V.

**\*48 [50]** Harris claims that the circuit court abused its discretion by refusing to consider evidence in Harris's "Motion to Supplement the Record." Because Harris did not raise this issue in the circuit court, it is deemed waived. See *Whitehead v. State,* 593 So.2d 126 (Ala.Crim.App.1991).

## VI.

**\*48** Harris contends that the circuit erred in summarily dismissing numerous claims raised in her original petition.

**\*48** The circuit court correctly ruled that the following claims were procedurally barred pursuant to Rule 32.2(a)(4), Ala. R.Crim. P., because they were addressed on appeal:
**\*48** 1. The trial court erred by removing trial counsel for seeking reasonable compensation.
**\*48** 2. The trial court erred by denying trial counsel's motion for compensation.
**\*48** 3. The trial court erred by excluding Harris from critical proceedings.
**\*48** 4. The trial court erred by failing to transcribe all trial court proceedings.
**\*48** 5. The trial court erred by failing to grant Harris's challenge for cause against veniremember [A.C.]
**\*48** 6. The trial court erred by failing to grant a change of venue.
**\*48** 7. The trial court erred by limiting cross-examination of Messrs. Trimble and Patterson.
**\*48** 8. The state engaged in numerous instances of unconstitutional misconduct.
**\*48** 9. The evidence was insufficient to sustain a conviction of capital murder.
**\*48** 10. Harris's conviction and sentence were improperly obtained on the basis of Mr. Harris's characteristics.
**\*48** 11. The trial court erred by admitting highly prejudicial photographs of Mr. Harris.
**\*48** 12. The trial court erred by inadequately instructing the jury.

**\*48 [51]** Harris also claims that the trial court erred in improperly correcting its sentencing order. This claim is procedurally barred because it was raised at trial and could have been raised on appeal, but was not. Rules 32.2(a)(2) and (3), Ala. R.Crim. P.

**\*48** For the foregoing reasons, the circuit court's denial of Harris's postconviction claims seeking relief based on alleged errors committed during the guilt phase is affirmed. However, the circuit court's denial of relief regarding the penalty phase is reversed for the reasons set forth in Part III. Thus, the cause is remanded to the circuit court for a new penalty-phase proceeding before a jury and then a judge, in accordance with §§ 13A-5-46 and 13A-5-47, Ala.Code 1975.

**\*49** AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

McMILLAN, P.J., concurs; COBB, J., concurs in part and dissents in part, with opinion, which SHAW , J., joins; WISE, J., concurs in part and dissents in part, with opinion; BASCHAB, J., concurs in the result, with opinion.COBB, Judge, concurring in part and dissenting in part.
**\*49** This is an appeal from the denial of a Rule 32, Ala. R.Crim. P., petition alleging, among other things, that trial counsel rendered ineffective assistance. I agree with the result reached in the main opinion affirming as to Harris's guilt-phase issues and reversing as to the penalty-phase issue and remanding the case for a new sentencing hearing before a jury. However, for the reasons stated in my special writing in *Taylor v. State,* [Ms. CR-02-0706, August 27, 2004] --- So.2d ---- (Ala.Crim.App.2004)(Cobb, J., concurring in part and dissenting in part), I dissent from the rationale in the affirmance of guilt-phase issues in the following parts of the opinion: II.A.7.f.1., II.A.7.f.4., II.A.7.f.5., II.A.7.f.6., II.A.7.f.7., II.A.7.f.8., II.A.7.f.9., and II.A.7.g.1., to the extent the main opinion affirms the circuit court's denial of these claims based on this Court's plain-error review

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

Page 51

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

of the underlying substantive claims on direct appeal. I would not deny an ineffective-assistance-of-counsel claim based only on this Court's previous plain-error review of the underlying substantive issues on direct appeal.

**\*49** For the foregoing reasons, I concur in part and dissent in part from the main opinion.

WISE, Judge, concurring in part and dissenting in part.

**\*49** I concur with Part I of the main opinion affirming the circuit court's denial of relief on Harris's *Batson* claim based on procedural bars. I also concur with Part II of the main opinion affirming the circuit court's denial of relief on Harris's claim of ineffective assistance of counsel during the guilt phase of her trial. However, I dissent from Part III of the main opinion reversing the circuit court's order insofar as it denies relief on Harris's claim of ineffective assistance of counsel during the penalty phase of her trial.

**\*49** To prevail on a claim of ineffective assistance of counsel, a defendant must establish (1) that his counsel's performance was deficient, and (2) that he was prejudiced by the deficient performance. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Ex parte Lawley,* 512 So.2d 1370, 1372 (Ala.1987). "The performance component outlined in *Strickland* is an objective one: that is, whether counsel's assistance, judged under 'prevailing professional norms,' was ' reasonable considering all the circumstances.' " *Daniels v. State,* 650 So.2d 544, 552 (Ala.Crim.App.1994) (quoting *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052). To show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052.

**\*50** As the main opinion acknowledges, based on

*Wiggins v. Smith,* 539 U.S. 510, 522-23, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), "the 'principal concern in deciding whether [counsel] exercised [the] "reasonable professional judgmen[t]," ' required by *Strickland,* is 'whether the investigation supporting counsel's decision not to introduce mitigating evidence of [defendant's] background was *itself reasonable.*' " --- So.2d at ----. However, even assuming that counsel's decision regarding the presentation of mitigation evidence rendered their performance deficient, I believe that Harris failed to prove that the outcome would have been different had that evidence been introduced; namely, that the circuit court would have elected not to override the jury's recommendation that she be sentenced to life imprisonment without the possibility of parole and sentence her to death.

**\*50** Harris's claim of ineffective assistance of counsel during the penalty phase primarily involved trial counsel's failure to present mitigating evidence of (1) her mental health; (2) the alleged abuse she suffered at the hands of her husband-the victim; and (3) her difficult childhood and traumatic life. With regard to these issues, I do not disagree that many aspects of Harris's life were tragic.

**\*50** The main opinion appears to place importance on the fact that the sentencing judge was less inclined to override a jury's recommendation of life imprisonment without parole in cases where at least eight jurors had voted for life imprisonment, citing *Wagner v. State,* 555 So.2d 1141 (Ala.Crim.App.1989). However, given the facts of this case, I do not believe that that fact alone would have changed the sentencing judge's decision in this case. In *Wagner,* the defendant had been convicted of capital murder based on burglary-homicide. By contrast, this case involved Harris's murder of her husband-a law-enforcement officer-for pecuniary gain. At the time of the victim's death, Harris was engaged in an extramarital affair with the man who would become one of her codefendants. Further, Harris asked her lover to hire someone to kill her husband, a jailer employed by the Montgomery County Sheriff's Department. Harris-the beneficiary of various insurance policies on the victim's life-stood to profit from her husband's death.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

**\*50** This Court, in reviewing Harris's conviction and sentence on direct appeal, addressed the propriety of Harris's death sentence. We noted that the sentencing judge properly found the existence of one aggravating circumstance-that the murder was committed for pecuniary gain-and one mitigating circumstance-that the defendant had no criminal history. *Harris,* 632 So.2d at 542. We held that the sentencing judge correctly rejected the existence of the mitigating circumstance that Harris's participation in the offense was relatively minor. *Id.* This Court also quoted at length from the sentencing judge's discussion of the nonstatutory mitigating circumstances, including the following:
**\*51** " 'The defendant had family and friends who cared about her and had relationships with her which were beneficial to them and her. She was a hard working and respected member of the community. She was a steady worker in her church and community. She was held in high regard by her employers and friends.' "

**\*51** 632 So.2d at 542.

**\*51** Clearly, there was ample evidence of mitigation before the sentencing judge to justify a sentence of life imprisonment without parole. While the use of a defendant's personal history, i.e., mental health, traumatic childhood, and history of spousal abuse, is more readily accepted today as evidence mitigating a defendant's criminal conduct, it should be noted that Harris was tried and convicted of this offense in 1989. At that time, the use of this kind of evidence was considerably less common and far less accepted. As we have previously noted, this Court should avoid using "hindsight" to evaluate counsel's performance. *Hallford v. State,* 629 So.2d 6, 9 (Ala.Crim.App.1992); *Cartwright v. State,* 645 So.2d 326 (Ala.Crim.App.1994). Because I do not believe that presentation of the aforementioned mitigation evidence would have changed the sentencing judge's decision to override the jury's advisory verdict of life imprisonment and sentence Harris to death, I must respectfully dissent from Part III of the main opinion.
BASCHAB, Judge, concurring in the result.
**\*51** Although I do not agree with all of the language or reasoning in the main opinion, I do agree with the result. In making this decision, I am cognizant

that "[t]here has never been a case where additional witnesses could not have been called," *State v. Tarver,* 629 So.2d 14, 21 (Ala.Crim.App.1993); that "counsel does not necessarily render ineffective assistance simply because he does not present all possible mitigating evidence," *Williams v. State,* 783 So.2d 108, 117 (Ala.Crim.App.2000); and that " 'counsel may make a reasonable strategic judgment to present less than all possible available evidence in mitigation.' *Stanley v. Zant,* 697 F.2d 955, 965 (11th Cir.1983), cert. denied, 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984)." *Lundy v. State,* 568 So.2d 399, 403 (Ala.Crim.App.1990). However, in this case, it does not appear that counsel conducted a sufficient investigation into the appellant's background to make an informed decision about what mitigating evidence to present. Also, additional mitigating evidence could have made a difference with regard to the jury's sentence recommendation and the trial court's decision with regard to overriding or accepting the jury's recommendation. Accordingly, I respectfully concur in the result.

*On Applications for Rehearing*

PER CURIAM.
**\*51** The State of Alabama and Louise Harris have filed applications for rehearing from our decision of October 29, 2004, which applications we are overruling. We write solely for the purpose of responding to certain claims that this Court on original submission erred in reaching its decision and to acknowledge the Alabama Supreme Court's opinion in *Ex parte Jenkins,* [Ms. 1031313, April 8, 2005] --- So.2d ---- (Ala.2005), *which overrules* our application of the relation-back doctrine on original submission.

**\*51** On October 29, 2004, this Court released a per curiam opinion affirming Louise Harris's conviction for murder made capital because it was committed for pecuniary or other valuable consideration or pursuant to a contract or for hire, see § 13A-5-40(a)(7), Ala.Code 1975, but we remanded the case for a new penalty-phase proceeding before a jury and then a judge, in accordance with §§ 13A-5-46 and 13A-5-47, Ala.Code 1975. Presiding

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

Judge McMillan concurred; Judge Cobb concurred in the result in part and dissented in part, with an opinion; Judge Baschab concurred in the result, with opinion; Judge Shaw concurred in part and dissented in part and joined Judge Cobb's special writing; and Judge Wise concurred in part and dissented in part, with opinion. The State has filed an application for rehearing asking this Court to reconsider its ruling reversing the sentence and remanding the case for a new penalty phase and Harris has filed an application for a rehearing asking this Court to reconsider its affirmance of the conviction.

**\*51** On application for rehearing, the State has essentially presented the same arguments it presented in its brief on original submission. However, the State asserts that we "ignore[ed] clearly established federal precedent, not to mention an opinion of this Court itself released just a few months before releasing this opinion, holding that residual doubt is one of the most effective (and in this case successful) strategies a defense lawyer can pursue during a capital sentencing." (State's brief on application for rehearing at p. 26.) The State quotes as follows from *Jenkins v. State*, [Ms. CR-97-0864, February 27, 2004] --- So.2d ---- (Ala.Crim.App.2004):
**\*51** " 'A lawyer's time and effort in preparing to defend his client in the guilt phase of a capital case continues to count at the sentencing phase. Creating lingering doubt has been recognized as an effective strategy for avoiding the death penalty. We have written about it. *See, e.g., Stewart v. Dugger*, 877 F.2d 851, 855-56 (11th Cir.1989). In addition, a comprehensive study on the opinions of jurors in capital cases concluded:
**\*51** " ' "Residual doubt" over the defendant's guilt is the most powerful "mitigating" fact.-[The study] suggests that the best thing a capital defendant can do to improve his chances of receiving a life sentence has nothing to do with mitigating evidence strictly speaking. The best thing he can do, all else being equal, is to raise doubt about his guilt.'
**\*51** " 'Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?*, 98 Colum.L.Rev. 1538, 1563 (1998) (footnotes omitted); *see* William S. Geimer & Jonathan Amsterdam, *Why Jurors Vote Life or*

*Death: Operative Factors in Ten Florida Death Penalty Cases*, 15 Am.J.Crim.L. 1, 28 (1988) (" [t]he existence of some degree of doubt about the guilt of the accused was the most often recurring explanatory factor in the life recommendation cases studied."); *see also* Jennifer Treadway, Note, " *Residual Doubt" in Capital Sentencing: No Doubt it is an Appropriate Mitigating Factor*, 43 Case W.Res.L.Rev. 215 (1992). Furthermore, the American Law Institute, in a proposed model penal code, similarly recognized the importance of residual doubt in sentencing by including residual doubt as a mitigating circumstance. So, the efforts of Tarver's lawyer, during trial and sentencing, to create doubt about Tarver's guilt may not only have represented an adequate performance, but evidenced the most effective performance in defense to the death penalty.' "

**\*51** *Jenkins v. State*, --- So.2d at ---- (quoting *Tarver v. Hopper*, 169 F.3d 710, 715-16 (11th Cir.1999)).

**\*51** There is no conflict between the instant case and *Jenkins. Jenkins* acknowledges that residual doubt is not a mitigating factor. *Jenkins* states "[The study] suggests that the best thing a capital defendant can do to improve his chances of receiving a life sentence *has nothing to do with mitigating evidence strictly speaking.*" --- So.2d ---- at (quoting *Tarver*, 169 F.3d at 715, quoting in turn Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?* 98 Colum. L.Rev. 1538, 1563 (1998)) (emphasis added.) Moreover, Jennifer Treadway, Note, *"Residual Doubt" in Capital Sentencing: No Doubt it is an Appropriate Mitigating Factor*, 43 Case W. Res. L.Rev. 215, 216 (1992), states that its purpose "is to advocate the use of residual doubt in capital sentencing." The note further acknowledges that the United States Supreme Court "has never recognized an Eighth Amendment right to argue this issue, leaving the decision regarding the admission of a residual doubt argument to state determination." 43 Case W. Res.L.Rev. at 216. Moreover, this Court's found reversible error on original submission not *because* the defense relied on residual doubt during the penalty phase, but because the defense relied on residual doubt without conducting a reasonable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

investigation into possible mitigating evidence before making its decision.

**\*51** We have reviewed the other issues presented in the State's application for rehearing, and we conclude that the original opinion sufficiently addressed those issues. Based on the foregoing, the State's application for rehearing is overruled.

**\*51** On application for rehearing, Harris asserts that we incorrectly decided many of the guilt-phase issues. We have examined that contention and in this opinion, we address one argument made on application for rehearing, but we do not change the result we initially reached.

**\*51** [52] Harris contends that in Parts IV and V of the opinion on original submission we "erroneously invoke[d] the case of *Whitehead v. State,* 593 So.2d 126 (Ala.Crim.App.1991), to hold that Mrs. Harris has 'waived' two claims from appellate review-the circuit court's refusal to consider the testimony of expert witness Stephen Glassroth and the evidence presented in her Motion to Supplement the Record-because the claims were not raised before the circuit court after that court made its ruling." (Harris's brief on application for rehearing at p. 23.) Assuming without determining that our reliance on *Whitehead* was misplaced, the outcome remains unchanged. Absent the procedural bar taken from *Whitehead,* Part IV of the main opinion set forth an alternative reason why Glassroth's testimony was insufficient to support a finding of ineffective assistance of counsel, and we are not persuaded by Harris's additional argument that that reasoning was incorrect. Thus, we decline at this time to consider Harris's argument concerning *Whitehead,* and we decline to change the result we initially reached as to Part IV.

**\*51** [53] As to Part V, we issued no alternative finding in Part V. However, some three months after the hearing on the petition Harris submitted several exhibits as attachments to the affidavits of Stuart W. Gold, counsel for Harris in her Rule 32, Ala. R.Crim. P., proceeding. In footnote 89 to Harris's petition, she states the following regarding those exhibits:
**\*51** "Exhibits 1 and 2 (case action summaries of

cases in which Judge Thomas overrode a jury recommendation of life without parole) were relevant to show that failure to secure additional votes increased the likelihood that Judge Thomas would override the jury's recommendation.... Exhibits 3 and 4 (articles and news transcripts concerning the extensive pre-trial news coverage of Mrs. Harris's case) were relevant to support her claims that trial counsel were ineffective in pursuing their motion to change venue.... Exhibits 25, 26, and 29 (Mr. McCarter's criminal record and plea agreement and Mr. Trimble's case action summary) were relevant to Mrs. Harris's claim that Messrs. Trimble and McCarter were ineffectively cross-examined and to the State's misleading closing argument."

**\*51** (Harris's brief on appeal n. 89 at pp. 77-78.)

**\*51** [54] Though the documents were not considered by the trial court, the content of the documents was referred to in post-hearing submissions. Thus, the content was before the circuit court. Moreover, Harris was granted a new sentencing hearing; thus, her argument regarding Judge Thomas is moot. Moreover, this Court may take judicial notice of Judge Thomas's record in death-penalty cases. As to venue, the cross-examination of Trimble and McCarter, and the State's closing argument, these challenges were adequately addressed on the merits on direct appeal or were barred from Rule 32 review.

**\*51** Harris's other issues were thoroughly addressed by this Court in its opinion on original submission.

**\*51** [55] In Part II.A.5. of the main opinion we stated that Harris's claim that trial counsel were ineffective for allowing the prosecutor to misstate the number of blacks on the jury was barred from review because under the principle of relation back that claim did not relate back to her original petition or to her amended petition. Recently in *Ex parte Jenkins,* [Ms. 1031313, April 8, 2005] --- So.2d ---- (Ala.2005), the Alabama Supreme Court explained that the Alabama Rules of Criminal Procedure govern the amendment of postconviction pleadings and that the civil doctrine of "relation-back" had no application in the amendment of Rule 32, Ala.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

R.Crim. P., petitions, and that thus, with certain exceptions, that doctrine could not be used to bar claims presented in an amendment. Thus, that Court expressly overruled that part of *Harris* relying on the "relation-back" doctrine. Because we also reached the merits of the claim in our opinion, however, the result we reached in Part II.A.5. of our opinion on original submission, remains the same.

**\*51 APPLICATIONS OVERRULED.**

McMILLAN, P.J., and COBB, BASCHAB, and SHAW, JJ., concur.
WISE, J., adheres to her original concurrence in part and dissent in part.

> FN1. The Supreme Court addressed only the issue whether "Alabama's capital sentencing statute is unconstitutional because it does not specify the weight the judge must give to the jury's recommendation and thus permits arbitrary imposition of the death penalty." *Harris v. Alabama,* 513 U.S. 504, 505, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).

> FN2. All of Harris's filings in this case-in the circuit court and in this court-were by counsel.

> FN3. Harris argues that at trial the prosecution misled the trial court as to the correct number of black jurors selected for the jury. For the reasons stated in Part II.A.5. of this opinion, we disagree. Thus, as on direct appeal, we find that the state used 11 of 19 strikes to remove 11 of 18 black veniremembers. Five blacks served on the jury and one black served as an alternate. However, in Part I, we will address the argument as presented by Harris.

> FN4. Harris was represented at trial by lead counsel Eric Bowen and cocounsel Knox Argo. Other than the instant case, Bowen had been cocounsel in prosecuting two capital cases and done appellate work on one other capital case. Harris's case was

the first time he acted as defense in a capital case. Although Argo had been cocounsel for the prosecution in capital cases, at the time he was assigned to Harris's case he had less than five years' experience in the practice of law and this was the first time he had represented a client during the penalty phase of a capital-murder case.

> FN5. We note that although the trial court spoke in terms of comparisons between the population of blacks in Montgomery County and the percentage of blacks on the venire, a higher percentage of blacks served on the jury than were present in the venire of 50 from which jurors were selected.

> FN6. Harris also claims on appeal from the order denying her Rule 32 petition that this Court made an erroneous factual findings on direct appeal. The proper avenue to challenge this court's factual findings is in an application for rehearing.

> FN7. In maintaining her innocence, Harris rejected the State's plea offer of a sentence of life imprisonment without parole.

> FN8. Presumably, the significance of having Mrs. Starr as a character witness was that she is the mother of Bart Starr, who played football at the University of Alabama and later for the Green Bay Packers.

> FN9. The murder of Harris's father was never solved.

> FN10. Bowen testified that he did not recall the character witnesses from the guilt phase to testify again at the penalty phase because the jury and trial court had already heard their testimony and because he did not want the State to have another chance to cross-examine those witnesses.

> FN11. Harris was a church employee for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- So.2d ----                                                    Page 56

--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)
**(Cite as: --- So.2d ----)**

many years before Ivey joined the church staff.

FN12. Dr. Loring described battered woman syndrome generally as a situation where a woman increasingly fears a man whom she had initially loved, but is now terrified that he will harm or kill her. " There is usually emotional abuse, name-calling, degredation and the like" inflicted upon the woman. (Rule 32 hearing, vol. 16, p. 251.) The woman may feel helpless, suffer low self-esteem, depression, or panic, and may lash out to protect herself. After an abusive episode the man might act remorseful and promise to never do it again.

FN13. Dr. Loring defined PTSD generally as "where an individual experiences something that's beyond the norm of human experience, some kind of horrible, horrific incident or series of incidents.... [T]here is either an acute terror that someone experiences or something that's ongoing." (Rule 32 hearing, vol. 16, p. 245-46.)

FN14. According to Dr. Shaffer, DES is a condition recognized by the American Psychiatric Association that "measures a condition known as dissociation which involves a splitting off of reality, whereby certain memories and perceptions are unavailable to the patient at specific times." (Rule 32 Record vol. 2, page 327.)

FN15. We acknowledge that the evidence from the guilt phase of the trial was properly before the trial court for its consideration during the penalty phase and that it did not have to be re-presented during the penalty phase of the trial.

FN16. Fawbush interviewed only Harris before submitting his report. He admitted on cross-examination by the State that favorable conclusions in the report were based on conversations with Harris and

defense counsel and not on any independent investigation.

FN17. "With the recent adoption of § 15-18-82.1, Ala.Code 1975, Alabama's method of execution was changed from electrocution to lethal injection. Therefore, any issue concerning the constitutionality of electrocution has been rendered moot by the adoption of this alternate method of execution." *Adams v. State,* [Ms. CR-98-0496, August 29, 2003] --- So.2d ----, ---- (Ala.Crim.App.2003).

FN18. In Harris's brief on appeal, this claim is contained under subsection "C" of Part II. Part II of Harris's brief alleges claims of ineffective assistance of counsel. However, claim "C" asserts error on the part of the circuit.

Ala.Crim.App.,2004.
Harris v. State
--- So.2d ----, 2004 WL 2418073 (Ala.Crim.App.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT   C

IN THE SUPREME COURT OF ALABAMA
OCTOBER 21, 2005

1041347

Ex parte State of Alabama.  PETITION FOR WRIT OF CERTIORARI TO
THE COURT OF CRIMINAL APPEALS  (In re: Louise Harris v. State
of Alabama) (Montgomery Circuit Court: CC 88-1237.60; Court of
Criminal Appeals: CR-01-1748).

ORDER

ON REHEARING EX MERO MOTU

    Consistent with this Court's opinion in Ex parte Harris,
[Ms. 1041332, October 21, 2005] ___ So. 2d ___ (Ala. 2005)
(opinion on rehearing ex mero motu), released today, this
Court's opinion of August 19, 2005, in Harris v. State (Ms.
1041347) is withdrawn.  The State's petition for a writ of
certiorari is denied.

    OPINION OF AUGUST 19, 2005, WITHDRAWN; WRIT DENIED.

    Woodall, J., and Nabers, C.J., and See, Lyons, Harwood,
Stuart, Smith, Bolin, and Parker, JJ., concur.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court
of Alabama, do hereby certify that the foregoing is
a full, true and correct copy of the instrument(s)
herewith set out as same appear(s) of record in said
Court.
Witness my hand this 21st day of October, 2005

Robert G Esdale Sr
Clerk, Supreme Court of Alabama

# EXHIBIT   D



RELEASED

OCT 2 1 2005

CLERK
SUPREME COURT OF ALABAMA

Notice: This opinion is subject to formal revision before publication in the advance sheets of Southern Reporter. Readers are requested to notify the Reporter of Decisions, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 242-4621), of any typographical or other errors, in order that corrections may be made before the opinion is printed in Southern Reporter.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2005-2006

---

### 1041332

---

### Ex parte Louise Harris

### PETITION FOR WRIT OF CERTIORARI
### TO THE COURT OF CRIMINAL APPEALS

### (In re:  Louise Harris

### v.

### State of Alabama)

### (Montgomery Circuit Court, CC-88-1237.60;
### Court of Criminal Appeals, CR-01-1748)

### On Rehearing Ex Mero Motu

LYONS, Justice.

1041332

The opinion of August 19, 2005, is withdrawn, and the following is substituted therefor.

In _Ex parte Pierce_, 576 So. 2d 258 (Ala. 1991), this Court was presented with the following question: "Should this Court grant a petition for certiorari to review a decision of the Court of Criminal Appeals that affirmed the petitioner's conviction but also remanded the cause to the trial court for a new sentencing hearing?"  576 So. 2d at 258.  The Court answered that question as follows:

> "When the Court of Criminal Appeals remands a case for some action to be performed by the trial court, as it has in this case, it retains jurisdiction of the case.  ...
>
> "....
>
> "The Court of Criminal Appeals has not yet affirmed the petitioner's sentence of death, and there remains an issue concerning that sentence. The petition for the writ of certiorari, therefore, is premature and is due to be denied."

576 So. 2d at 259.  See also _Ex parte Charest_, 854 So. 2d 1101 (Ala. 2002), in which this Court denied a petition for the writ of certiorari because it had been filed prematurely, i.e., before the Court of Criminals had made a final decision in the case, which it had remanded to the trial court to allow the State to respond to the merits of certain Rule 32, Ala. R.

2

1041332

Crim. P., claims raised by the petitioner and the trial court had not yet filed its return to remand.

In this case, in reviewing a Rule 32 petition filed by Harris, the Court of Criminal Appeals affirmed Harris's conviction but remanded the cause for the trial court to conduct a new sentencing hearing. Both Harris and the State petitioned for a writ of certiorari. It appeared initially that these petitions were premature because the Court of Criminal Appeals had ordered a new sentencing hearing in the case; however, this case is distinguishable from Pierce. Here, the Court of Criminal Appeals did not order a return to its remand order, and that court, therefore, did not retain jurisdiction over the case. Therefore, the judgment of the Court of Criminal Appeals in this case is a final decision from which a petition for a writ of certiorari is proper.

In order to clarify for the State and the criminal defense bar what constitutes a final decision of the Court of Criminal Appeals from which a petition for a writ of certiorari can be filed in this Court pursuant to Rule 39, Ala. R. App. P., we hold that when the Court of Criminal Appeals remands a case, unless the Court of Criminal Appeals

3

1041332

has expressly directed a return to its remand order, we will treat its decision as final and a petition for a writ of certiorari will lie as to both the State and the defendant. To the extent that Ex parte Pierce holds otherwise, it is hereby overruled. In so holding, we expressly do not abrogate the exception to the final-decision requirement in those cases in which the Court of Criminal Appeals has "set out a holding that [is] applicable to all cases as a matter of legal principle." McCoo v. State, [Ms. 1031852, April 29, 2005] ___ So. 2d ___, ___ (Ala. 2005); see Bishop v. State, 608 So. 2d 345 (Ala. 1992).

Turning to the merits of Harris's petition for the writ of certiorari, we have examined the grounds raised by Harris, and we grant the petition as to Harris's claim regarding a violation of Batson v. Kentucky, 476 U.S. 79 (1986); her claim that her trial counsel failed to maintain continuity in representation; and her claim that several of her ineffective-assistance-of-counsel arguments were not precluded by findings of no plain error on direct appeal.

4

1041332

OPINION OF AUGUST 19, 2005, WITHDRAWN; OPINION SUBSTITUTED; WRIT GRANTED AS TO SPECIFIED ISSUES.

Nabers, C.J., and See, Harwood, Woodall, Stuart, Smith, Bolin, and Parker, JJ., concur.

5

# EXHIBIT   E



RELEASED

1 2 2006

CLERK
SUPREME COURT OF ALABAMA

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of _Southern Reporter_. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 242-4621), of any typographical or other errors, in order that corrections may be made before the opinion is printed in _Southern Reporter_.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2005-2006

---

### 1041332

---

### Ex parte Louise Harris

#### PETITION FOR WRIT OF CERTIORARI
#### TO THE COURT OF CRIMINAL APPEALS

#### (In re:  Louise Harris

#### v.

#### State of Alabama)

#### (Montgomery Circuit Court, CC-88-1237.60;
#### Court of Criminal Appeals, CR-01-1748)

LYONS, Justice.

I. Facts and Procedural History

On July 13, 1989, Louise Harris was convicted of capital

1041332

murder.  The facts underlying that conviction are set out in
the Alabama  Court  of  Criminal  Appeals'  opinion  affirming
Harris's conviction and sentence. Harris v. State, 632 So. 2d
503, 508-09 (Ala. Crim. App. 1992).  The jury recommended by
a  vote  of  7-5  that  Harris  be  sentenced  to  life  in  prison
without  the  possibility  of  parole,  but  the  trial  court
rejected  the  jury's  recommendation  and  sentenced  Harris  to
death.   This  Court  affirmed  the  Court  of  Criminal  Appeals'
judgment. Ex parte Harris, 632 So. 2d 543 (Ala. 1993).   On
certiorari  review  from  this  Court's  affirmance  of  Harris's
conviction  and  sentence  on  direct  appeal,  the  United  States
Supreme  Court  considered  the  constitutionality  of  Alabama's
death-penalty statute and ultimately affirmed the judgment of
this Court. Harris v. Alabama, 513 U.S. 504 (1995).

On June 22, 1995, Harris filed in the Montgomery Circuit
Court a petition for postconviction relief pursuant to Rule
32, Ala. R. Crim. P.   The circuit court denied Harris's
petition.  On appeal, the Court of Criminal Appeals reversed
the circuit court's judgment in part, affirmed it in part, and
remanded the case for a new sentencing hearing. Harris v.
State, [Ms. CR-01-1748, Oct. 29, 2004] ___ So. 2d ___, ___

2

1041332

(Ala. Crim. App. 2004) ("Harris I").  Harris then filed a petition for the writ of certiorari with this Court, challenging that portion of the Court of Criminal Appeals' judgment affirming in part the circuit court's denial of Harris's Rule 32 petition.  We granted certiorari review to consider the following issues: 1) whether the Court of Criminal Appeals erred in rejecting Harris's argument that the prosecutor impermissibly exercised peremptory strikes against black veniremembers in violation of Batson v. Kentucky, 476 U.S. 79 (1986); 2) whether the Court of Criminal appeals erred in holding that several of Harris's ineffective-assistance-of-counsel claims were precluded by its determination on direct appeal that there was "no plain error"; and 3) whether the Court of Criminal Appeals erred in rejecting Harris's ineffective-assistance-of-counsel claim based on the alleged failure of her counsel to maintain "continuity of representation."

## II. Standard of Review

"[W]hen the facts are undisputed and an appellate court is presented with pure questions of law, that court's review in a Rule 32 proceeding is de novo." Ex parte White, 792 So.

3

1041332

2d 1097, 1098 (Ala. 2001).   However, where the facts in a postconviction proceeding are disputed and the circuit court has resolved those disputed facts, "[t]he standard of review on appeal in a post conviction proceeding is whether the trial judge abused his discretion when he denied the petition. Ex parte Heaton, 542 So. 2d 931 (Ala. 1989)." Elliott v. State, 601 So. 2d 1118, 1119 (Ala. Crim. App. 1992).

### III. Analysis

### A. Harris's Batson Claim

In her Rule 32 petition, Harris contends that, in exercising its peremptory strikes of members of the venire, the prosecutor in Harris's trial violated Batson by purposefully discriminating against potential black jurors. The Court of Criminal Appeals held that Harris's Batson claim was procedurally barred under Rules 32.2(a)(2) and (4), Ala. R. Crim. P., as a ground that had been raised and addressed at trial and on direct appeal. Harris I, ___ So. 2d at ___.   We note that Rules 32.2(a)(3) and (5), Ala. R. Crim. P., also preclude relief based on any ground that could have been, but was not, raised at trial or on appeal, with an exception not applicable here for grounds questioning the trial court's

4

1041332

jurisdiction.

Indeed, Harris's Batson claim was raised at trial and on direct appeal, but was rejected based on the following language set forth in Harrell v. State, 571 So. 2d 1270, 1271 (Ala. 1990): "When the evidence shows only that blacks were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully established venire, an inference of discrimination has not been created." See Harris v. State, 632 So. 2d at 513. However, in Ex parte Thomas, 659 So. 2d 3, 7 (Ala. 1994), a case decided after Harris's direct appeals at the state level had been exhausted, but before the United States Supreme Court had disposed of her case on certiorari review, this Court held:

> "We disapprove the statement in Harrell [v. State, 571 So. 2d 1270 (Ala. 1990),] indicating that '[w]hen the evidence shows only that blacks were struck and that a greater percentage of blacks sat on the jury than sat on the lawfully established venire, an inference of discrimination has not been created,' 571 So. 2d at 1271, to the extent that it has been construed to preclude a finding of a prima facie Batson violation where the attorney engaged in a pattern of striking blacks from the venire."

In her appeal from the circuit court's denial of her Rule 32 petition, Harris argued to the Court of Criminal Appeals that, even though she had made a Batson claim at trial and on

5

1041332

direct appeal, she was entitled to have that claim reviewed in light of _Thomas_, which she contended had a "retroactive" effect and was applicable to convictions not yet final when _Thomas_ was announced.    In effect, she argued that such retroactivity was an exception to the procedural bars of Rule 32.2.  The Court of Criminal Appeals held that _Thomas_ did not "establish a new rule of criminal procedure," and therefore did not apply retroactively to Harris's _Batson_ challenge. _Harris I_, ___ So. 2d at ___.  Therefore, the court concluded, Harris's _Batson_ claim was procedurally barred.  We granted Harris's petition for the writ of certiorari in order to determine if the Court of Criminal Appeals' ruling that Harris's _Batson_ claim was procedurally barred conflicts with that court's prior cases indicating that _Thomas_ should be applied retroactively to convictions not yet final when _Thomas_ was decided.

In support of her argument in favor of retroactive application of _Thomas_, Harris cites _Gorum v. State_, 671 So. 2d 761, 764 (Ala. Crim. App. 1994), a case decided on December 29, 1994, in which the Court of Criminal Appeals held:

> "The Alabama Supreme Court issued an opinion in
> _Ex parte Thomas_ on May 20, 1994.  On September 2,

6

1041332

　　1994, the Supreme Court withdrew the May 20, 1994,
opinion and substituted another one. We note that
the appellant was tried on February 28, 1994, before
the Alabama Supreme Court issued its original
opinion in <u>Ex parte Thomas</u> on May 20, 1994.
<u>Nevertheless,</u> Thomas <u>controls</u>."

(Emphasis added.)  Harris contends that the above-emphasized

language in <u>Gorum</u> reveals that this Court's decision in <u>Thomas</u>

should be applied retroactively in considering her <u>Batson</u>

claim.  Thus, Harris contends, the Court of Criminal Appeals'

decision in the instant case conflicts with <u>Gorum</u>.  However,

the Court of Criminal Appeals in <u>Gorum</u> was considering a

<u>Batson</u> claim presented <u>on direct appeal</u>.  <u>Gorum</u> did not

involve postconviction collateral review under Rule 32, Ala.

R. Crim. P.  Harris cites several other decisions by the Court

of Criminal Appeals that she contends also indicate that

<u>Thomas</u> should be applied retroactively.  However, like <u>Gorum</u>,

those decisions all involved direct appeals.  See, e.g.,

<u>Stargell v. State</u>, 672 So. 2d 1359 (Ala. Crim. App. 1994);

<u>Drake v. State</u>, 668 So. 2d 877 (Ala. Crim. App. 1995); and

<u>McClain v. State</u>, 659 So. 2d 161 (Ala. Crim. App. 1994).  None

of the cases Harris cites held that <u>Thomas</u> must be applied

under the circumstance here presented, i.e., a postconviction

collateral attack in a case in which the <u>Thomas</u> decision

7

1041332

followed unsuccessful direct state appeals attacking the original judgment of conviction, but preceded the United State Supreme Court's decision on certiorari review.[1]

Harris contends that she is nevertheless entitled to the retroactive benefit of Thomas. This is so, Harris argues, because certiorari review of this Court's affirmance on direct appeal of Harris's conviction and sentence was still pending in the United States Supreme Court when this Court decided Thomas. In other words, Harris argues that, as in the Gorum line of cases making Thomas available to other cases on direct appeal, her conviction, pending on certiorari review in the United States Supreme Court, was not "final" when Thomas was decided. Harris cites Griffith v. Kentucky, 479 U.S. 314 (1987), in which the United States Supreme Court held that Batson should be applied retroactively to cases not yet final when Batson was decided. The Griffith Court defined a final case as "a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time

---

[1] As noted, the United States Supreme Court, after considering the constitutionality of Alabama's capital-sentencing statute, ultimately affirmed the judgment of this Court effectively affirming Harris's conviction and sentence.

1041332

for a petition for certiorari [to the United States Supreme Court] elapsed or a petition for certiorari finally denied." 479 U.S. at 321 n.6. Because certiorari review of her conviction and sentence was still pending in the United States Supreme Court when this Court decided Thomas, Harris contends that her conviction was not yet final and that therefore Thomas should be retroactively applied to her Batson claim. We disagree.

The United States Supreme Court in Griffith was dealing with the retroactive application of its own earlier decision (Batson) to a conviction, still subject to review by certiorari in that Court, that had been affirmed by a state supreme court and where the petition for the writ of certiorari to the United States Supreme Court challenged that affirmance. Griffith did not, nor do any other cases cited by Harris, involve the retroactive application of a state court's interpretation of United States Supreme Court precedent, expressly overruling a prior interpretation of that state court, to a conviction that had been upheld by the state court on direct appeal, yet was, at the time of the new pronouncement, subject to further review only by certiorari in

9

1041332

the United States Supreme Court.    And we do not construe
Griffith as requiring such retroactive application.

Harris contends that the United States Supreme Court's
reasons for applying its most current interpretation of the
United States Constitution to cases still subject to that
court's direct review compel this Court to apply Thomas
retroactively to cases that had been finally reviewed by our
Court on direct appeal yet were still pending in the United
States Supreme Court when Thomas was announced.  We disagree.
In Teague v. Lane, 489 U.S. 288, 304 (1989), the United States
Supreme Court restated its reasons for applying its most
current interpretation of federal constitutional law to only
those cases that are still subject to that Court's direct
review, either on certiorari review of state-court proceedings
affirming a judgment of conviction on direct appeal or
directly from a United States Circuit Court of Appeals:

> "In Griffith v. Kentucky, 479 U.S. 314 (1987),
> we rejected as unprincipled and inequitable the
> Linkletter[ v. Walker, 381 U.S. 618 (1965),]
> standard for cases pending on direct review at the
> time a new rule is announced, and adopted the first
> part of the retroactivity approach advocated by
> Justice Harlan [in Mackey v. United States, 401 U.S.
> 667, 675 (1971) (Harlan, J., concurring in judgments
> in part and dissenting in part); and Desist v.
> United States, 394 U.S. 244, 256 (Harlan, J.,

10

1041332

dissenting)].  We agreed with Justice Harlan that 'failure to apply a newly declared constitutional rule to criminal cases pending on direct review violates basic norms of constitutional adjudication.' 479 U.S., at 322. We gave two reasons for our decision.  First, because we can only promulgate new rules in specific cases and cannot possibly decide all cases in which review is sought, 'the integrity of judicial review' requires the application of the new rule to 'all similar cases pending on direct review.' <u>Id.</u>, at 323.  We quoted approvingly from Justice Harlan's separate opinion in <u>Mackey</u>, supra, 401 U.S., at 679:

> "'"If we do not resolve all cases <u>before us</u> <u>on direct review</u> in light of <u>our best</u> <u>understanding of governing constitutional</u> <u>principles</u>, it is difficult to see why we should so adjudicate any case at all.... In truth, the Court's assertion of power to <u>disregard current law in adjudicating cases</u> <u>before us</u> that have not already run the full course of appellate review is quite simply an assertion that our constitutional function is not one of adjudication but in effect of legislation."' 479 U.S., at 323."

(Emphasis added.)  Thus, the United States Supreme Court has

determined that, as a judicial body, it must consider its most

current interpretation of federal constitutional law in

disposing of cases arising from direct review, as opposed to

collateral review of a postconviction petition, i.e., it

considers its most current interpretation in cases petitioning

for the writ of certiorari to the lower appellate court

seeking review of the affirmance of a conviction by such court

11

1041332

..on direct appeal. That is precisely what this Court did when we decided Harris's Batson claim on direct appeal from the judgment of conviction based on Harrell, which was our most current interpretation of what federal constitutional law required at the time.

The United States Supreme Court continued in Teague:

"Second, because 'selective application of new rules violates the principle of treating similarly situated defendants the same,' we refused to continue to tolerate the inequity that resulted from not applying new rules retroactively to defendants whose cases had not yet become final. [Griffith v. Kentucky, 479 U.S. 314], at 323-324 [(1987)] (citing Desist [v. United States], 394 U.S. [244], at 258-259 [(1969)] (Harlan, J., dissenting)).'"

489 U.S. at 304. The "similarly situated defendants" the United States Supreme Court considers itself bound to treat the same are defendants who can still come before that Court on certiorari review of an appeal from a final judgment of conviction or from a decision of a United States Court of Appeals. The term does not include petitioners whose judgments of conviction have previously been affirmed or have otherwise become final and who are now collaterally attacking the conviction in a postconviction proceeding. In fact, the United States Supreme Court refused, in Allen v. Hardy, 478

12

1041332

U.S. 255 (1986), to apply Batson retroactively to a petitioner appearing before that Court on collateral review of a previous final judgment of conviction. The procedural posture of the postconviction petitioner in relation to the United States Supreme Court in Allen is analogous to Harris's posture in relation to this Court in the instant case. Neither the United States Supreme Court's rationale in Giffith for applying its most current interpretation of federal constitutional law to cases pending before it, nor the definition of a "final" case in Griffith compels the application of Thomas to Harris's Batson claim. Rather, for purposes of Harris's argument that Thomas applies, we conclude that her conviction was final when this Court decided Thomas. Therefore, Harris's case is distinguishable from those cases she cites indicating that Thomas should apply retroactively only to convictions not yet final.

Harris does not argue that, even if her conviction became final before Thomas was released, Thomas should nevertheless apply to her. Therefore, we do not address that issue. Because the Court of Criminal Appeals' ruling that Thomas does not apply retroactively to Harris's Batson claim does not

13

1041332

conflict with the cases Harris cites, we affirm its judgment. However, we express no opinion as to the Court of Criminal Appeals' conclusion that Thomas did not "establish a new rule of criminal procedure." Harris I, ___ So. 2d at ___.

We note that in Ex parte Floyd, 571 So. 2d 1234 (Ala. 1990), a postconviction petitioner argued that he was due a new trial based on an alleged violation of Batson, which was decided after his direct appeals at the state-court level had been exhausted but while his petition for the writ of certiorari was pending before the United States Supreme Court, which ultimately denied that petition. This Court ignored the fact that the petitioner, in his direct appeal, had failed to argue in both the Court of Criminal Appeals and in this Court that the prosecutor had discriminated in exercising peremptory strikes. The Court's action in ignoring what appears to have been a failure to preserve error was based on its conclusion that it was bound to apply Batson pursuant to the United States Supreme Court's decision in Griffith that Batson should apply to cases not yet "final" when Batson was decided, because that is what the Court in Floyd concluded the United States Supreme Court should have done when Floyd's certiorari

14

1041332

petition was pending before it, but inexplicably failed to do. Nothing in <u>Floyd</u> requires this Court in this collateral proceeding to apply <u>Thomas,</u> which effected a change in our construction of United States Supreme Court precedent and which was announced after Harris's direct appeals in the state-court system had been exhausted.

### B. Harris's Ineffective-Assistance-of-Counsel Claims

In <u>Thomas v. State</u>, 766 So. 2d 860, 953 (Ala. Crim. App. 1998), the Court of Criminal Appeals held that, because the trial court's failure in that case to give a jury instruction on manslaughter did not amount to plain error, i.e., it did not or probably did not adversely affect the substantial rights of the defendant, the defendant also could not show on postconviction review that he was prejudiced, within the meaning of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), by his counsel's failure to object to the failure to give a manslaughter instruction. However, in <u>Ex parte Taylor</u>, [Ms. 1040186, Sept. 30, 2005] ___ So. 2d ___ (Ala. 2005), we expressly rejected the reasoning that "a petitioner in a Rule 32, Ala. R. Crim. P., proceeding cannot, as a matter of law, establish prejudice under <u>Strickland</u>, when on direct appeal

15

1041332

the Court of Criminal Appeals has found no plain error with respect to the substantive claim." ___ So. 2d at ___. In her petition for the writ of certiorari, Harris contended that the Court of Criminal Appeals incorrectly rejected several of Harris's ineffective-assistance-of-counsel claims based on findings of "no plain error" on Harris's direct appeal. Harris contends that, in light of Taylor, we should reverse that court's judgment and remand the case to the Court of Criminal Appeals for consideration of whether Harris was actually prejudiced by certain acts or omissions of her trial counsel that she contends amounted to ineffective assistance. Upon further reflection, we conclude that we improvidently granted the writ of certiorari as to Harris's no-plain-error issue.

Harris contends that her counsel were ineffective 1)in failing to request and obtain appropriate jury instructions regarding accomplice testimony, 2)in failing to object to or to challenge by rebuttal several allegedly erroneous and prejudicial statements made by the prosecution during closing arguments, and 3)in failing to object to the admission of a

16

1041332

photograph of the victim while he was alive.[2]

Harris argued to the Court of Criminal Appeals that her trial counsel were ineffective because, she said, they "failed to request a jury charge stating that accomplice testimony must be corroborated by _independent_ evidence that connects the defendant with the offense." _Harris I_, ___ So. 2d at ___. The Court of Criminal Appeals considered the merits of that claim and held that the instruction actually given by the trial court followed the substance of § 12-21-222, Ala. Code 1975, which provides:

> "A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."

Thus, the Court of Criminal Appeals held, Harris's counsel had no ground upon which to base an objection. Therefore, the Court of Criminal Appeals' ruling on this issue was not based solely on a finding of no plain error on direct appeal.

---

[2]Harris listed several other specific ineffective-assistance claims in her petition for certiorari review and in her brief in support of that petition, but she abandoned all but these three in her reply to the State's brief.

17

1041332

The Court of Criminal Appeals also rejected Harris's claim regarding her counsel's failure to object to the introduction of a photograph of the victim before his death based on the court's determination that Harris had failed to meet her burdens under Rules 32.3 and 32.6(b), Ala. R. Crim. P.:

> "Harris presented nothing at the Rule 32 hearing suggesting error or prejudice in trial counsel's failure to object to the pre-death photograph of Isaiah Harris. Thus, the record supports the circuit court's ruling that this claim is unsupported by any factual basis; accordingly, it fails to satisfy either the burden of proof requirements of Rule 32.3, Ala. R. Crim. P., or the specificity requirements of Rule 32.6(b), Ala. R. Crim. P."

Harris I, ___ So. 2d at ___. The Court of Criminal Appeals also noted that, on direct appeal, it had held that a photograph of the victim before his death was relevant and admissible to identify the victim. Harris I, ___ So. 2d ___. Because the photograph was admissible, the Court of Criminal Appeals held that Harris had failed to demonstrate how her counsel's failure to object to its introduction was error or how counsel's failure to object prejudiced Harris. Therefore, the Court of Criminal Appeals' ruling was clearly based on a ground other than a finding of no plain error on direct

18

1041332

appeal.

As to Harris's claims that her counsel failed to object to or to challenge by rebuttal several statements made by the prosecution during closing arguments, the Court of Criminal Appeals held that Harris had failed to meet her burden of proof under Rule 32.3, Ala. R. Crim. P., and her burden of pleading under Rule 32.6(b), Ala. R. Crim. P. Thus, again, the Court of Criminal Appeals' ruling on that issue was not based solely on a finding of no plain error on direct appeal.

We granted Harris's petition for the writ of certiorari to consider her claim that "several of her ineffective-assistance-of-counsel arguments were not precluded by findings of no plain error on direct appeal." Ex parte Harris, [Ms. 1041332, Oct. 21, 2005] ___ So. 2d ___, ___ (Ala. 2005). The Court of Criminal Appeals made alternative findings, which it concluded supported the circuit court's denial of Harris's ineffective-assistance-of-counsel claims in her Rule 32 petition. The presence of those independent, alternative grounds pretermit consideration of the effect of the finding of no plain error on direct appeal. Because we did not grant certiorari review to consider the validity of

19

1041332

the Court of Criminal Appeals' alternative justifications for denying Harris relief, the issue of the inconsistency of the Court of Criminal Appeals' decision with <u>Taylor</u> is moot, and we conclude that we improvidently granted Harris's petition for the writ of certiorari on that issue. Accordingly, we quash the writ of certiorari to the extent it was granted to consider whether the Court of Criminal Appeals erred in rejecting Harris's ineffective-assistance-of-counsel claims on the basis that there was no finding of plain error on direct appeal.

### C. Failure of Harris's Counsel to Maintain Continuity of Representation

We granted Harris's certiorari petition to consider her claim that the Court of Criminal Appeals erred in rejecting, based on procedural grounds, her argument that her trial counsel were ineffective in that they failed to maintain continuity of representation. The Court of Criminal Appeals held that that claim was procedurally precluded under Rule 32.2(a)(3), Ala. R. Crim. P., because it could have been, but was not, raised at trial. <u>Harris I</u>, ___ So. 2d at ___. Harris argues that her claim could not realistically have been raised at trial, because, she contends:

20

1041332

"To do so would have required one of Mrs. Harris's nine assigned attorneys to appreciate and articulate--amid the revolving door of attorney dismissals, withdrawals and appointments that forms the basis of this claim---their inability to form the necessary bond with a client facing the gravest of charges, and their resulting ineffective assistance."

(Harris's brief in support of petition at 51.)    Harris concedes in her brief that, while she was represented by 11 different attorneys before her trial started, 1 of those attorneys was appointed approximately 9 months before her trial started and another was appointed approximately 3 months before her trial started.    Those two attorneys represented Harris throughout the guilt and sentencing phases of trial. Harris's trial counsel had at least nine months in which to consider whether the fact that Harris had been represented by so many different pretrial attorneys amounted to ineffective assistance.    Therefore, we agree with the Court of Criminal Appeals that that claim is procedurally barred because it could have been, but was not, raised at trial.

### IV. Conclusion

To the extent we granted Harris's petition for the writ of certiorari in order to consider Harris's argument that the Court of Criminal Appeals erred in concluding that her

21

1041332

ineffective-assistance claims were precluded by the finding of no plain error on direct appeal, we quash the writ.  In all other respects, we affirm the judgment of the Court of Criminal Appeals.

WRIT QUASHED IN PART; AFFIRMED.

Nabers, C.J., and See, Harwood, Woodall, Stuart, Smith, Bolin, and Parker, JJ., concur.

# EXHIBIT  F

# IN THE SUPREME COURT OF ALABAMA



July 21, 2006

**1041332**

Ex parte Louise Harris.  PETITION FOR WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS  (In re: Louise Harris v. State of Alabama)   (Montgomery Circuit Court: CC88-1237.60; Criminal Appeals : CR-01-1748).

## <u>ORDER</u>

The application for rehearing filed in this cause is overruled.

LYONS, J. -  Nabers, C.J., and See, Harwood, Woodall, Stuart, Smith, Bolin, and Parker, JJ., concur.

I Robert G. Esdale, Sr., as Clerk of the Supreme Court of Alabama, do hereby certify that the foregoing is a full, true and correct copy of the instrument(s) herewith set out as same appear(s) of record in said Court.

Witness my hand this 21st day of ___July,___ ___2006___

Clerk, Supreme Court of Alabama